**CASE NO. 22-3289**

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔣𝔬𝔯 𝔱𝔥𝔢
## 𝔖𝔦𝔵𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

**Andrea Goldblum**
*Plaintiff-Appellant*

v.

**University of Cincinnati**
*Defendant-Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
Civil Action No. 1:19-cv-00398
Honorable Matthew W. McFarland, United States District Judge, presiding

**ORIGINAL BRIEF OF PLAINTIFF-APPELLANT**
Andrea Goldblum

/s/ Joshua Adam Engel
Joshua Adam Engel (OH 0075769)
ENGEL & MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
 (513) 445-9600
 (513) 492-8989 (Fax)
engel@engelandmartin.com

**CORPORATE DISCLOSURE**

Appellant is not a subsidiary or affiliate of a publicly owned corporation. There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE ................................................................ ii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ................................ 1

JURISDICTIONAL STATEMENT ....................................................... 2

STATEMENT OF ISSUES ................................................................. 3

STATEMENT OF THE CASE ............................................................ 4

    A.   Facts ...................................................................................... 4

        1.   Goldblum Served As The UC Title IX Coordinator .............. 4

        2.   The Houston Matter ........................................................ 5

    B.   Goldblum's Investigation Of Houston Matter And Subsequent
       Termination ........................................................................ 8

    C.   Procedural History .............................................................. 14

SUMMARY OF ARGUMENT ............................................................ 15

ARGUMENT .................................................................................. 18

    A.   Standards Of Review .......................................................... 18

    B.   Summary Judgement Is Not Warranted And Goldblum Should
       Be Given The Opportunity To Present Her Retaliation Case To
       A Jury ................................................................................ 19

        1.   Standard .......................................................................... 19

            a.   Summary Judgment ...................................................... 19

            b.   The *McDonnell Douglas* Test ...................................... 20

        2.   UC's Denial Of Wrongdoing Is Not Sufficient For
            Summary Judgment ....................................................... 21

3.    The *Prima Facie* Case Of Retaliation ........................................22

    a.    Plaintiff Engaged In Protected Activity .............................22

    b.    Causal Connection ......................................................22

4.    Pretext ...........................................................................24

    a.    The Claimed Misconduct Did Not Have A Basis In Fact.................................................................................25

        i.    The Letter Was Not Misconduct.............................26

        ii.    A Title IX Coordinator Cannot Be Insubordinate ..............26

    b.    Suspicious Timing Combined With Independent Evidence Permits An Inference Of Retaliation ...........................29

        i.    Lack Of Concerns About Goldblum's Job Performance Prior To The Protected Activity.....................31

        ii.    UC Was Motivated To Prevent An Investigation Of Misconduct .................................................33

        iii.    Evidence About Other Misconduct Was Contrived...............................................................36

        iv.    The Changing Explanations And Outright Lies ..................39

    c.    The Claimed Misconduct Was Insufficient To Justify Termination ......................................................41

C.    Goldblum Should Have Been Permitted Additional Discovery...................47

    1.    Standard ........................................................................47

        a.    Motion For Protective Order .............................................47

        b.    Rule 56(d) ................................................................48

    2.    Denying Discovery Into Potential Comparators Was Contrary To This Court's Decision In *Bobo* ..............................49

3.   Prohibiting The Deposition Of UC's President Was An Abuse Of Discretion ...................................................... 50

a.   The Record Did Not Support The District Court's Order .................................................................... 50

b.   Pinto Had Discoverable Information ............................................... 51

CONCLUSION ......................................................................... 54

CERTIFICATE OF COMPLIANCE .......................................... 55

CERTIFICATE OF SERVICE ................................................. 55

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS .............. 56

# TABLE OF AUTHORITIES

## CASES

*A.C. v. Shelby Cty. Bd. of Edn.*, 711 F.3d 687 (6th Cir. 2013) ................................................ 30

*Abboud v. Liberty Mut. Ins. Group Inc.*, 711 F.App'x 773 (6th Cir. 2017) ........................... 18

*Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496 (6th Cir. 2007) .................... 38

*Adamov v. U.S. Bank Nat'l Ass'n*, 681 F. App'x 473 (6th Cir. 2017) ................................ 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................................. 19

*Aquilina v. Wriggelsworth*, 759 F.App'x 340 (6th Cir. 2018) ...................................... 30

*Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006) ................................................. 30

*Bailey v. Baldwin Cty. Bd. of Edn.*, S.D.Ala. No. 14-0305, 2016 U.S. Dist. LEXIS 1441 (Jan. 6, 2016) ............................................................. 35

*Ball v. Union Carbide Corp.*, 385 F.3d 713 (6th Cir. 2004) ....................................... 49

*Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382 (6th Cir. 1993) ...................... 19

*Barrett v. Whirlpool Corp.*, 556 F.3d 502 (6th Cir. 2009) ........................................ 43

*Baseball at Trotwood, LLC v. Dayton Professional Baseball Club*, S.D.Ohio No. C-3-98-260, 2003 U.S. Dist. LEXIS 27460 (Sep. 2, 2003) ................................... 24

*Blair v. Henry Filters, Inc.*, 505 F.3d 517 (6th Cir. 2007) .................................. 25, 35

*Blakeslee v. Shaw Infrastructure, Inc.*, D. Alaska No. 3:09-CV-0214, 2010 U.S. Dist. LEXIS 76295 (July 27, 2010) ........................................................ 36

*Blessing v. Ohio Univ.*, S.D.Ohio No. 2:09-CV-0762, 2011 U.S. Dist. LEXIS 140182 (Dec. 6, 2011) ............................................................. 42

*Bobo v. United Parcel Service, Inc.*, 665 F.3d 741 (6th Cir. 2012) ......................... 16, 49-50

*Braithwaite v. Timken Co.*, 258 F.3d 488 (6th Cir. 2001) ......................................... 37

*Brewer v. New Era, Inc.*, 564 F. App'x 834 (6th Cir. 2014) ....................................... 43

*Burns v. Jacor Broadcasting Corp.*, 128 F. Supp. 2d 497 (S.D. Ohio 2001) ......................... 22

*Bush v. Rauch*, 38 F.3d 842 (6th Cir. 1994) .......................................................... 18

*Campbell v. Univ. of Akron*, 211 Fed Appx. 333 (6th Cir. 2006) ......................................... 44

*Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979) ......................................................... 19

*Cardinal v. Metrish*, 564 F.3d 794 (6th Cir. 2009) ..................................................... 48

*Carrasco v. NOAMTC Inc,* 124 Fed. Appx. 297 (6th Cir. 2004) ........................................... 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................ 19

*CenTra, Inc. v. Estrin*, 538 F.3d 402 (6th Cir. 2008) ................................................. 49

*Charlton-Perkins v. Univ. of Cincinnati*, 6th Cir. No. 21-3840, 2022 U.S. App. LEXIS 15364, (June 3, 2022) ............................................................ 36

*Chen v. Dow Chem. Co.*, 580 F.3d 394(6th Cir. 2009) ................................................... 24

*Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579 (6th Cir. 2002) .................................. 39

*Colvin v. Veterans Admin. Med. Ctr.*, 390 F. App'x 454 (6th Cir. 2010) ................................ 45

*DeBoer v. Musashi Auto Parts, Inc.*, 124 F.App'x 387 (6th Cir. 2005) ............................... 32, 43

*Dennis v. Columbia Collection Med. Ctr.*, 290 F.3d 639 (4th Cir. 2002) ................................ 40

*Dews v. A.B. Dick Co.*, 231 F.3d 1016 (6th Cir. 2000) ............................................... 21, 45

*DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004) ...................................................... 30

*Faure v. Ohio State Univ.*, S.D.Ohio No. 2:19-cv-1949, 2021 U.S. Dist. LEXIS 238314 (Dec. 14, 2021).......................................................... 42

*Fuhr v. Hazel Park Sch. Dist.*, 710 F. 3d 668 (6th Cir. 2013) ....................................... 20, 22

*Fuller v. Mich. Dep't of Transp.*, 580 F. App'x 416 (6th Cir. 2014) .................................... 20

*Gaglioti v. Levin Grp., Inc.*, 508 F. App'x 476 (6th Cir. 2012) ....................................... 38

*George v. Youngstown State Univ.*, 966 F.3d 446 (6th Cir. 2020) ....................................... 23

*Glen Eden Hosp., Inc. v. Blue Cross and Blue Shield of Michigan, Inc.*, 740 F.2d 423 (6th Cir. 1984)....................................................................... 18

*Gordon v. Traverse City Area Pub. Schools*, 686 F.App'x 315 (6th Cir. 2017) ...................... 20

*Griffin v. Finkbeiner*, 689 F.3d 584 (6th Cir. 2012) .................................................... 43

*Hatcher v. Bd. of Trustees of S. Illinois Univ.*, 829 F.3d 531 (7th Cir. 2016) ......................... 52

*Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151 (6th Cir. 2010) ............................................ 44

*Hawthorne v. Univ. of Tennessee Health Science Ctr.*, 203 F. Supp. 3d 886
    (E.D.Tenn. 2016) ........................................................................................ 40

*Herrera v. Churchill McGee, LLC*, 545 F.App'x 499 (6th Cir. 2013) .................................. 23

*Hooks v. Rumpke Transp. Co., LLC*, 6th Cir. No. 16-3681, 2017 U.S. App.
    LEXIS 26226 (Aug. 8, 2017) ........................................................................... 33

*Hostettler v. College of Wooster*, 895 F.3d 844 (6th Cir. 2018) ........................................ 35

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ........................................... 19

*Johnson v. Fifth Third Bank*, 685 F.App'x 379 (6th Cir. 2017) ...................................... 32

*Jones v. Potter*, 488 F.3d 397 (6th Cir. 2007) ....................................................... 44

*Jones-McNamara v. Holzer Health Sys.*, 630 F.App'x 394 (6th Cir.2015) ........................... 20

*Joostberns v. UPS*, 166 F.App'x 783 (6th Cir. 2006) ................................................. 25

*Kafele v. Javitch, Block, Eisen & Rathborne*, S.D. Ohio No. 2:03-cv-638, 2005
    U.S. Dist. LEXIS 48484 (Apr. 4, 2005) ............................................................... 48

*Kline v. Mortgage Elec. Sec. Sys.*, S.D. Ohio No. No. 3:08-cv-408, 2014 U.S.
    Dist. LEXIS 141027 (Oct. 1, 2014) .................................................................... 48

*Lacy v. United States Dept. of Agriculture*, 278 F.App'x 616 (6th Cir. 2008) ....................... 53

*Lindsay v. Yates*, 578 F.3d 407 (6th Cir. 2009) ...................................................... 30

*Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106 (6th Cir. 2001) ....................... 37

*Manzer v. Diamond Shamrock Co.*, 29 F.3d 1078 (6th Cir. 1994) ........................... 24, 25, 45

*Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405 (6th Cir. 2008) ....................... 25

*Martinez v. City of New York*, No. 16 CV 79, 2017 U.S. Dist. LEXIS 205854 (E.D.N.Y. Dec. 14, 2017) ............................................................... 50

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................. 20

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) ............................................. 20

*McKinley v. City of Mansfield*, 404 F.3d 418 (6th Cir. 2005) ................................... 53

*Mellon v. Cooper-Jarrett, Inc.*, 424 F.2d 499 (6th Cir. 1970) ................................... 47

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008) ........................... 22

*Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883 (6th Cir. 2020) ....................... 21, 25

*Nelson v. Christian Bros. Univ.*, 226 F. App'x 448 (6th Cir. 2008) ........................... 20

*Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540 (6th Cir. 2004) ........................... 51

*NLRB v. Long Island Assn. for Aids Care*, 870 F.3d 82 (2d Cir. 2017) ..................... 27

*NLRB v. New York Univ. Med. Ctr.*, 702 F.2d 284 (2d Cir. 1983) ........................... 41

*Pearce v. Chrysler Group, L.L.C. Pension Plan*, 615 F.App'x 342 (6th Cir. 2015) ............... 18

*Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716 (6th Cir. 2011) ..................................................................... 20

*Plott v. Gen. Motors Corp.*, 71 F.3d 1190 (6th Cir. 1995) ..................................... 49

*Powell v. Morris*, 37 F. Supp. 2d 1011 (S.D. Ohio 1999) ................................... 22

*Reid v. Aubrey's Restaurant*, 6th Cir. No. 20-5440, 2021 U.S. App. LEXIS 33391 (July 12, 2021) ................................................................. 23

*Riordan v. Kempiners*, 831 F.2d 690 (7th Cir.1987) ....................................... 22

*Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274 (6th Cir. 2012) ......................... 23, 25, 30

*Serrano v. Cintas Corp.*, 699 F.3d 884 (6th Cir. 2012) ................................... 17, 51

*Shaw v. Danley*, 6th Cir. No. 98-6579, 2000 U.S. App. LEXIS 545, (Jan. 10, 2000) ..................................................................... 33

*Siggers v. Campbell*, 652 F.3d 681 (6th Cir. 2011) ....................................... 53

*Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309 (6th Cir. 2001) ............................ 29

*Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998) .......................................... 25

*Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998) .......................................... 37

*Smith v. Leggett Wire Co.*, 220 F.3d 752 (6th Cir. 2000) ....................................... 35

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011) ............................ 24

*Stanczyk v. Prudential Ins. Co. of Am.*, N.D.Iowa No. 15-CV-0097, 2016 U.S.
    Dist. LEXIS 197491 (Aug. 11, 2016) ....................................................... 50

*Stein v. Atlas Indus., Inc.*, 730 F. App'x 313 (6th Cir. 2018) ...................... 23, 35-36

*Stevenson v. Gen. Elec. Co.*, S.D.Ohio No. C-1-77-122, 1978 U.S. Dist. LEXIS
    15133, at *2-3 (Oct. 4, 1978) ............................................................. 47

*Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654  (7th Cir. 2013) ................. 25

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) .............. 41

*Thurman v. Yellow Freight Systems*, 90 F.3d 1160 (6th Cir. 1996) .................... 39

*Tinal v. Norton Healthcare, Inc.*, W.D.Ky. No. 3:11-CV-596-S, 2014 U.S. Dist.
    LEXIS 191995 (July 14, 2014) ............................................................. 47

*Tingle v. Arbors at Hilliard*, 692 F.3d 523 (6th Cir. 2012) ........................... 21

*Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983) ............................. 47

*Turner v. City of Akron*, 324 F.App'x 453 (6th Cir. 2009) ........................... 33

*United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503 (6th Cir. 2009) .......... 18

*United States v. Leggett & Platt, Inc.*, 542 F.2d 655 (6th Cir. 1976) .................. 47

*V&M Star Steel v. Centimark Corp.*, 678 F.3d 459 (6th Cir. 2012) ................... 18

*Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72 (2d Cir. 2015) .............. 25

*Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392 (6th Cir. 2010) ................... 30

*Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003)............... 21, 45

*White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789 (6th Cir. 2004) ........... 39

*White's Landing Fisheries v. Buchholzer*, 29 F.3d 229 (6th Cir. 1994) .................................. 48

*Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400 (6th Cir. 2021) ..........................................30, 32

*Young v. Sabbatine,* 6th Cir. No. 99-6336, 2000 U.S. App. LEXIS 33891 (Dec. 19, 2000) .................................................................................................... 35

*Youssef v. Holder*, 19 F. Supp. 3d 167 (D.D.C 2014) .......................................... 40

*Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559 (6th Cir. 2003) ............................................ 20

## OTHER AUTHORITIES

20 U.S.C. §§ 1681 *et seq.* ................................................................................*passim*

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Appellant respectfully suggests that the Court would benefit from hearing oral argument in this matter.  This case raises an issue of significant concern: retaliation by educational institutions against those who complain about the creation of a hostile educational environment in violation of Title IX.  Appellant believes oral argument will assist the Court in its analysis of the disputed issues presented on appeal and will enable counsel to address any questions the Court may have.

## JURISDICTIONAL STATEMENT

This case arose under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* and Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e *et seq.* Accordingly, the District Court had jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343. (Complaint, R.1, PageID#1.)

This is an appeal from a final decision of a district court of the United States. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1291. A final judgment that disposed of all parties' claims was entered on March 28, 2022. (Judgment, R.90, PageID#3653.) A timely Notice of Appeal was filed on March 28, 2022. (Notice of Appeal, R.91, PageID#3654.)

**STATEMENT OF ISSUES**

Whether the District Court committed reversible error in granting Defendants-Appellees' Motion for Summary Judgment by concluding that there was not a genuine dispute as to any material issue of fact and Defendant-Appellee was entitled to judgment as a matter of law on Plaintiff-Appellant's retaliation claim under Title IX. (Order, R.89.)

Whether the District Court committed reversible error in denying Plaintiff-Appellant's Motion to Defer Consideration of the Motion for Summary Judgment and Allow Time to Take Discovery and other related discovery Orders by not permitting Plaintiff to take the deposition of the University's president or conduct discovery aimed at identifying comparators. (Order, R.81; Order, R.45; Order, R.79.)

## STATEMENT OF THE CASE

### A.    Facts

#### 1.    Goldblum Served As The UC Title IX Coordinator

The University of Cincinnati ("UC") is a public institution located within the city of Cincinnati, Ohio with more than 90 undergraduate and graduate programs and an enrollment of roughly 46,000 students within its 13 individual colleges.  UC voluntarily participates in federal funding programs.  (Complaint, R.1, PageID#2; Answer, R.24, PageID#147.))

In July 2018, Goldblum was hired to serve as the Director of the University's Office of Gender Equity & Inclusion, a position commonly referred to as a "Title IX Coordinator."  Goldblum has over 30 years of experience in higher education, including serving as Title IX Coordinator at Kenyon College, University of the Pacific, and The Ohio State University.  (CV, R.54-1, PageID#1101-1107.)  Her responsibilities included ensuring timely, impartial investigations of complaints of alleged instances of sexual harassment and/or sexual assault on campus.  (Job Description, R.54-1, PageID# #950.)  As a Title IX Coordinator, Goldblum was expected to act independently.  (Goldblum Aff., R.69-1, PageID#2702; Marshall Depo. R.55, PageID#1159.) Goldblum was empowered to initiate and conduct investigations designed to identify and expose patterns or systemic problems with Title IX compliance at UC.  (Goldblum Aff., R.69-1, PageID#2699.)

Bleuzette Marshall, the University's Vice President for Equity, Inclusion and Community Impact, was Goldblum's direct supervisor.

## 2.    The Houston Matter

William Houston was a student at UC. Houston was a former Ohio State University and Bowling Green State University football player who was convicted of gross sexual imposition. (Entry, R72-1, PageID#3025-3031.)   Officials at UC were aware that Houston was a convicted sex offender who was the subject of misconduct investigations at multiple universities prior to his admission. (*See e.g.* Emails, R.72-1, PageID#3033-3038.)   Houston had been investigated for sexual misconduct at Ohio State.   (Report., R.72-1, PageID#2987-2998.)   Houston had been suspended by Bowling Green following an investigation and hearing under the university's code of student conduct for "sexual contact without permission." (Houston Records, R.72-1, PageID#2987-2018.)

The procedure for prospective UC students with criminal backgrounds was to include input from public safety. This did not occur for Houston. (Miller Depo., R.62, PageID#2225-2226; Responses to Interrogatories, R.69-7, PageID#2958.)   Instead of a review by Public Safety, UC admissions staff contacted Daniel Cummins, an assistant dean who worked in the Student Affairs Office. In the summer of 2016, after meeting with Houston, but without reviewing his disciplinary or criminal history, Cummins

recommended that Houston be admitted to UC.[1] (Cummins Depo., R.60, PageID#2109-2110; Miller Depo., R.62, PageID#2234.)

On January 23, 2019, the University published an online article recognizing graduating students who wore a "triumph cord" at graduation indicting that the students had overcome "obstacles" to graduate. Houston was profiled as one of those students. (Article, R.54-1, PageID#977.)[2] The article failed to mention that the "obstacle" he had overcome was a conviction for a felony sex offense and restrictions on his presence on campus because he was a registered sex offender. (Complaint, R.1, PageID#7; Petren Depo. R. 58, PageID#1872-1874.)

The publication of the article made female UC students feel vulnerable to sexual assault and, as a result, unreasonably interfered with students' work or academic performance and created an intimidating, hostile and offensive work or learning environment for students.[3] (Corey Aff., R.69-4, PageID#2882; Cunningham Aff.,

---

[1] Houston's admission to UC had the potential to constitute a Title IX violation in that it had the effect of unreasonably interfering with students' work or academic performance or of creating an intimidating, hostile or offensive work or learning environment. (Bullard Report, R.69-6, PageID#2939.) Houston's admission to UC may have also been a violation of UC Policy 11-02 because his admission had the foreseeable effect of creating an intimidating, hostile, or offensive work or learning environment. (Bullard Rep., R.69-6 PageID#2940.)

[2] Currently available at https://www.uc.edu/news/articles/2019/01/n2060727.html. References to Houston have been delated. An editorial note from the Dean states, "Out of sensitivity to members of our community, the original information in this article has been modified."

[3] Comments on Facebook included: "Applauding sexual predators is a slap in the face to student survivors…."; "The whole city already jokes about UC parties being where

6

R.69-3, PageID#2879-2880.)   Worse: UC officials received emails suggesting that Houston had assaulted other persons on campus.  (Email, R.66 PageID#2531; Marshall Depo., R.55, PageID#1217-1221.)   Administrators realized that there was a problem for UC and its image.  One administrator wrote, "Oh no. I don't even know how he would have gotten admitted to UC." Another administrator wrote, "We need to figure out how to deal with this ASAP. Because this could be REALLY bad."  (Email, R.66 PageID#3141.)

---

girls go to get raped. At least y'all at the administration are admitting you know this is happening. Thank you for publicly taking a side."   Comments on Twitter also demonstrated potential impact:  "…Just admit UC as a whole hates women" and "Good to know our local college is out here supporting rapists. #boycottUC… And this is NOT THE FIRST TIME UC HAS DONE THIS."

**B.      Goldblum's Investigation Of Houston Matter And Subsequent Termination**

Goldblum first learned about the Houston Matter around February 5, 2019. (Goldblum Depo., R.54, PageID#758-760.)  Goldblum became concerned about the impact on students and believed that UC was obligated to respond under Title IX and UC Policy.  She believed that UC had an obligation under Title IX to acknowledge that the students who were traumatized by the Houston article and awards had been heard by the UC administration even though many did not use their actual names online. (Goldblum Depo., R.54, PageID#782-784.)  Goldblum also was concerned that UC honoring a sex offender showed that UC sided with sex offenders (particularly if they were athletes) which could make those on campus feel unsafe.  (Goldblum Depo., R.54, PageID#800.)  On February 9, 2019, Goldblum received a copy of an email indicating that Houston may have sexually assaulted other students at UC, which caused her to be concerned that there were unidentified members of the campus community who had been assaulted by Houston.  (Email, R.66 PageID#2530-2532; Goldblum Depo., R.54, PageID#784.)  Goldblum believed that UC providing resources on its web page and through training events on campus was insufficient.  Instead, Goldblum believed the best way to share resources, such as the counseling center, the on-campus advocates, medical assistance options and off-campus resources, was through a letter to the editor to the student newspaper.  (Goldblum Depo., R.54, PageID#782-783, 792.)

Goldblum became concerned that the admission of students, like Houston, with backgrounds as convicted sex offenders could pose a risk to the community. She also was concerned about possible systemic issues in the University of Cincinnati admissions process, including whether public safety or the Title IX Office was consulted prior to the admission of the student. (Goldblum Aff., R.69-3, PageID#2698-2699; Goldblum Depo., R.54, PageID#858.) Based on her training and experience, Goldblum believed that if UC was not taking proper precautions, conducting risk assessments, or following established procedures, the admission of convicted sex offenders could unreasonably interfere with other students' work or academic performance and create an intimidating, hostile and offensive work or learning environment for students. (Goldblum Aff., R.69-3, PageID#2698-2699.)

Goldblum communicated her concerns to Marshall and other UC administrators about the Houston Matter and possible systemic issues in the admissions process. On February 9, 2019, Goldblum wrote in an email, "There may be questions re: who knew what when he was admitted…" (Email, R.66 PageID#3198.) On February 11, 2019, Goldblum informed Marshall about student complaints, including specifically the complaint outlined in a February 8, 2019 email alleging that Houston had sexually assaulted students at UC. (Goldblum Aff, R.69-1, PageID#2700.)

Goldblum told Marshall that she "would be commencing an investigation into the Houston Matter in particular and the admissions process for convicted sex offenders in general." (Goldblum Aff., R. 69-1, PageID#2699-2700.) Goldblum sent

an email to the UC Admissions Office requesting more information about the process for the admission of Houston and students with criminal records. (Email, R.66 PageID#2559.) Goldblum also told Marshall that her investigation would extend beyond Houston's admission and that there were systemic concerns. (Goldblum Depo. R.54, PageID#795.) She believed that although Houston had graduated, there was a safety risk because if Houston was improperly admitted, other similarly situated students may have been admitted without following proper procedures.[4] Goldblum expressed a concern that there was no process in place to appropriately vet students with similar backgrounds which could lead to systemic issues because there could be others on campus who constituted a risk to the community. (Goldblum Depo., R.54, PageID#871-874.)

During a February 12, 2018 meeting with Debra Merchant, the UC Vice President for Student Affairs, and Juan Guardia, the Assistant Vice President for Student Affairs, Goldblum told the other UC officials that she would be commencing an investigation into the Houston Matter and the admissions process for convicted sex offenders. The next day, February 13, 201, Goldblum reiterated to Marshall that she would be commencing an investigation into the Houston Matter in particular and the admissions process for convicted sex offenders in general. (Goldblum Aff, R.69-1,

---

[4] Cummins testified that "there has always" been convicted sex offenders on UC's campus and living in the residence halls. (Cummins Depo. R. 60, PageID#2121.)

PageID#2700.)    Goldblum proceeded open an investigative file in the UC case management system, "Maxient." (Goldblum Depo., R.54, PageID#831; Report, R.66-1, PageID#2539.)

Goldblum also told Marshall that she believed UC had an obligation to offer resources to the community. (Goldblum Depo., R.54, PageID#794-795.) On February 12, 2019, Plaintiff drafted a letter to the student newspaper, the News Record, and shared a copy with Marshall and others at UC. Goldblum drafted the Letter as a way to get out information about resources and options to the community. Based on her training and experience, Plaintiff did not believe just listing resources on the web page was sufficient. (Goldblum Depo., R.54, PageID#793.)

Marshall told Plaintiff not to send the letter. Goldblum believed that she had a responsibility as Title IX Coordinator to send the letter and that Marshall was using "delay tactics." (Goldblum Depo., R.55, PageID#803-805.). Believing that she had independent authority to act, Goldblum sent the letter, anyway, on February 12, 2019. (Goldblum Depo., R.54, PageID#81-82.)  On the morning of February 13, 2019, Goldblum sent a revised letter. (Goldblum Depo., R.54, PageID#803.)  For reasons that have never been adequately explained, the letter was never published. (*See* Marshall Depo., R.55, PageID#1248.)

Marshall believed that Goldblum's actions were in violation of UC Policy 15.02. This Policy outlines that it is a violation for any employee to engage in insubordination, or other deviations from standard and acceptable behavior. (Policy, R.55-1,

11

PageID#1351.)  While an employee may be terminated for violating UC Policy 15.02, another UC Policy, Policy 15.03, states that UC "subscribes to the principle of progressive corrective action…"  (Policy, R.55-1, PageID#1354.)

On February 21, 2019, Marshall met with a representative of Human Resources. The HR representative testified that Marshall had decided to reprimand Goldblum in accordance with the principles of progressive discipline described with Policy 15.03. (Awadalla Depo., R.34-3. PageID#363.)   A reprimand, the undisputed record shows, would have been consistent with the practices of academic institutions; such institutions typically impose a reprimand for this type of conduct.  (Dougherty Rep., R.69-2, PageID#2864-2856.)  On or about February 27, 2019, Marshall changed her mind and decided to terminate Plaintiff.  (Marshall Depo., R.55, PageID#1292.)

On March 15, 2019, Marshall, accompanied, by a representative from HR and a uniformed police officer, met with Goldblum.  Prior to the meeting, the video from the police officer's body camera captured Marshall dancing and laughing with the HR representative. (Video, R.71, PageID#2961.)[5]  Goldblum was told that she was being

---

[5] The video, for the convenience of the Court, is available at https://youtu.be/XA-GvrjWBFs.  A student group described Marshall as dancing "joyfully" prior to the meeting.  https://www.facebook.com/studentsforsurvivors/posts/853308348434667. Marshall denies this, offering the strained explanation that she was demonstrating "Zumba" moves. (Marshall Depo., R.55, PageID#1312.).

terminated but was given the option to resign in lieu of a termination.  (Marshall Depo., R.55, PageID#1181.)  Goldblum resigned[6] and was escorted off campus.

Marshall subsequently lied to multiple people about Plaintiff's termination. (Cunningham Aff., R.69-3, PageID#2881; Corey Aff., R.69-4, PageID#2881; Marshall Depo., R.55, PageID#1307-1308.)

This litigation followed.

---

[6] This resignation was not voluntary.  (Goldblum Depo., R.54, PageID#844.)

**C.    Procedural History**

On May 27, 2019, Goldblum brought this action for violation of Title IX and Title VII.  (Complaint, R.1, Page ID#1-20.)  The trial court (Dlott, J.) adopted a Report and Recommendation denying a Motion to Dismiss Plaintiff's Title IX Claim; a Title VII claim, which had been pled in the alternative, was dismissed.  (Order, R.25, PageID#163-173.)

Discovery proceeded.  The trial court (McFarland, J.) denied a number of efforts to obtain additional discovery by Plaintiff.  (Order, R.45; Order R.79.)  On March 28, 2022, the trial court (McFarland, J.) granted Defendant's Motion for Summary Judgment.  (Order, R.89.)  Final Judgment was entered.  (Judgment, R.90.)  This appeal followed.  (Notice of Appeal, R.91.)

## SUMMARY OF ARGUMENT

This is a textbook retaliation case.

Goldblum complained that the admission and promotion of a convicted felony sex offender by UC created a hostile environment where students, and especially survivors of sexual assault, did not feel safe. In her role as an independent Title IX Coordinator, Goldblum was authorized to inform students of available resources and to investigate systemic problems in the UC admissions process. This was all protected activity.

Goldblum's supervisor claimed that Goldblum was terminated because she was insubordinate. What was Goldblum's insubordinate act? Sending a letter to the school newspaper offering resources to students who were adversely affected by the Houston Matter. UC, of course, denies any unlawful motivation behind terminating Goldblum for what, by all appearances, was a minor and inconsequential act. But this Court does not simply accept UC's denials at face value; instead, this Court, as part of *de novo* review, proceeds to conduct a commonsense inquiry into whether UC fired Goldblum for an unlawful reason. The facts, viewed in the light most favorable to Goldblum, support a conclusion that UC jumped at her alleged insubordination as an excuse to terminate Goldblum. In doing so, UC silenced a critic, shut down an investigation into systemic wrongdoing, and sent a clear message to other employees that they should protect the image of UC above the safety of students.

There is an issue of fact about whether Goldblum's action constituted insubordination: (i) almost every other UC employee who testified stated that the letter (which was never published) was not inappropriate; and (ii) Goldblum was entitled to act independently.

There is an issue fact about, even if Goldblum was insubordinate, whether this single act provided justification for termination: (i) UC also has a policy of progressive discipline; and (ii) two experts offered uncontradicted affidavits that an academic employer is highly unlikely to terminate an employee with no prior disciplinary history for sending an unauthorized email to the student newspaper.

There is an issue of fact about whether the claim of 'insubordination' was pretextual when viewed in the context of the suspicious timing between Goldblum's protected activity and her discharge based on independent evidence: (i) there was a lack of prior concerns about Goldblum's job performance; (ii) UC had an independent motive to cover-up misconduct related to the Houston matter; (iii) UC administrators offered shifting and unsubstantiated *post-hoc* justifications; and (iv) UC administrators lied about the reason for Goldblum's termination.

Finally, the District Court abused its discretion in denying Goldblum relevant discovery and then denying her Rule 56(d) Motion. The decision of the District Court limiting discovery aimed at identifying possible similarly situated employees is contrary to this Court's decision in *Bobo v. United Parcel Service*, Inc., 665 F.3d 741, 749 (6th Cir. 2012). The decision of the District Court granting a protective order preventing the

deposition of UC's University president – even after Goldblum's supervisor testified

that she discussed the decision to terminate Goldblum with the President – is contrary

to this Court's decision in *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012).

**ARGUMENT**

**A.    Standards Of Review**

This Court reviews grants of summary judgment *de novo. Abboud v. Liberty Mut. Ins. Group Inc.*, 711 F.App'x 773, 776 (6th Cir. 2017), *citing V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012).

This Court reviews a district court's decision on whether to grant additional discovery under Rule 56(d) for an abuse of discretion.  *Bush v. Rauch*, 38 F.3d 842, 849 (6th Cir. 1994); *Glen Eden Hosp., Inc. v. Blue Cross and Blue Shield of Michigan, Inc.*, 740 F.2d 423 (6th Cir. 1984).  This Court similarly reviews challenges to a district court's discovery orders for an abuse of discretion.  *Pearce v. Chrysler Group, L.L.C. Pension Plan*, 615 F.App'x 342, 350 (6th Cir. 2015), *citing United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 510 (6th Cir. 2009).

**B.      Summary Judgement Is Not Warranted And Goldblum Should Be Given The Opportunity To Present Her Retaliation Case To A Jury**

Title IX of the Education Amendments of 1972 is a federal statute designed to prevent sexual discrimination and harassment in educational institutions, like UC, receiving federal funding. Title IX specifically provides: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).   Individuals may sue funding recipients for violating Title IX. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979). This implied right of action includes retaliation claims. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

**1.      Standard**

**a.      Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant has the burden of establishing that there are no genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  A court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986); *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).

### b.    The *McDonnell Douglas* Test

Title IX retaliation claims are analyzed using the same standard as Title VII retaliation claims. *Fuhr v. Hazel Park Sch. Dist.*, 710 F. 3d 668, 673 (6th Cir. 2013); *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2008). Accordingly, Title IX retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Fuller v. Mich. Dep't of Transp.*, 580 F. App'x 416, 423 (6th Cir. 2014); *Gordon v. Traverse City Area Pub. Schools*, 686 F.App'x 315, 319-320 (6th Cir. 2017). Under that framework, there is a three-part analysis:

- First, the employee must establish a *prima facie* case of retaliation by a preponderance of the evidence;

- Second, the employer may articulate a legitimate, nondiscriminatory reason for the adverse employment action;

- Third, the employee may then seek to show that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for retaliation.

*See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

To establish a *prima facie* case, a plaintiff must show the following elements: (1) she was engaged in a protected activity; (2) her employer knew that she engaged in the protected activity; and (3) her employer discharged her as a result of the protected activity. *Jones-McNamara v. Holzer Health Sys.*, 630 F.App'x 394, 398 (6th Cir.2015), *citing Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003).

A plaintiff can show pretext, *i.e.* refute the legitimate, nondiscriminatory reason offered by a defendant, by showing, *inter alia*, that the proffered reason: (i) had no basis in fact; (ii) did not actually motivate the defendant's challenged conduct; or (iii) was insufficient to warrant the challenged conduct. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003), *citing Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). These three categories are not the exclusive means by which a plaintiff can show pretext but are simply a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020), *quoting Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012).

### 2. UC's Denial Of Wrongdoing Is Not Sufficient For Summary Judgment

UC, of course, denies any wrongdoing. But this Court is not required to credulously accept UC's explanations, especially on a summary judgment record. "[R]arely will an employer admit to having discharged an employee in retaliation for exercising a right." *Foster v. AlliedSignal Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) (citation omitted). *See also Burns v. Texas City Refining, Inc.*, 890 F.2d 747, 751 (5th Cir. 1989) ("[D]efendants are rarely courteous enough to admit in some documented form that an asserted rationale behind a discharge is really a pretext for an illicit motive."). A sophisticated employer like UC and its highly educated employees will neither admit retaliatory intent or unlawful animus, nor leave a well-developed trail, because "it is so

easy to concoct a plausible reason for… firing" an employee. *Riordan v. Kempiners*, 831 F.2d 690, 697-698 (7th Cir.1987).

### 3.    The *Prima Facie* Case Of Retaliation

#### a.    Plaintiff Engaged In Protected Activity

Plaintiff communicated to Marshall and other UC administrators her concerns about the Houston Matter and systemic issues related to the admissions process for convicted sex offenders.[7]  (Marshall Depo., R.55, PageID#1277-78; Goldblum Aff., R.69-1, PageID#2699.)

#### b.    Causal Connection

Timing, *alone*, can provide evidence of causation for purposes of a *prima facie* case under this Court's precedents.[8]  This Court has been explicit:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation.

*Fuhr*, 710 F.3d at 675, *citing Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("temporal proximity between the events is significant enough to constitute

---

[7] Goldblum had a reasonable, good faith, belief that a Title IX violation had occurred. (Bullard Rep., R.69-6, PageID#2939.)  Goldblum's "success on her retaliation claim does not depend on the merits of the underlying" protected activity. *Burns v. Jacor Broadcasting Corp.*, 128 F. Supp. 2d 497 (S.D. Ohio 2001), *citing Powell v. Morris*, 37 F. Supp. 2d 1011, 1016 (S.D. Ohio 1999).

[8] Even if the temporal link is this case were insufficient, Marshall created an independent link when she testified that she was aware of Plaintiff's complaints when she decided to terminate Plaintiff.  (Marshall Depo., R.55, PageID#1276, 1278.)

evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation"). This view was reaffirmed last year in an unpublished opinion. *Reid v. Aubrey's Restaurant*, 6th Cir. No. 20-5440, 2021 U.S. App. LEXIS 33391, at *6 (July 12, 2021) ("close temporal proximity, standing alone, is sufficient to show a causal connection at the *prima facie* stage"), *citing George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020) (noting Sixth Circuit cases find causal link for purposes of *prima facie* case when "the adverse employment action is often taken just days or weeks from when the employer learns of the employee's protected activity"). *See also Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) (temporal proximity "is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case").[9]

---

[9] Plaintiff engaged in the protected activity in Mid-February. On or about February 27, 2019, Marshall decided to terminate Goldblum. (Marshall Depo., R.55, PageID#1290-1291.) This is well within the time period to be sufficient, by itself, under this Court's precedents. *Stein v. Atlas Indus., Inc.*, 730 F. App'x 313, 319 (6th Cir. 2018) ("How close is 'very close'?... [O]ur cases indicate that the line should be drawn shy of the ten-week mark."); *Adamov v. U.S. Bank Nat'l Ass'n*, 681 F. App'x 473, 475-76 (6th Cir. 2017) (plaintiff terminated approximately one month after complaining of discrimination) *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012) (time period of approximately two months after protected activity "suffice[d]… to meet the low threshold of proof necessary to establish a *prima facie* case of retaliatory discharge"); *Herrera v. Churchill McGee, LLC*, 545 F.App'x 499, 502 (6th Cir. 2013) (employee terminated month following complaint; this "presents a sufficiently close temporal proximity to allow us to make an inference of causation").

### 4.  Pretext

A plaintiff need only present sufficient evidence on any one of the three forms of pretext.  *See Baseball at Trotwood, LLC v. Dayton Professional Baseball Club*, S.D.Ohio No. C-3-98-260, 2003 U.S. Dist. LEXIS 27460, at *199 (Sep. 2, 2003) ("If there is a sufficient evidentiary basis for finding that any of these three forms of pretext exists, then it is for the trier of fact to determine whether the defendant was truly motivated by race"), *citing Manzer v. Diamond Shamrock Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Appellant will present the evidence structured in terms of the three traditional manners of proving pretext but remains cognizant that this Court has emphasized that "it is important to avoid formalism" in reviewing questions of pretext, "lest one lose the forest for the trees." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 n.4 (6th Cir. 2009).

In order to survive summary judgment, Goldblum needed only present a plausible story about why UC might have been motivated to retaliate against her.  That story, consistent with this Court's 'commonsense' approach, may consist of bits and pieces from which an inference of unlawful intent might be drawn by a jury after viewing the entire picture.  In this respect, it is important to keep in mind that that it is not necessary for any one category of evidence to be conclusive; this Court views the record "as a whole."[10]  *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 414 (6th

---

[10] Other circuits have expressed this same idea by observing that a plaintiff may survive summary judgment by presenting a convincing "mosaic" of circumstantial evidence. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *Vega v. Hempstead*

Cir. 2008). *See also Carrasco v. NOAMTC Inc.,* 124 Fed. Appx. 297, 305 (6th Cir. 2004) (the court must "carefully consider the totality of the facts in the record when evaluating claims of retaliation").

### a.    The Claimed Misconduct Did Not Have A Basis In Fact

A claim that a decision had "no basis in fact" is "essentially an attack on the credibility of the employer's proffered reason" and "consists of showing that the employer did not actually have cause to take adverse action against the employee based on its proffered reason." *Joostberns v. UPS*, 166 F.App'x 783, 791 (6th Cir. 2006), *citing Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998); *Manzer,* 29 F.3d at 1084.[11]

---

*Union Free School Dist.*, 801 F.3d 72, 87 (2d Cir. 2015); *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 660  (7th Cir. 2013).

[11] The District Court took an overly narrow view of the "no basis in fact" inquiry, suggesting that an employee must prove that "the thing that the [employer] said happened did not actually happen."  (Order, R.89, PageID#3649.)  The District Court failed to consider that evidence misconduct "did not actually happen" is just one of many ways to attack the credibility of the proffered reason.  In practice, the test articulated by the District Court would limit the "no basis in fact" inquiry to the narrow and rare situation where a plaintiff is able to present evidence that the proffered reason was entirely fabricated.  But this Court focuses on the broader question of whether an employer's reasons were 'credible' and whether there was 'cause' for the discipline. *Seeger,* 681 F.3d at 285, *quoting Joostberns*, 166 F. App'x at 791.  To survive a motion for summary judgment, a plaintiff need only present evidence sufficient to "rebut, but not to disprove, the defendant's proffered rationale" *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007).

The District Court relied on *Miles*, *supra*.  In *Miles,* this Court noted that in the "no basis in fact" inquiry an employee "must show that the facts underlying her employer's allegations never occurred."  946 F.3d at 890.  The District Court seems to have 'over-read' *Miles* as suggesting this is the exclusive way to satisfy this element; *Miles* is better understood as this Court describing one of the many ways an employee is permitted to challenge the underlying basis for a finding of misconduct.

Two categories of evidence suggest that UC did not have cause to believe Goldblum was insubordinate: (i) the letter was not inappropriate; and (ii) Marshall did not have the authority to tell Goldblum not the send the letter.

### i.      The Letter Was Not Misconduct

Sending the letter to the editor was not misconduct, even in the face of a direct order. (Letter, R.72-1, PageID#3075.) Plaintiff creates an issue of fact on this issue by submitting her affidavit stating, "Based on my training and experience, sending the letter was not misconduct but, instead, was required in order to fulfill the University's Title IX obligations." (Goldblum Aff., R.69-1, PageID#2702.) This Affidavit is not merely self-serving; a number of UC witnesses, including the Dean of the College of Arts and Sciences, did not believe that the letter to the student newspaper was inappropriate. (Holstrom Depo., R.57, at PageID#1831; Petren Depo., R.58, PageID#1926.) The evidence submitted by UC is practically devoid of any description of why the letter to the editor was misconduct by itself.[12]

### ii.      A Title IX Coordinator Cannot Be Insubordinate

Goldblum's conduct could not constitute insubordination because Marshall, lacked the authority to give a directive prohibiting the Title IX Coordinator from

---

[12] Marshall did not state that anything was really inappropriate, only that she generally had questions; Marshall's primary complaint was that Goldblum "is not tasked with issuing University responses or University messaging." (Marshall Depo. R.55, PageID#1246.). Marshall never told any other UC employee that the letter was inappropriate. (*See e.g,* Awadalla Depo., R.34-3, PageID#363 (Marshall never said that anything in the letter was "inaccurate or inappropriate").)

sending the letter.[13]  The role of the Title IX Coordinator involves independent discretion and Title IX coordinators may use this discretion to make independent determinations as to notification of resources and referrals.[14]  (Goldblum Aff., R.69-1, PageID#2702.).

Marshall admitted in her deposition that Goldblum was entitled to act independently to raise awareness:

> Q    Are Title IX Coordinators] empowered to act independently?
> A    What do you mean by independently?
> Q    Well, are they entitled to conduct investigations even if higher authorities at the University did not wish those investigations to take place?
> A    Yes.
> Q    Do they have full discretion in determining the best way to raise awareness about issues involving discriminatory harassment?...
> A    Yes.

---

[13] The District Court's decision failed to consider whether Marshall's instruction was lawful.  The refusal to obey an unlawful order cannot, by definition, be insubordination.  *Cf. NLRB v. Long Island Assn. for Aids Care*, 870 F.3d 82, 88 (2d Cir. 2017) ("an employer may not discharge an employee for refusing to comply with an unlawful order prohibiting protected activity" (citations omitted)).  The District Court's decision, if permitted to stand, would eviscerate the anti-retaliation provisions of Title VII and Title IX.  An employer could order employees not to engage in protected activity and then discipline them for 'insubordination' when they did so.

[14] A Title IX coordinator, in accordance with guidance from the Department of Education, should be independent.  April 24, 2015 Dear Colleague Letter.  Marshall acknowledged that the intention of the Title IX coordinator is to act independently in accordance with federal guidance. (Marshall Depo., R.55, PageOD#1153, PageID#1193.)  In 2001, the Department of Education specifically suggested that a school could respond to anonymous complaints in a publication by submitting a letter to the student newspaper.  Marshall admitted that a letter to the newspaper, such as that proposed by Plaintiff, would be appropriate under this Guidance. (Marshall Depo., R.55, PageID#1134.)

(Marshall Depo. R.55, PageID#1159.)  Goldblum explained that she sent the letter to the newspaper "As a way to get out information about resources and options" to the community.    (Goldblum Depo., R.54, PageID#793.) Marshall admitted in her deposition that Goldblum was permitted to do exactly what she did in this case – inform the community about resources – without prior permission of her supervisor:

> Q Does the Title IX Coordinator at the University of Cincinnati have an obligation to inform the community about available resources?
> A Yes. Not the sole obligation, but yes.
> Q Does the person typically need prior approval before sending out communications that inform the community about resources?
> A No.

(Marshall Depo., R.55, PageID#1318.)[15]

The record contains additional evidence on this point.  An expert concluded that the letter Goldblum proposed to send was "was reasonable, fell under her duties as Title IX Coordinator, and was in line with OCR expectations and industry standard."

_____

[15] The fact that Goldblum's letter may have upset the UC administration is a feature, not a bug.  Marshall acknowledged that Goldblum's job was to be disruptive:

> Q… [T]here's a Quaker expression about speaking truth to power. Have you heard that expression?
> A I have….
> Q Is part of the job of the Title IX Coordinator to speak truth to power at the University?
> A Yes.
> Q Even if speaking truth to power might upset other people at the University.
> A Yes…

(Marshall Depo., R.55, PageID#1193.)

(Bullard Rep., R.69-6, PageID#2943.)  This expert explains that it was not misconduct to send the letter, even if the supervisor disagreed with the decision, because, in part, it is not unusual for a "Title IX Coordinator's proposed action" to "run afoul of other campus administrators, including their direct supervisor or campus leadership."[16] (Bullard Rep., R.69-6, PageID#2943.)   A second expert is even more explicit that Plaintiff's refusal to follow Marshall's directive was permissible and consistent with the guidance from the Department of Education:

> While Ms. Goldblum's behavior may have been deemed "severe" because she "defied a direct order," she acted in a way that is required of a Title IX Coordinator… The role of the Title IX Coordinator involves independent discretion and they are trained to use this discretion to make determinations as to notification of resources and referrals.

(Dougherty Rep., R.69-2, PageID#2864, *citing* April 24, 2015 Dear Colleague Letter.) None of this was contested.

### b.    Suspicious Timing Combined With Independent Evidence Permits An Inference Of Retaliation

This Court has held that "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 317 (6th Cir. 2001).   However – and this is important – this Court has repeatedly held that

---

[16] Marshall, not Goldblum, committed the actual misconduct and should have been subject to discipline by UC: "Marshall, who did not serve as the Title IX Coordinator or have the extensive Title IX training and experience as Ms. Goldblum, interfered with Ms. Goldblum's responsibilities."  (Bullard Rep, R.69-5, PageID#2942.)

"suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 421 (6th Cir. 2021), *citing Seeger,* 681 F.3d at 285. *See also Asmo v. Keane, Inc.*, 471 F.3d 588, 598 (6th Cir. 2006) ("temporal proximity can be used [as] "indirect evidence" to support an employee's claim of pretext."), *citing DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) ("this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise."). *Cf. A.C. v. Shelby Cty. Bd. of Edn.*, 711 F.3d 687, 704 (6th Cir. 2013) ("suspiciously timed" reports could be considered in determining whether a school had a "retaliatory motive" in reversing a grant of summary judgment on an ADA claim); *Lindsay v. Yates*, 578 F.3d 407, 421 (6th Cir. 2009) ( "the timing of" of the termination of a purchase agreement "itself casts doubt on the veracity of the [defendant's] explanation" in Fair Housing Act case).

The temporal proximity between the exercise of the Plaintiff's protected conduct and the allegedly retaliatory action must, therefore, be considered.[17]  There was no dispute that Goldblum was terminated shortly after engaging in protected activity. The

---

[17] This is true outside of the employment context, too. "In past cases, [this Court has] looked to factors such as the 'temporal proximity' between the exercise of the plaintiff's allegedly protected conduct and the allegedly retaliatory action to supply the inference of intent." *Aquilina v. Wriggelsworth*, 759 F.App'x 340, 346 (6th Cir. 2018), *citing Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010).

record in this case contains four categories of independent evidence to consider in connection with this fact of suspicious timing: (i) the lack of prior concerns about job performance; (ii) the independent motive of UC to cover-up misconduct related to the Houston matter; (iii) shifting and unsubstantiated *post-hoc* justifications; and (iv) Marshall's lies about the reason for Goldblum's termination.

### i.      Lack Of Concerns About Goldblum's Job Performance Prior To The Protected Activity.

The record does not show any material issues with Goldblum's performance prior to her complaints about the Houston Matter.  Marshall testified to this explicitly:

> Q … [P]rior to February 2019, did you have any issues with her job performance?
> A No.

(Marshall Depo. R.55, PageID#1189.)  Although Marshall cited some minor inter-personal issues in her deposition,[18] there is no evidence in the record that Marshall was in any way be troubled by Goldblum's job performance until after she started to investigate the Houston Matter.

---

[18] Marshall claimed that certain employees had complained about Goldblum.  These complaints were related to Goldblum questioning practices at UC in her independent role as Title IX Coordinator.  Marshall conceded that it was "appropriate" for Goldblum to ask question if she saw "systemic problems" and that nobody complained that she acted unprofessionally.   At worst, some employees complained that Goldblum was "a little too strong" in her criticisms and made people feel like they were "under attack."  (Marshall Depo., R.55, PageID#1194.)  But, again, that was Goldblum's job; Marshall admitted that the fact that other UC employees were "complaining about Goldblum doesn't mean that Goldblum wasn't doing her job."  (Marshall Depo., R55, PageID#1189-1193.)

Under this Court's precedents in *DeBoer v. Musashi Auto Parts, Inc.*, 124 F.App'x 387 (6th Cir. 2005), and *Wyatt*, *supra*, this fact, combined with suspicious timing, is enough to defeat summary judgment.[19]  In *DeBoer*, this Court reversed a grant of summary judgment in favor of an employee after concluding that pretext could be established, in part, on temporal proximity.  As independent evidence, this Court considered that the employer "did not appear to be troubled by" any poor conduct by the employee until after she engaged in protected activity. 124 F.App'x at 393-395.  In *Wyatt*, *supra,* this Court reversed a grant of summary judgment in a retaliation case where the record contained "conflicting evidence" about whether disciplinary action for "poor performance" was pretextual.  This Court said:

> suspicious timing coupled with the inconsistent explanations make it such that a trier-of-fact would need to weigh the evidence and make credibility determinations to decide whether [the employee's] performance… actually was poor and actually motivated her removal or whether [the supervisor] retaliated against [the employee]…

999 F.3d at 421-422.  This case is much stronger than *DeBoer* or *Wyatt*.  Not only did Goldblum have no history of prior disciplinary issues at UC, her work both in general and specifically on the Houston Matter had actually been contemporaneously praised.

---

[19] This Court has declined to consider temporal proximity as evidence of pretext when there is a pre-existing justification for disciplinary action.  For example, in *Johnson v. Fifth Third Bank*, 685 F.App'x 379, 387 (6th Cir. 2017), this court declined to take into account the "suspicious timing" of disciplinary action where an employee had "a long history of performance problems" documented in performance reviews prior to the protected activity.  That is not this case.

The University's PR representative wrote, "Thanks for your help here and the great, much needed strides you've made in Title IX." (Email, R.66, PageID#2549.)

### ii. UC Was Motivated To Prevent An Investigation Of Misconduct

Goldblum's concern about systemic issues in the UC admissions process were well-founded; UC had a lot to hide.[20] UC is supposed to consult with public safety officials before admitting convicted sex offenders, yet did not do so for Houston and, apparently, other applicants with similar background. (Miller Depo., R.62, PageID#2225-2226; Response to Interrogatories, R.69-7, PageID#2958.) Admissions staff tellingly ignored Plaintiff's inquiries. (Byland Depo., R. 69-5, PageID#2907-2908.) This created significant financial and reputational exposure for UC. (Bullard Rep., R.69-6 at PageID#2043-2944.)

---

[20] The District Court credulously accepted Marshall's "proffered rationale for seeking Goldblum's resignation" and never questioned whether the suspicious timing or other independent evidence raised an issue of credibility. (Order, R.89, PageID#3651.) This is a fundamental error; this Court has warned that in considering a summary judgment motion a judge should not consider a defendant's self-serving statements denying an improper motive. *Hooks v. Rumpke Transp. Co., LLC*, 6th Cir. No. 16-3681, 2017 U.S. App. LEXIS 26226, at *11 (Aug. 8, 2017) (reversing grant of summary judgment because jury could "disbelieve [defendant's] self-serving statement" about reason for terminating employee). *Cf. Turner v. City of Akron*, 324 F.App'x 453, 456 (6th Cir. 2009) ("we cannot accept the employer's proffered rationale uncritically"). This Court has explained that a court should "not grant a defendant summary judgment in an employment discrimination action merely because the defendant states that it did not" violate civil rights laws. *Shaw v. Danley*, 6th Cir. No. 98-6579, 2000 U.S. App. LEXIS 545, at *19-20 (Jan. 10, 2000).

Goldblum's termination successfully ended any investigation into the allegation that Houston had sexually assaulted a student on UC's campus or into the flawed admissions process at UC. The investigation by Goldblum was transferred to her successor (selected by Marshall) on the day she was terminated and closed a month later with no evidence of any work being conducted. (Maxient Report, R.72-1, PageID#3076-3083.) Worse, UC tried to cover-up matters by creating a fake investigation to be conducted by the person alleged to have been involved in the initial misconduct.[21] An admission by Marshall in her deposition that she buried this issue is particularly revealing:

> Q Do you intend to take any actions to change the manner in which the University of Cincinnati decides to admit convicted sex offenders?...
> [A]: I don't know. I need to learn what the process is.
> Q In the past 11 months, have you taken any actions to learn what the process is for the University of Cincinnati to admit convicted sex offenders?
> A No.

(Marshall Depo., R.55, PageID#1321 (objection omitted).)[22]

---

[21] How do we know this was a fake investigation? Certainly not by coincidence Cummins opened a formal investigation on the same day Goldblum started her investigation. Cummins did this even though he acknowledged that the Title IX Office is supposed to conduct these investigations. (Cummins Depo., R.60, PageID#2099. He then assigned himself to the investigation even though he acknowledged that there was a conflict since he was a witness. (Cummins Depo., R.60, PageID#2104.) Unsurprisingly, this sham 'investigation' was never completed.

[22] The District Court rejected this evidence, suggesting that "there is little to nothing, besides [plaintiff's] own speculation, connecting this mostly *post hoc* material to the University's actual motivation." (Order, R.89, PageID#3650.) The District Court failed

A reasonable juror might infer from the fact that UC had a motive to cover-up these Title IX issues that administrators seized upon an otherwise innocuous insubordinate act to terminate an employee who would have brought the misconduct to light.[23]  This Court used that exact same rationale to reverse a grant of summary judgment in *Stein v. Atlas Industries*, *supra*.  In *Stein*, an employer terminated an employee

---

to consider that every coverup and retaliatory act is, by definition, *post hoc* and that, in this case, it worked.

The District Court also failed to consider the incestuous nature of the whole situation. After Goldblum complained about the Houston matter, when Marshall sought out information about Goldblum's job performance to justify her termination, the *only* person she contacted was the daughter of the person Goldblum would have investigated.  (Marshall Depo., R. 55, PageID#1316.)  At trial, UC will be provided the opportunity to prove that this was an innocent coincidence, but, viewing the evidence in the light most favorable to Goldblum, when combined with suspicious timing and other evidence, this coincidence helps to establish that there is a triable question of fact as to whether UC's proffered reason for Goldblum's termination was pretextual.  *Cf. Bailey v. Baldwin Cty. Bd. of Edn.*, S.D.Ala. No. 14-0305, 2016 U.S. Dist. LEXIS 1441, at *47 (Jan. 6, 2016) ("In the words of Buffy the Vampire Slayer, however, 'there are two things I don't believe in: coincidences and leprechauns.'").

[23] The District Court made a significant error in the standard of proof.  Instead of applying the Rule 56 standard, the District Court appeared to require Goldblum to show that "the 'sheer weight' of the circumstantial evidence" showed that the "University's proffered rationale is 'more likely than not' a coverup…" (Order, R.89, PageID#3650.) The case cited by the District Court for this proposition, *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000), does not support this analysis because it was before this Court after trial.  In this case, on summary judgment, Goldblum was only required to present sufficient evidence from which a jury could – but was not required to – find pretext.  This Court has warned that "credibility judgments and weighing of the evidence are improper" in summary judgment decisions.  *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).  *Young v. Sabbatine,* 6th Cir. No. 99-6336, 2000 U.S. App. LEXIS 33891, at *20 (Dec. 19, 2000) ("credibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment"). By considering whether the "weight" of the evidence supported Goldblum's claims, the District Court apparently did precisely that.

who had missed some days at work. The employer, like in this case, claimed it was just following its policy. This Court said that summary judgment was not appropriate because at trial the employee "could paint a picture suggesting" that the employer was motivated by an improper purpose.[24]  This Court explained:

> [the employer] simply bided its time and waited—Gotcha! style—for [the employee] to make a mistake. And then, when he did, the company jumped at the chance to cut him loose. This is a story that, in view of the evidence, a reasonable jury could believe. So [the employee] should have the chance to tell it. The district court thus erred in granting [the employer] summary judgment…

730 F.App'x at 323.  *Stein*, thus, stands for the proposition that motive is evidence of pretext that a jury should be allowed to consider.  "It should be obvious that a company with real misconduct to hide would have more motive to terminate a whistle-blowing employee than would a company with clean hands." *Blakeslee v. Shaw Infrastructure, Inc.*, D. Alaska No. 3:09-CV-0214, 2010 U.S. Dist. LEXIS 76295, at *2 (July 27, 2010).

### iii.    Evidence About Other Misconduct Was Contrived

Marshall, in her *post hoc* deposition, did not testify that Goldblum was terminated only for insubordination.   Instead, Marshall and UC also cited other potential misconduct.  (*See* Interrogatory Answer, R.44-2, PageID#586; Marshall Depo. R.55-,

---

[24] This Court recently reversed a dismissal in favor of UC in a separate employment discrimination case. *Charlton-Perkins v. Univ. of Cincinnati*, 6th Cir. No. 21-3840, 2022 U.S. App. LEXIS 15364, (June 3, 2022).  In *Charlton-Perkins*, some of the same individuals involved in this case allegedly tried a different cover-up tactic to obscure discriminatory hiring practices: cancelling a search "to conceal the discriminatory reason for the failure to hire."  2022 U.S. App. LEXIS 15364, at *16

PageID#1172-1173.)  Marshall, claimed that she terminated Plaintiff not only because of insubordination but also for two additional reasons: (1) she had received reports that Goldblum was acting in an unprofessional manner and disrupting the work environment; and (2) she had received reports that that Goldblum was not performing her job adequately by delaying assigning cases.[25]  (Marshall Depo., R.55, PageID#1172-1173.)

By itself, the fact that Marshall started to examine Goldblum's job performance only after Goldblum started investigating the Houston Matter is evidence of pretext. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435-36 (6th Cir. 2009) (increased scrutiny following shortly after protected activity is evidence of pretext).

But there is more.

---

[25] Defendant cannot claim the honest belief exception. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)("as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect")

In determining whether Marshall had an "honest belief" in her reasons, this Court must examine whether Marshall established a "reasonable reliance" on the particularized facts available to her. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001)*, quoting Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998).  This Court has explained, "the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.*  Marshall and the HR office made essentially no inquiry.  In claiming that Plaintiff was disruptive to the Title IX Office, she contacted one person, Shaw – a person with a significant conflict of interest and limited experience – and never tried to verify this information.  (Marshall Depo., R.55, PageID#1284-1285.)  Marshall also, after attempting to obfuscate, could not testify that she took steps to verify the claim that Plaintiff had delayed assigning cases.  (Marshall Depo., R.55, PageID#1284-1285.)

There was no contemporaneous support for any of the other reasons Marshall stated. No misconduct unrelated to sending a letter to the newspaper was mentioned during the meeting when Plaintiff was terminated; the only thing Marshall says while meeting with Plaintiff is "I wanted to let you know that I've given a lot of thought to our February 12th incident…" (Goldblum Aff., R.69-1, PageID#2703, *citing* video and transcript (PageID#2850-2857).) Not a single contemporaneous document supports Marshall's claimed motivation. (Marshall Depo., R.55, PageID#1174-1175, 1178.) This lack of contemporaneous evidence is evidence of pretext under this Court's precedents. *See, e.g., Gaglioti v. Levin Grp., Inc.*, 508 F. App'x 476, 482 (6th Cir. 2012) (evidence that an employer's asserted legitimate reasons for firing a plaintiff were concocted after-the-fact can be evidence of pretext). And this Court has observed, "we are skeptical of undocumented accounts of employee conduct that may have been created post-termination." *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 503 (6th Cir. 2007).

Finally, there is an issue of fact here, as Goldblum submitted an Affidavit unequivocally denying any unprofessional conduct. (Goldblum Aff., R.69-1, PageID#2701.) Goldblum has, in her affidavit, also denied any delay in assigning cases and provided specific reasons for her actions in this small subset of cases. (*Id.* (summaries of the cases attached to Affidavit).)

### iv. The Changing Explanations And Outright Lies

The very fact that Marshall and UC changed the reasons for forcing Goldblum to resign, combined with suspicious timing, is evidence of pretext. Marshall originally was focused on the alleged insubordination. The human resources employee who met with Marshall could not testify that Marshall initially raised any complaints about Plaintiff outside of the Houston Matter.

> Q. Do you have any specific recollection of Marshall indicating any complaints about the job performance of Andrea Goldblum?
> A. No.

(Awadalla Depo, PageID#363.) No additional reasons are explicitly set forth in the draft letter Marshall was going to use to terminating Goldblum. (Email, R.66, PageID#2577-2579.)

Why is this important? Two reasons.

First, Marshall's shifting stories, especially when combined with the other evidence undermining her proffered justification, is sufficient to create a genuine issue of material fact as to whether Plaintiff was terminated in retaliation for her protected activity.[26] This Court has found that such inconsistencies can support a finding of pretext: "An employer's changing rationale for making an adverse employment decision

---

[26] Later, the HR representative testified slightly differently, suggesting that Marshall had raised other concerns. But she only was able to provide vague examples of Plaintiff being disruptive, suggesting in a conclusory manner that Plaintiff was "showcasing subjective opinions and emotions." (Awadalla Depo. R.34-3, PageID#367.) She subsequently acknowledged, "showcasing subjective opinions and emotions" is not a violation of any UC policy. (*Id.*)

can be evidence of pretext." *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002), *quoting Thurman v. Yellow Freight Systems*, 90 F.3d 1160, 1167 (6th Cir. 1996). *See also White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789 (6th Cir. 2004) (offer of contradictory reasons for a challenged job transfer "supported a finding of pretext"). *See also Dennis v. Columbia Collection Med. Ctr.*, 290 F.3d 639 (4th Cir. 2002) ("The fact that an employer has offered inconsistent *post hoc* explanations for its employment decisions is probative of pretext.").

<u>Second</u>, Marshall lied to at least two people about the reasons for Goldblum's termination.[27] One witness states, "I, along with some other students, spoke to Marshall about the termination of Goldblum on or about April 26, 2019. Marshall lied to us during that conversation." (Corey Aff., R.69-4, PageID#2881-2882.) Another states, "I spoke to Marshall about Title IX issues on the date that Goldblum was terminated. Marshall lied to me." (Cunningham Aff., R.69-3, PageID#2881. *See also* Email, R.72-1, PageID#3220.) This, alone, may be sufficient evidence of pretext. "Evidence that tends to show that decisionmakers lied about material facts regarding a plaintiff's protected activity and subsequent adverse employment action can serve as evidence of pretext." *Hawthorne v. Univ. of Tennessee Health Science Ctr.*, 203 F. Supp. 3d 886, 894 (E.D.Tenn. 2016), *citing Youssef v. Holder*, 19 F. Supp. 3d 167, 185 (D.D.C 2014) (noting

---

[27]This is why the deposition of Pinto was necessary. Marshall discussed the termination with Pinto, and the contemporaneous reasons she gave to Pinto for the termination are important. *See infra.*

that evidence that decision-makers lied about their knowledge of protected activity could constitute evidence of retaliatory intent).

### c. The Claimed Misconduct Was Insufficient To Justify Termination

"Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen*, 580 F.3d at 400 n.4. The termination of an employee with no prior disciplinary history for sending an email to the student newspaper offering resources to victims of sexual assault without permission – an email was never published! – is so dubious that it should raise a question of an ulterior motive.[28]

Even though UC's policies permitted immediate termination for insubordination, that is not how the policy was implemented. There was an expectation

---

[28] In the summary judgment briefing, Plaintiff described UC's argument that termination under these circumstances was justified as "almost laughable, on its face." Despite criticism from the District Court, Plaintiff stands by that characterization. (Order., R.89, PageID#3651.) As noted, *supra*, nobody at UC (excepting self-serving testimony from Marshall) thought there was anything wrong with Goldblum's letter to the newspaper. The District Court's rhetoric in this respect reveals a failure to adequately appreciate both the commonsense nature of the inquiry and that the Civil Rights Laws require courts to examine critically employer rationales when they are presented as explanation for allegedly discriminatory or retaliatory conduct. By not even considering whether terminating an employee for such a minor and harmless infraction is inconsistent with commonsense, the District Court unjustifiably multiplied Plaintiff's burden. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (an employment-discrimination plaintiff may present evidence "showing that the employer's proffered explanation is unworthy of credence"). As a matter of both commonsense and federal law, an employer's submission of a dubious justification for firing an employee who engaged in protected activity is itself evidence which may persuade the finder of fact that unlawful retaliation actually occurred. *Cf. NLRB v. New York Univ. Med. Ctr.*, 702 F.2d 284, 298 (2d Cir. 1983) (suggesting that an employer's explanation "flies in the face of commonsense").

that Goldblum would receive a reprimand or be formally warned before termination.[29]

(Goldblum Aff., R.691-, PageID#2702-2703.) An expert in academic matters provided

an opinion that institutions would typically impose a reprimand for this type of conduct

consistent with the principles of progressive discipline:[30]

> I am not aware of any institution of higher learning that applies principles of progressive discipline that would terminate Ms. Goldblum under those circumstances. Instead, institutions of higher learning would impose a reprimand or warning, at most, in such circumstances… This highly unusual action permits an inference that Marshall was actually motivated by other reasons.

(Dougherty Rep., R.69-2, PageID#2865.)  A second expert testifies, "Even assuming

Ms. Goldblum's approach was not supported by her supervisor, it was certainly not an

action that would warrant termination at any other comparable institution."  (Bullard

---

[29] The District Court observed that the UC Policy listed termination as a possible outcome.  (Order, R. 89, PageID# 3651.)  True enough.  But the District Court never considered whether the policy had been implemented unlawfully; other courts in this Circuit have recently rejected this simplistic analysis.  A district court in this Circuit recently found that the expectations of university employees that they would not be terminated prior to receiving a warning for certain misconduct was sufficient to establish pretext, even in the presence of a policy stating that "the university reserves the right to move to immediate termination when warranted."  *Faure v. Ohio State Univ.*, S.D.Ohio No. 2:19-cv-1949, 2021 U.S. Dist. LEXIS 238314, at *34 (Dec. 14, 2021).

[30] The District Court never addresses this expert evidence.  *Cf. Blessing v. Ohio Univ.*, S.D.Ohio No. 2:09-CV-0762, 2011 U.S. Dist. LEXIS 140182, at *55 (Dec. 6, 2011) ("The testimony of an expert… can aid the jury in weighing the employer's true motivation.").

Rep., R.69-6, PageID#2944.) Notably, this evidence is unrefuted; Defendant did not obtain an expert opinion to the contrary.[31]

Pretext may also be shown by the fact that other high-ranking employees were not similarly punished for similar misconduct. This Court has observed that in evaluating retaliation claims, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals.[32] *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516-517 (6th Cir. 2009). This Court has also observed that evidence of an

---

[31] A reprimand would have been consistent with the principles of progressive discipline under UC policies. (Compare Marshall Depo., R.55, PageID#1162-1163 (discussing importance of progressive discipline). The HR employee who assisted Marshall testified: "[Marshall and I] discussed the scenario where [Goldblum]was insubordinate, and written reprimand and last chance warning came up as an option for her discipline." (Awadalla Depo., R.363, PageID#363.) While the UC Policy provides that an employee may be terminated for insubordination, the fact that this is possible is not the end of the pretext analysis. UC Policy 15.03, states that UC "subscribes to the principle of progressive corrective action…" (Policy, R.55-1, PageID#1354.) The failure of UC to follow its progressive discipline policy, when combined with suspicious timing and other independent evidence, is further evidence of pretext. *See e.g. Deboer*, 124 F. App'x at 394 (failure to follow handbook calling for counseling prior to their termination or demotion was probative of pretext); *Brewer v. New Era, Inc.*, 564 F. App'x 834, 841 (6th Cir. 2014) (failure to adhere to seniority policy, when considered in combination with other evidence of pretext, sufficient to create a genuine issue of material fact on pretext claim).

[32] The District Court said that the comparators are not relevant because "the plain language of the conduct policy provides that any violation, including insubordination, suffices to result in immediate termination." (Order, R.89, PageID#3652.) This is fundamentally in conflict with this Court's opinions, as the question at this stage of the analysis is not whether termination was permissible, but whether an inference of pretext can be drawn from the inconsistent manner in which the policy was applied.

employer's treatment of other employees is often relevant to an employer's motive in acting against a plaintiff. *Griffin v. Finkbeiner*, 689 F.3d 584, 600 (6th Cir. 2012).

In this case, UC produced the records related to other director-level employees who violated the rule against insubordination.[33] These records show that UC reprimanded employees who have engaged in what appeared to be more serious conduct and reserves terminations for egregious and repeated insubordinate conduct. The record, for example, includes the disciplinary files of two individuals who also violated UC's rule against insubordination but received less severe discipline.[34] (Report., R.69-2, PageID#2867; Report, R.69-2, PageID#2871.) An expert reviewed all of the

---

[33] The District Court suggested that Goldblum had not shown that her conduct was similar to proposed comparators. (Order, R.89, PageID#3652.) This was error. The issue of whether any two employees are similarly situated often presents a question of fact for the jury, and an exact comparison was not necessary. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (6th Cir. 2010) (ordinarily, the question of whether employees are similarly situated is for the jury to determine). This Court has held that a district court errs by granting summary judgment if a reasonable jury could find that two employees are similarly situated, and the expert opinions presented by Plaintiff certainly get past that line. *See e.g., Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007) (citation omitted) (jury question where "reasonable minds could differ as to whether a preponderance of the evidence establishes that [plaintiff] was treated more harshly than similarly situated employees"); *Campbell v. Univ. of Akron*, 211 Fed Appx. 333, 345-46 (6th Cir. 2006) (district court improperly granted summary judgment where reasonable jury could conclude that others received less discipline for same or greater infractions).

The further irony here is that the Court denied Goldblum the ability to take this discovery. *See infra.*

[34] One employee essentially stole university property and refused to follow a direct order to return it. (Report, R.69-2, PageID#2867.) The other employee engaged in repeated misconduct, including failing to follow a direct order to keep some information confidential. (Report, R.69-2, PageID#2871.) Unlike the Goldblum matter, the insubordinate acts in these two cases actually harmed the institution.

files of individuals who were insubordinate and concluded that Goldblum was treated

differently:

> The records produced by UC confirm my opinion that no institution of
> higher learning that applies principles of progressive discipline would have
> terminated Goldblum for her alleged misconduct.  These records show
> that UC commonly reprimands employees who engage in more serious
> conduct, follows principles of progressive discipline, and has only
> terminated employees who have shown a pattern of severe misconduct.
> In my opinion, the inconsistencies between UC's action in this case and
> actions in other cases permits an inference that Marshall was actually
> motivated by other reasons.

(Dougherty Aff., R.69-2, PageID#2859.)

The disparate treatment of director-level employees who violated the same work

– insubordination – creates an issue of fact that the termination of Plaintiff was

pretextual.  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003), *citing*

*Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000); *Manzer*, 29 F.3d at 1084

(pretext may be shown by "evidence that other employees…  were not fired even

though they engaged in substantially identical conduct to that which the employer

contends motivated its discharge of the plaintiff").  This was sufficient to defeat

summary judgment because Goldblum was "not required to show that [her] proposed

comparator's actions were identical to [her] own." *Colvin v. Veterans Admin. Med. Ctr.*,

390 F. App'x 454, 458-59 (6th Cir. 2010).  Appellant acknowledges that the fact of each

disciplinary case is unique, but she only needed to show that the proposed comparators

engaged in acts of comparable seriousness. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 612 (6th

Cir. 2002).[35] This Court has observed that the issue of whether employees are similarly situated often presents a question of fact for the jury, and an exact comparison was not necessary. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (6th Cir. 2010) (ordinarily, the question of whether employees are similarly situated is for the jury to determine).

---

[35] For example, a District Court in this Circuit recently found sufficient evidence of pretext to defeat summary judgment where a female State Trooper, but not male Troopers, was disciplined for having tattoos. *Yerkes v. Ohio State Hwy. Patrol*, S.D.Ohio No. 2:19-cv-2047, 2021 U.S. Dist. LEXIS 247838, at *28 (Dec. 30, 2021). The *Yerkes* court did not require that the employees be identical in every respect, only that they violated the same work rule.

**C.    Goldblum Should Have Been Permitted Additional Discovery**

The District Court abused its discretion in denying Plaintiff relevant discovery and then denying Plaintiff's Rule 56(d) Motion.  Goldblum sought multiple areas of discovery, but this Appeal focuses on two areas: (i) the deposition of the UC President; and (ii) identifying other employees who were disciplined at UC for similar conduct.

Because these issues overlap, they will be briefed together.

**1.    Standard**

**a.    Motion For Protective Order**

The scope of permissible discovery, in general, is broad.  *United States v. Leggett & Platt, Inc.*, 542 F.2d 655, 657 (6th Cir. 1976).  Relevance for discovery purposes is, by definition, broader than for trial purposes.  *Mellon v. Cooper-Jarrett, Inc.*, 424 F.2d 499, 500-501 (6th Cir. 1970).  The scope of permissible discovery in discrimination cases is particularly broad. *Stevenson v. Gen. Elec. Co.*, S.D.Ohio No. C-1-77-122, 1978 U.S. Dist. LEXIS 15133, at *2-3 (Oct. 4, 1978).  *See also Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1520 (10th Cir.1995) ("discovery in discrimination cases should not be narrowly circumscribed"); *Tinal v. Norton Healthcare, Inc.*, W.D.Ky. No. 3:11-CV-596-S, 2014 U.S. Dist. LEXIS 191995, at *11-12 (July 14, 2014) ("no question exists in the Court's mind that discovery in a federal civil rights action is intended to be broad in scope"), *citing Trevino v. Celanese Corp.*, 701 F.2d 397, 405-406 (5th Cir. 1983) ("The imposition of unnecessary limitations on discovery is especially frowned upon in [employment discrimination] cases.").

Courts in this Circuit require a party resisting discovery to state with specificity and support with affidavits that a discovery request is unduly burdensome or that the discovery sought is not discoverable under the Federal Rules. *Kafele v. Javitch, Block, Eisen & Rathborne*, S.D. Ohio No. 2:03-cv-638, 2005 U.S. Dist. LEXIS 48484, at *2 (Apr. 4, 2005) (As a general rule, "[a]ll grounds for an objection... shall be stated with specificity... The mere statement by a party that an interrogatory or request for production is overly broad, burdensome, oppressive and irrelevant is not adequate to voice a successful objection."); *Kline v. Mortgage Elec. Sec. Sys.*, S.D. Ohio No. No. 3:08-cv-408, 2014 U.S. Dist. LEXIS 141027, at *13 (Oct. 1, 2014) ("A responding party must show specifically how each discovery request is burdensome and oppressive by submitting affidavits or offering evidence revealing the nature of the burden.").

### b.    Rule 56(d)

Rule 56(d) of the Federal Rules of Civil Procedure establishes a procedure when a party asserts that additional discovery is necessary to respond to a motion for summary judgment. *Cardinal v. Metrish*, 564 F.3d 794, 797 (6th Cir. 2009) (Rule 56(d) is intended to provide a mechanism for the parties and the court "to give effect to the well-established principle that the plaintiff must receive a full opportunity to conduct discovery to be able to successfully defeat a motion for summary judgment"). *White's Landing Fisheries v. Buchholzer*, 29 F.3d 229, 231-232 (6th Cir. 1994) (it is improper to grant summary judgment if the party seeking Rule 56(d) relief is given an insufficient opportunity for discovery). This Court has made clear that "[i]f the [party seeking relief

under Rule 56(d)] has not 'receive[d] a full opportunity to conduct discovery,' denial of that party's Rule 56(d) motion and ruling on a summary judgment motion would likely constitute an abuse of discretion." *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196-97 (6th Cir. 1995), *quoting Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004).[36]

### 2.     Denying Discovery Into Potential Comparators Was Contrary To This Court's Decision In *Bobo*

The District Court limited discovery into other UC employee who had been disciplined for insubordination to "director-level" employees.     (Order, R.79, PageID#3606-3608.)  Discovery of other employees who were disciplined for the exact same reason is relevant to the claim that the employment action was pretextual because the misconduct was insufficient to warrant termination. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003), *citing Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

In *Bobo*, *supra*, this Court held that discovery of the type sought by Plaintiff not only is permissible, but that it is reversible error to deny such discovery.  This Court reversed a decision of a district court limiting discovery aimed at identifying possible similarly situated employees.  This court observed, "Discrimination cases frequently turn on whether the plaintiff can identify one or more comparators who are similarly

---

[36] This Court has provided guidance as to the factors a court should evaluate in considering whether to permit the requested discovery. *See CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008); *Plott*, 71 F.3d at 1196-97.

situated in all relevant respects." 665 F.3d at 753. *See also Louzon v. Ford Motor Co.*, 718 F.3d 556, 567 (6th Cir. 2013).

In addition, the District Court's decision was an abuse of discretion because UC, as the party resisting production, failed to establish that the burden or expense of the proposed discovery outweighs its likely benefit; Defendant did not provide any evidence in the record of this burden. *Stanczyk v. Prudential Ins. Co. of Am.*, N.D.Iowa No. 15-CV-0097, 2016 U.S. Dist. LEXIS 197491, at *8 (Aug. 11, 2016) ("a party alleging undue burden… must demonstrate that the burden of producing the requested information would outweigh its beneficial value"); *Martinez v. City of New York*, No. 16 CV 79, 2017 U.S. Dist. LEXIS 205854, at *1 (E.D.N.Y. Dec. 14, 2017) ("The party resisting discovery bears the burden of demonstrating that the discovery sought is burdensome or expensive [and] must also show that the burden or expense is unreasonable in light of the benefits to be secured from the discovery.").

### 3. Prohibiting The Deposition Of UC's President Was An Abuse Of Discretion

The District Court denied Plaintiff the ability to depose UC's Present, Neville Pinto, even though he has had direct and relevant knowledge of the facts of this case and was personally involved in numerous aspects of this matter.

### a. The Record Did Not Support The District Court's Order

The protective order prohibiting the deposition of Pinto was issued on the grounds that the deposition was unduly burdensome or oppressive. (*See* Order, R.45,

PageID#611.)  This was an abuse of discretion because the claims of undue burden and disproportionate discovery were simply not supported by the record.  Noticeably absent from the record is any evidentiary support by affidavit or otherwise for their claims of undue burden.  Pinto never submitted an affidavit or other evidence denying that he had knowledge of this issue or information about Marshall's state of mind; nothing in the record suggest that a deposition would be unduly burdensome.

This was an abuse of discretion.  "Absent a concrete, factual showing of oppression, harassment or other specific harm, such arguments are routinely rejected in the Sixth Circuit."  *UPS Co. v. DNJ Logistic Group, Inc.*, W.D.Ky. No. 3:16-CV-00609, 2018 U.S. Dist. LEXIS 112961, at *31 (Apr. 16, 2018) (collecting cases).  This Court has not adopted the "High Ranking Official" or "Apex" rule that assumes depositions of high-level executives are harassing and abusive and should not be compelled absent a specific showing that the individual possesses relevant evidence not readily obtainable from other sources.  *Serrano v. Cintas Corp.*, *supra*.  In *Serrano*, this Court held that to justify a protective order preventing deposition of a high-ranking employee, a party must provide "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements."  699 F3d at 901, *quoting Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540, 550 (6th Cir. 2004).

### b.    Pinto Had Discoverable Information

The record supports the conclusion that Pinto likely possesses discoverable information.  Marshall testified that she had discussed the letter that Goldblum wished

to send to the student newspaper with Pinto.  (Marshall Depo., R.55, PageID#1244; Marshall Depo., R.55, PageID#1254-1255.)  Marshall also testified that she discussed the decision to terminate, instead of simply reprimand, Goldblum with Pinto. (Marshall Depo., R.55, PageID#1296-1298.) Goldblum testified that Marshall had indicated that Pinto was aware of Goldblum's investigation of the Houston Matter and that Marshall "got in trouble for it."  (Goldblum Depo., R.54, PageID#917.)  The only information in the record about the conversations between Marshall and Pinto is from Marshall; there are no contemporaneous notes or memoranda.  While Marshall – if believed – "may very well have made her decision without any retaliatory motive, this is precisely the type of factual question which entitles a plaintiff to discovery." *Hatcher v. Bd. of Trustees of S. Illinois Univ.,* 829 F.3d 531, 538 (7th Cir. 2016).

The deposition of Pinto was not a fishing expedition; Marshall testified that she discussed the matters at the heart of the litigation with Pinto.  Pinto was not disclosed as a person likely to have discoverable information in Defendant's initial disclosures and the full extent of his role was not apparent before Marshall's deposition.  (Initial Disclosures, R.43-1, PageID#563.)   Affirming the decision of the District Court would set two bad precedents: (i) it would establish a novel legal proposition that discovery in civil matters must be limited to only one participant in an important conversation; and

(ii) it would defeat the purposes of initial disclosures and permit a party to hide a witness who possessed discoverable information.[37]

This Court has specifically held that a district court abused its discretion in denying a Rule 56(d) motion where a party was not given "a reasonable opportunity to conduct further discovery." *McKinley v. City of Mansfield*, 404 F.3d 418, 443 (6th Cir. 2005). In *McKinley*, this Court found that the party was entitled "to depose the named defendants and anyone else reasonably likely to offer relevant information…" prior to the court ruling on a motion for summary judgment. *Id. Cf. Siggers v. Campbell*, 652 F.3d 681, 697 (6th Cir. 2011) (finding district court abused its discretion in denying plaintiff's motion to delay consideration of summary judgment motions in order to obtain more discovery).

---

[37]If no deposition was permitted, then the District Court should have granted Plaintiff's request for an adverse inference to prevent UC from benefitting from the decision to not produce a witness who possesses otherwise discoverable information. Underlying this is the commonsense observation that if Pinto possessed information that was helpful to UC, or he could corroborate Marshall's testimony, UC would have been eager for him to testify. *See Lacy v. United States Dept. of Agriculture*, 278 F.App'x 616, 620 (6th Cir. 2008) (adverse inference arises "when a party fails to call a witness peculiarly within his power to produce and whose testimony would elucidate the transaction).

**CONCLUSION**

The Order Granting the Motion for Summary Judgment should be reversed, and this case remanded for further proceedings including appropriate further discovery.

Respectfully submitted,

_____/s/ Joshua Adam Engel_____
Joshua Adam Engel (0075769)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Suite 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g) and 6 Cir R. 32(a) I hereby certify that that this document complies with the type-volume limitation. This document contains 12,807 words, excluding the portions listed in 6 Cir. R. 32(b), as calculated by Microsoft Word.

/s/ Joshua Adam Engel
Joshua Adam Engel (0075769)

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Reid T. Caryer, reid.caryer@OhioAGO.gov
Marissa J. Palumbo, marissa.palumbo@ohioago.gov

/s/ Joshua Adam Engel
Joshua Adam Engel (0075769)

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| Record Entry Number | Description | Date Entered | PageID# Range |
|---|---|---|---|
|  |  |  |  |
| 1 | COMPLAINT | 5/27/20 | 1-20 |
| 24 | ANSWER | 11/18/2019 | 146-162 |
| 25 | ORDER Adopting Report and Recommendations on MOTION to Dismiss | 11/25/2019 | 163-173 |
| 33 | MOTION for Protective Order | 2/3/2020 | 240-250 |
| 34 | RESPONSE to MOTION for Protective Order and EXHIBITS | 2/5/2020 | 251-429 |
| 35 | REPLY to RESPONSE to MOTION for Protective Order | 2/6/2020 | 430-436 |
| 36 | ORDER granting MOTION for Protective Order | 2/12/2020 | 437-438 |
| 39 | OBJECTION to ORDER granting MOTION for Protective Order and EXHIBITS | 2/13/2020 | 485-529 |
| 41 | ORDER following informal discovery conference | 2/25/2020 | 532-534 |
| 42 | RESPONSE to OBJECTION to ORDER granting MOTION for Protective Order | 2/26/2020 | 535-550 |
| 43 | REPLY to RESPONSE to OBJECTION to ORDER granting MOTION for Protective Order | 2/28/2020 | 551-566 |

| Record Entry Number | Description | Date Entered | PageID# Range |
|---|---|---|---|
| | | | |
| 44 | OBJECTION to ORDER and EXHIBITS | 3/3/2020 | 567-607 |
| 45 | ORDER overruling OBJECTION | 3/4/2020 | 608-613 |
| 46 | RESPONSE to OBJECTION to ORDER | 3/17/2020 | 614-624 |
| 47 | REPLY to RESPONSE to OBJECTION to ORDER | 3/20/2020 | 625-630 |
| 49 | ORDER following informal discovery conference | 4/15/2020 | 632-634 |
| 51 | OBJECTION to ORDER and EXHIBITS | 4/16/2020 | 640-709 |
| 52 | RESPONSE to OBJECTION to ORDER | 4/27/2020 | 715-724 |
| 53 | NOTICE of Filing Deposition Transcripts and Deposition EXHIBITS | 4/29/2020 | 725-727 |
| 54 | DEPOSITION of Andrea Goldblum and EXHIBITS | 4/29/2020 | 728-1107 |
| 55 | DEPOSITION of Bleuzette Marshall | 4/29/2020 | 1108-1581 |
| 56 | DEPOSITION of Morgan Shaw | 4/29/2020 | 1582-1762 |
| 57 | DEPOSITION of Lisa Holstrom | 4/29/2020 | 1763-1851 |
| 58 | DEPOSITION of Ken Petren | 4/29/2020 | 1852-1957 |

| Record Entry Number | Description | Date Entered | PageID# Range |
|---|---|---|---|
| | | | |
| 59 | DEPOSITION of M.B. Reilly | 4/29/2020 | 1958-2079 |
| 60 | DEPOSITION of Daniel Cummins | 4/29/2020 | 2080-2170 |
| 61 | DEPOSITION of Karla Phillips | 4/29/2020 | 2171-2211 |
| 62 | DEPOSITION of Caroline Miller | 4/29/2020 | 2212-2265 |
| 63 | DEPOSITION of Tamara Byland | 4/29/2020 | 2266-2298 |
| 64 | NOTICE of Filing Declarations and Expert Witness Report | 4/29/2020 | 2299-2379 |
| 65 | MOTION for Summary Judgment | 4/30/2020 | 2380-2423 |
| 66 | Corrected EXHIBITS | 5/8/2020 | 2424-2682 |
| 69 | NOTICE of filing of Affidavits and EXHIBITS | 5/18/2020 | 2696-2959 |
| 71 | NOTICE of filing of video exhibit | 5/18/2020 | 2961 |
| 72 | Unredacted EXHIBITS under seal | 5/19/2020 | 2952-3222 |
| 73 | RESPONSE to MOTION for Summary Judgment and EXHIBITS | 5/19/2020 | 3223-3285 |

| Record Entry Number | Description | Date Entered | PageID# Range |
|---|---|---|---|
| | | | |
| 74 | MOTION to Defer Consideration of MOTION for Summary Judgment and EXHIBIT | 5/19/2020 | 3286-3293 |
| 76 | REPLY to RESPONSE to MOTION for Summary Judgment | 6/1/2020 | 3294-3573 |
| 77 | RESPONSE to MOTION to Defer Consideration of MOTION for Summary Judgment | 6/8/2020 | 3574-3499 |
| 78 | REPLY to RESPONSE to MOTION to Defer Consideration of MOTION for Summary Judgment | 6/11/2020 | 3500-3601 |
| 79 | ORDER overruling Objections | 7/29/2020 | 3602-3609 |
| 80 | ORDER overruling Objections | 7/29/2020 | 3609-3613 |
| 81 | ORDER denying MOTION to Defer Consideration of MOTION for Summary Judgment | 10/8/2020 | 3614 |
| 89 | MOTION granting MOTION for Summary Judgment | 3/38/2020 | 3638-3652 |
| 90 | JUDGMENT | 3/28/2020 | 3653 |
| 91 | NOTICE OF APPEAL | 3/28/2020 | 3654 |