## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**ANDREA GOLDBLUM,**

**Plaintiff – Appellant,**

**v.**

**UNIVERSITY OF CINCINNATI,**

**Defendant – Appellee.**

**CASE NO. 22-3289**

On appeal from the United States District Court
for the Southern District of Ohio, Western Division,
Honorable Matthew W. McFarland
CASE NO. 1:19-cv-00398

## BRIEF OF DEFENDANT-APPELLEE UNIVERSITY OF CINCINNATI

DAVE YOST (0056290)
OHIO ATTORNEY GENERAL

*/s/ Marissa J. Palumbo*

MARISSA J. PALUMBO (0089283)
COLLEEN KOEHLER (0090728)
Senior Assistant Attorneys General
Employment Law Section
30 E. Broad Street, 16th Floor
Columbus, Ohio 43215
(614) 644-7257 – Telephone
(614) 752-4677 – Facsimile
elsreview@OhioAGO.gov

*Attorneys for Defendant-Appellee*

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ...................................................................... iii

I.      STATEMENT REGARDING ORAL ARGUMENT ................................ vii

II.     STATEMENT OF ISSUES PRESENTED ....................................................1

III.    STATEMENT OF THE CASE ......................................................................2

       a.    Procedural History.................................................................................2

       b.    Summary of the Relevant Facts ...........................................................3

             1.    In early 2019, the University's College of Arts & Sciences published an online article profiling some of its graduating students who had received a "triumph cord." ...........................4

             2.    Goldblum became aware of the Article and sent a letter about the Student and the Article to the editor of the student newspaper despite Marshall's directive to wait ...........................................5

             3.    After ignoring Marshall's directive, Goldblum again defied Marshall's instructions by sending a slightly revised version of the letter to the student newspaper the very next day..............10

             4.    After meeting with Human Resources about Goldblum's insubordination and further investigating Goldblum's actions, Marshall decided to give Goldblum the option to resign in lieu of termination ...............................................................................11

IV.    SUMMARY OF THE ARGUMENT ..........................................................13

V.     LAW AND ARGUMENT...........................................................................14

       a.    Standard of Review ............................................................................14

       b.    Goldblum's Title IX claim fails as a matter of law............................ 14

             1.    Goldblum has not set forth a *prima facie* case .........................15

2.    The University's legitimate, non-retaliatory reasons for seeking Goldblum's resignation: insubordination and unacceptable behavior ..................................................................................18

3.    Goldblum cannot show that the University's decision was pretext for retaliation ..........................................................................21

a.    Marshall's reasons for seeking Goldblum's resignation are based in fact and well-supported by the record ............. 22

b.    Goldblum has no admissible evidence to suggest her resignation was motivated by anything other than her own insubordination ...............................................................25

c.    Goldblum cannot show that her insubordination and misconduct were insufficient to motivate the University to seek her resignation .......................................................34

C.    The District Court did not abuse its discretion in placing reasonable limitations on discovery ......................................................................37

1.    Goldblum was permitted to conduct discovery regarding potential comparators in a manner consistent with this Court's precedent ....................................................................................39

2.    The District Court did not commit an abuse of discretion by issuing a protective order precluding Goldblum from deposing the University's President .........................................................41

3.    The District Court did not abuse its discretion in denying Goldblum's Rule 56(d) motion ..................................................43

VI.    CONCLUSION ..............................................................................44

VII.    CERTIFICATE OF COMPLIANCE ...........................................................46

CERTIFICATE OF SERVICES ...............................................................46

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS .............47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahad v. Wilkie*,
  787 F. App'x 286 (6th Cir. 2019) ...............................................................34, 39

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).........................................................................................32

*Beil v. Lakewood Eng'g and Mfg. Co.*,
  15 F.3d 546 (6th Cir. 1994) ............................................................................14

*Bobo v. United Parcel Serv., Inc.*,
  665 F.3d 741 (6th Cir. 2012) ...............................................................39, 40, 41

*Boyd v. State Farm Ins.*,
  158 F.3d 326 (5th Cir. 1998) ..........................................................................37

*Braithwaite v. Timken Co.*,
  258 F.3d 488 (6th Cir. 2001) ..........................................................................36

*Brooks v. Am. Broad. Cos., Inc.*,
  999 F.2d 167 (6th Cir. 1993) ..........................................................................23

*Cicero v. Borg-Warner Auto., Inc.*,
  280 F.3d 579 (6th Cir. 2012) ..........................................................................25

*Clark Cnty. Sch. Dist. v. Breeden*,
  532 U.S. 268 (2001) (per curiam).....................................................................18

*Ercegovich v. Goodyear Tire & Rubber Co.*,
  154 F.3d 344 (6th Cir. 1998) ..........................................................................41

*Gecewicz v. Henry Ford Macomb Hosp. Corp.*,
  683 F.3d 316 (6th Cir. 2012) ..........................................................................31

*Gordon v. Traverse City Area Pub. Schs.*,
  686 F. App'x 315 (6th Cir. 2017).....................................................................15

*Halsey v. AGCO Corp.*,
  755 F. App'x 524 (6th Cir. 2018).....................................................................38

*Hardesty v. Kroger Co.*,
758 F. App'x 490 (6th Cir. 2019) ........................................................................24

*Hartsel v. Keys*,
87 F.3d 795 (6th Cir. 1984) ...............................................................................33

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005)......................................................................................15, 16

*Johnson v. Manitowoc Boom Trucks, Inc.*,
484 F.3d 426 (6th Cir. 2007) .............................................................................37

*Johnson v. Ohio Dep't of Pub. Safety*,
942 F.3d 329 (6th Cir. 2019) .............................................................................35

*Jordan v. Kohl's Dep't Stores*, *Inc.*,
490 F. App'x 738 (6th Cir. 2012)......................................................................23

*Kenney v. Aspen Techs., Inc.*,
965 F.3d 443 (6th Cir. 2020) .............................................................................17

*Kinney v. McDonough*,
6th Cir. No. 21-1414, 2022 U.S. App. LEXIS 2635 (Jan. 26, 2022) .................17

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)...........................................................................................36

*Louzon v. Ford Motor Co.*,
718 F.3d 556 (6th Cir. 2013) .............................................................................35

*Manzer v. Diamond Shamrock Chems. Co.*,
29 F.3d 1078 (6th Cir. 1994) .................................................................25, 26, 34

*McKinley v. City of Mansfield*,
404 F.3d 418 (6th Cir. 2005) .............................................................................43

*McMillan v. Castro*,
405 F.3d 405 (6th Cir. 2005) .............................................................................35

*Miles v. S. Cent. Hum. Res. Agency, Inc.*,
946 F.3d 883 (6th Cir. 2020) .................................................................23, 39, 40

iv

*Montell v. Diversified Clinical Servs., Inc.*,
   757 F.3d 497 (6th Cir. 2014) .................................................................17, 18, 27

*Nelson v. Christian Bros. Univ.*,
   226 F. App'x 448 (6th Cir. 2007) ......................................................................27

*Nelson v. Tennessee Gas Pipeline Co.*,
   243 F.3d 244 (6th Cir. 2001) ............................................................................36

*Pelcha v. MW Bancorp, Inc.*,
   988 F.3d 318 (6th Cir. 2021) ............................................................................24

*Savage v. Gee*,
   665 F.3d 732 (6th Cir. 2012) ............................................................................14

*Seay v. TVA*,
   339 F.3d 454 (6th Cir. 2003) ............................................................................35

*Seeger v. Cincinnati Bell Tel. Co.*,
   681 F.3d 274 (6th Cir. 2012) ............................................................................23

*Sims v. Cleland*,
   813 F.2d 790 (6th Cir. 1987) ............................................................................22

*Smith v. Chrysler Corp.*,
   155 F.3d 799 (6th Cir. 1998) ......................................................................22, 23

*Smith v. Legget Wire Co.*,
   220 F.3d 752 (6th Cir. 2000) ............................................................................37

*Tingle v. Arbors at Hilliard*,
   692 F.3d 523 (6th Cir. 2012) ............................................................................21

*United States v. Rohner*,
   634 F. App'x 495 (6th Cir. 2015) ......................................................................14

*Wasek v. Arrow Energy Servs.*,
   682 F.3d 463 (6th Cir. 2012) ......................................................................16, 27

*Wexler v. White's Fine Furniture, Inc.*,
   317 F.3d 564 (6th Cir. 2003) ............................................................................21

*White v. Columbus Metro. Hous. Auth.*,
    429 F.3d 232 (6th Cir. 2005) .................................................................36

*Wright v. Murray Guard, Inc.*,
    455 F.3d 702 (6th Cir. 2006) .................................................................23

**Statutes**

20 U.S.C. § 1681 ......................................................................1, 14, 15

42 U.S.C. § 2000e, *et seq.*...........................................................1, 2

Ohio Adm. Code 3361:30-19-01(B) ....................................................28

**Other Authorities**

Fed. R. Civ. P. 26 ...........................................................................38, 43

Fed. R. Evid. 407 .................................................................................32

Fed. R. Evid. 702 ...........................................................................36, 37

## I.    STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee University of Cincinnati believes that oral argument is unnecessary. This is a straightforward case of employee insubordination that does not pose a complicated fact pattern. The briefs in this case will fully present the facts, issues, and arguments for the Court, and the University does not believe oral argument will add anything of benefit beyond what is in the briefs. If, however, the Court determines that oral argument is necessary in reaching a determination in this matter, the University stands ready to participate.

## II. STATEMENT OF ISSUES PRESENTED

The first issue on appeal is whether the District Court (McFarland, J.) properly granted summary judgment to the University of Cincinnati in connection with former employee Andrea Goldblum's claim of retaliation under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. (Order, R. 89, PageID 3638-52).

The remaining issues on appeal challenge the District Court's various discovery rulings. First, Goldblum asks the Court to consider whether the District Court abused its discretion in ruling she could not depose the University's President, Dr. Pinto, who was not the decisionmaker and had very limited, second-hand knowledge regarding Goldblum's insubordination and resulting resignation in lieu of termination. Next, she asks whether the District Court abused its discretion in limiting discovery regarding potential comparators to other employees at the University who, like Goldblum, held director-level positions. Finally, she asks this Court to consider whether the District Court abused its discretion in denying her request to defer consideration of the University's motion for summary judgment and allow her time to conduct the additional discovery described above.

Goldblum has not appealed the District Court's dismissal of the retaliation claim she brought under Title VII, 42 U.S.C. § 2000e, *et seq*. (Civil App. Statement, Doc. 5; App. Br., Doc. 16, p. 14; *see also* Order, R. 25, PageID 163-73).

## III.   STATEMENT OF THE CASE

### A.   Procedural History

After Goldblum was offered—and accepted—the opportunity to resign her position at the University of Cincinnati in lieu of termination, she brought this action alleging retaliation under Title VII and Title IX. (Compl., R. 1, PageID 1-20). The District Court (Dlott, J.) adopted a Report and Recommendation dismissing Goldblum's Title VII claim but allowing her to proceed on her Title IX claim. (Order, R. 25, PageID 163-73).

Thereafter, the parties engaged in extensive discovery, exchanging several thousands of pages of documents and conducting eleven depositions (ten taken by Goldblum, and one taken by the University). The Magistrate Judge held multiple discovery conferences to address Goldblum's various attempts at attaining additional, unfettered discovery. (*See, e.g.*, Order Overruling Pl.'s Objections to Mag. J.'s Order, R. 45, PageID 611 (referencing the Magistrate Judge's "active involvement" in resolving discovery disputes, "including telephone conferences, live conferences, and *in camera* review of materials")). Relevant to this appeal are two discovery rulings that were adopted by the District Court (McFarland, J.): (1) an order preventing Plaintiff from deposing the University's President, and (2) an order limiting discovery on potential comparators to the University employees who, like Goldblum, held a director-level position. (Order, R. 45, PageID 608-13; Order,

R. 79, PageID 3602-08).

Following the end of discovery, the University filed a Motion for Summary Judgment. (Def.'s Mot. Summ. J., R. 65, PageID 2380-2400). When briefing on that motion was nearly complete, Goldblum filed a motion pursuant to Fed. R. Civ. P. 56(d) asking the Court to defer summary judgment consideration and allow additional discovery. (Pl.'s Rule 56(d) Mot., R. 74, PageID 3286-91). In her motion, Goldblum claimed she needed to depose the University's President and obtain additional discovery on potential comparators. (*See id.*) The Court denied the motion, finding that it "has already addressed these issues exhaustively." (Order, R. 81, PageID 3614).

On March 28, 2022, the District Court granted summary judgment in favor of the University, concluding that "Goldblum fails to show that the University's reason for seeking her resignation was pretextual." (Order, R. 89, PageID 3652). This appeal followed. (Pl.'s Notice Appeal, R. 91, PageID 3654).

B.    **Summary of the Relevant Facts**

The University hired Goldblum as the Executive Director, Gender Equity & Inclusion ("Title IX Coordinator") in June 2018. (Marshall Dep., R. 55 at PageID 1182; Dep. Exs., R. 54-1 at PageID 1101; Pl.'s Resp. Proposed Undisputed Facts, R. 73-1 at PageID 3247, ¶9). Goldblum's responsibilities included day-to-day application and review of the University's policies and practices related to Title IX.

3

(Dep. Exs., R. 54-1 at PageID 950-51).

Dr. Bleuzette Marshall, the University's Vice President for Equity, Inclusion and Community Impact, was Goldblum's direct supervisor. (Goldblum Dep., R. 54 at PageID 747).

> **1. In early 2019, the University's College of Arts & Sciences published an online article profiling some of its graduating students who had received a "triumph cord."**

The University's College of Arts & Sciences ("College") gives "triumph cords" to students who have overcome an adversity in reaching graduation. (Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3252, ¶21). College faculty and staff members may send the name of a student they believe should receive a triumph cord to the College's administration. (*Id.* at ¶22). Students are not vetted before receiving these cords. (*Id.* at ¶24).

On January 23, 2019, the College published an online article (the "Article") profiling some of the graduating students who received a triumph cord. (*Id.* at ¶20; Dep. Exs., R. 54-1 at PageID 973-84). One of the students featured (the "Student") had attended six colleges over five and a half years. (Dep. Exs., R. 54-1 at PageID 973-84).

The Article received hundreds of Facebook posts. (Dep. Exs., R. 66-1 at PageID 2499-2519). Many posts were "venting and sharing their frustrations" and "upset about [the Student] being recognized." (Marshall Dep., R. 55, PageID 1212).

4

One post linked to a news article stating that Bowling Green State University had suspended the Student for two years stemming from a conviction for gross sexual imposition. (Dep. Exs., R. 66-1 at PageID 2499-2519; *see also generally* Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3253, ¶¶29-30). The College was not aware of this information at the time the Student was given the triumph cord. (Holstrom Dep., R. 57 at PageID 1788-91).

The College's Senior Assistant Dean, Lisa Holstrom, learned about the Facebook posts on February 6, 2019. She told her supervisor, the Dean of the College, Ken Petren, and the University's Executive Director of Public Relations, M.B. Reilly. (Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3256, ¶¶44, 45, 47).

**2. Goldblum became aware of the Article and sent a letter about the Student and the Article to the editor of the student newspaper despite Marshall's directive to wait.**

On Friday, February 8, 2019, Morgan Shaw, a member of Goldblum's staff, made Goldblum aware of the Article and Facebook posts. (*Id.* at ¶48; Dep. Exs., R. 54-1 at PageID 1008). Goldblum contacted Reilly and asked her to look at the posts. On February 11, Goldblum spoke with Reilly and indicated Reilly might receive questions about the Student's admission, that the University should offer resources, and let people know their options. (Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3257-58, ¶¶49-50, 55). Reilly suggested Goldblum contact the appropriate University offices for more information. (*Id.* at ¶55).

5

Marshall then learned about the Article and Facebook posts the evening of Monday, February 11, after Goldblum called her. (Marshall Dep., R. 55, PageID 1212-13). Marshall assumed the Student had entered the University prior to her attaining supervisory responsibilities over the Gender, Equity & Inclusion office, so she directed Goldblum to speak with the Vice President for Student Affairs, Debra Merchant, for information. (*Id.* at PageID 1216).

The very next day, February 12, Goldblum informed Reilly, that she wanted to contact the University's student newspaper about the Student and Article. (Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3260, ¶68). Reilly advised Goldblum to contact Marshall first. (*Id.* at PageID 3260-61, ¶69).

Goldblum contacted Marshall and informed her that she wanted to send a letter to the editor of the student newspaper addressing the Student and the Article. (*Id.* at PageID 3261, ¶72). Marshall asked for a copy of the proposed letter, which Goldblum sent at 11:59 a.m. that day. (Dep. Exs., R. 54-1 at PageID 1020; Marshall Decl. Ex., R. 64-1 at PageID 2305-06). Marshall indicated she would need to speak with colleagues to see what was happening and directed Goldblum not to send anything to the newspaper until Marshall finished having conversations with colleagues. (Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3262, ¶77).

After her conversation with Goldblum, Marshall learned Petren was going to provide a response. (Marshall Dep., R. 55 at PageID 1244, 1255; Pl.'s Resp.

Undisputed Facts, R. 73-1 at PageID 3262, ¶78). Petren wanted to provide a response on behalf of the College to show support to his students. (Petren Dep., R. 58 at PageID 1924; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3262, ¶79). Marshall shared this information with Goldblum that same day, February 12. (Dep. Exs., R. 66-1 at PageID 2661; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3262, ¶80).

Marshall then reviewed Goldblum's proposed newspaper letter again, asking Goldblum questions about the problematic portions of the letter, such as it: (1) identified the Student by name; (2) was written in the collective when Goldblum was not tasked with issuing messages on behalf of the entire University; (3) included the representation "[w]e are looking into various processes at work so that we can improve them," but when asked what that meant, Goldblum did not have an answer; and (4) stated "We must do better. We will do better," but when asked what that meant, Goldblum did not have an answer. (Marshall Dep., R. 55 at PageID 1246).

Marshall shared with Goldblum that "before we issue any University communications, we typically develop a FAQ, because once we put something out, folks will generally have more questions. And so we have to go through and have all of the potential questions already set up and answered so that members will have as much information as possible." (*Id.* at 1246-47).[1] Goldblum's letter did not have

---

[1]    Karla Phillips, the Interim Title IX Coordinator prior to Goldblum, agreed that Goldblum's letter was problematic and not an appropriate statement to make on behalf of the entire University. (Phillips Dep., R. 61 at PageID 2201).

that, and she could not speak to it. (*Id.*)

Marshall told Goldblum she would continue conversations with colleagues about the University's response and to hold off sending anything, but that she would follow up with Goldblum either way. (*Id.* at PageID 1257; Dep. Exs., R. 66-1 at PageID 2661).

At 4:36 P.M., Goldblum emailed a draft of her letter to Reilly. (Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3264, ¶85). It read as follows:

> Dear Editor:
>
> I am writing in response to the feedback and concerns expressed by members of our community regarding the award to and article about [the Student]. I understand that members of our community are being impacted by this situation and are hurting. <u>Please be assured that I hear you</u>. We are looking into various processes at work so that we can improve them. In the meantime, we have resources on campus for your support. . . . We must do better; we *will* do better, continuing to work to make the environment safe and equitable. Please don't give up on us, as we are not giving up on you. We are here and we hear you.

(Dep. Exs., R. 66-1, PageID 2533-34).

Reilly did not review the letter. Instead, she forwarded it to Marshall, assuming Marshall had given Goldblum permission to send the letter. (Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3264, ¶86; Dep. Exs., R. 66-1, PageID 2533-34).

At 4:49 p.m., still February 12, Petren emailed Reilly and others, telling them he would be modifying the Article and posting an editorial note about the reasons

for the modification.  (Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3264, ¶87).

At 5:08 p.m., just hours after their conversation and receiving Marshall's instruction to wait, Goldblum sent Marshall the following text message: "***Bleu: I am going to send in the letter to the editor. If there are any repercussions, I will accept them. I want to be done and go home.***" (Marshall Decl. Ex., R. 64-1 at PageID 2302; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3264, ¶88). Marshall responded, "***I'm on a call regarding the matter. Please do not send.***" (Marshall Decl. Ex., R. 64-1 at PageID 2302; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3264, ¶89).

By 5:26 p.m., Goldblum sent the letter to the student newspaper against Marshall's directive. (Dep. Exs., R. 54-1 at PageID 1022; *see also* Goldblum Dep., R. 54 at PageID 807).

Once Marshall ended her call, she called Goldblum and asked if she had sent the letter, to which Goldblum replied "yes" and that she did not regret it. (Marshall Dep., R. 55 at PageID 1251; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3264, ¶91). Marshall expressed her disappointment and explained to her, "You can't get ahead of our colleagues. There was already a process in place. We can't insert ourselves into the system or into a process." (*Id.*)

At 5:40 p.m., Petren sent Goldblum his statement regarding the Article and

informed her that the Student's portion of the Article would be removed.[2] (Dep. Exs., R. 54-1 at PageID 1028-29).

Goldblum then contacted Marshall to discuss Petren's statement, and Marshall directed her to work with Petren directly. (Marshall Dep., R. 55 at PageID 1234; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3265, ¶93). Goldblum emailed Petren, but by that time, his statement had been posted. (Dep. Exs., R. 54-1 at PageID 1026-27; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3265, ¶¶94, 96). Goldblum did not contact Petren again or ask that his response be revised. (Goldblum Dep., R. 54 at PageID 824; Petren Dep., R. 58 at PageID 1923).

### 3. After ignoring Marshall's directive, Goldblum again defied Marshall's instructions by sending a slightly revised version of the letter to the student newspaper the very next day.

At 7:27 a.m. on February 13, Goldblum sent a second email to the student newspaper, this time asking that it disregard her letter from the day before and, instead, use the attached new version. (Dep. Exs., R. 54-1 at PageID 1023-24; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3265, ¶98). The new version was similar to the first letter, except that it referenced the Title IX office. (*Id.*) Goldblum did not

---

[2]    Sometime later, the College met with student leadership and held a town hall with students to discuss their concerns about the Article and triumph cord. (Petren Dep., R. 58 at PageID 1930-39; Holstrom Dep., R. 57 at PageID 1832-34).

inform Marshall of this revised letter.[3]

**4. After meeting with Human Resources about Goldblum's insubordination and further investigating Goldblum's actions, Marshall decided to give Goldblum the option to resign in lieu of termination.**

Marshall first contacted Human Resources ("HR") regarding Goldblum's insubordination on February 13. (Marshall Dep., R. 55 at PageID 1270; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3266, ¶108). Marshall then met with HR on February 21 to discuss discipline options. (Marshall Dep., R. 55 at PageID 1283-84; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3266, ¶108).

After meeting with HR, Marshall spoke with colleagues to gain more insight into Goldblum's demeanor around the time she sent the letter. (Marshall Dep., R. 55 at PageID 1274, 1281). One of those individuals was Goldblum's direct report, Morgan Shaw. Shaw revealed that Goldblum was very upset the day after sending the letter, was crying a lot, convened the entire staff to discuss the matter multiple times, and shared with staff that Marshall had told her to wait to send the letter, but she sent it anyway. (*Id.* at PageID 1281-83; Shaw Dep., R. 56 at PageID 1729-33). Shaw also shared that, in general, Goldblum would often interrupt the staff's work for one to two hours at a time to just talk, she was delayed in assigning incident

---

[3]     After resigning, Goldblum told Marshall she sent the revised letter. (Marshall Decl. Ex., R. 64-1 at PageID 2303-04).

reports, and she would often make personal attacks against a colleague to staff. (Shaw Dep., R. 56 at PageID 1614-15, 1650-51, 1704, 1733-35).

Marshall also met with Goldblum, who remained steadfast that the University should have responded differently to the Article. (Marshall Dep., R. 55 at PageID 1287-89; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3266, ¶109). Marshall reiterated the need to work as a team and in a coordinated fashion, and that she was still dealing with the matter. (*Id.*)

The feedback Marshall received regarding Goldblum's actions relating to her insubordination, as well as her performance, solidified Marshall's decision to give Goldblum the chance to resign in lieu of termination for violating the University's conduct policy, which prohibits insubordination and deviations from standard and acceptable behavior. Specifically, Goldblum violated sections 3(c) and 3(ff) of HR Conduct Policy 15.02. Section 3(c) specifies insubordination as one such violation, defining "insubordination" as "refusal of an employee to follow instructions or to perform designated work where such instructions or work normally and properly are required of an employee." (Dep. Exs., R. 66-1, PageID 2428). Section 3(ff) includes "[a]ny other deviation from standard and acceptable behavior." (*Id.* at PageID 2430). Moreover, section 2 of the conduct policy provides: "For conduct and rule violations disciplinary action up to and including immediate termination may occur." (*Id.* at PageID 2428).

Marshall conveyed her decision to HR on February 27, 2019. (Marshall Dep., R. 55 at PageID 1168-73, 1291-92; Dep. Exs., R. 66-1 at PageID 2568). On March 15, 2019, Marshall met with Goldblum to let her know that Goldblum's employment was ending, but also to give her the opportunity to resign. (Marshall Dep., R. 55 at PageID 1294-95). Goldblum chose to resign in lieu of termination. (Dep. Exs., R. 54-1 at PageID 1035-36).

## IV.    SUMMARY OF THE ARGUMENT

Goldblum raises two issues in her appeal. One procedural—aimed at certain of the District Court's discovery orders—and one substantive—seeking reversal of summary judgment in the University's favor.

Substantively, this is a straightforward case of employee insubordination. Indeed, Goldblum *admits* she violated a direct order from her supervisor. That violation, not any illegal retaliatory motive, ended Goldblum's employment at the University, full stop. Consequently, the District Court correctly granted the University summary judgment on Goldblum's Title IX retaliation claim.

Procedurally, the District Court properly exercised its broad discretion to manage discovery. First, Goldblum sought University records on *every* employee disciplined for insubordination, without meaningful limitation; the District Court therefore properly placed appropriate limitations on discovery regarding potential comparators. Second, the District Court properly granted a protective order

preventing the University President's deposition—the President was not the decisionmaker and had *very* limited, second-hand knowledge regarding Goldblum's insubordination and resulting resignation in lieu of termination. These two issues formed the basis of Goldblum's Rule 56(d) motion, which was properly denied given the District Court's previously exhaustive review of the issues.

## V.    LAW AND ARGUMENT

### A.    Standard of Review

This Court reviews the grant of summary judgment *de novo*. *Savage v. Gee*, 665 F.3d 732, 737 (6th Cir. 2012).

This Court reviews "orders that limit or deny discovery…for abuse of discretion." *United States v. Rohner*, 634 F. App'x 495, 502 (6th Cir. 2015). An abuse of discretion "occurs when (1) the district court's decision is based on an erroneous conclusion of law, (2) the district court's findings are clearly erroneous, or (3) the district court's decision is clearly unreasonable, arbitrary or fanciful." *Beil v. Lakewood Eng'g and Mfg. Co.*, 15 F.3d 546, 551 (6th Cir. 1994).

### B.    Goldblum's Title IX claim fails as a matter of law.

The only remaining claim is Goldblum's retaliation claim arising under Title IX, 20 U.S.C. § 1681. Title IX prohibits sex discrimination by recipients of federal education funding. The statute provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). "Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).

Because Goldblum relies on indirect evidence of retaliation, the familiar *McDonnell-Douglas* burden-shifting framework applies. *Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 319-320 (6th Cir. 2017). To establish a *prima facie* case of Title IX retaliation, Goldblum must show that: (1) she engaged in a protected activity; (2) the University knew of her protected activity; (3) the University took an adverse action against her; and (4) there was a causal connection between the two. *Id.* The University may rebut a *prima facie* case by articulating a legitimate, nonretaliatory reason for its action. When the University does so, the burden shifts back to Goldblum to show that the University's proffered reason is pretextual. *Id.*

### 1. Goldblum has not set forth a *prima facie* case.

The protected activity that forms the basis of a Title IX retaliation claim is "complain[ing] of sex discrimination." *Jackson*, 544 U.S. at 184.

According to Goldblum, sometime between February 11 and February 13, 2019, she "communicated" to Marshall her concerns about the Facebook posts and

"systemic issues related to the admissions process for convicted sex offenders." (App. Br., Doc. 16 at p. 33). Most notably, Goldblum does not say she also complained of sex discrimination when she "communicated" with Marshall.

Moreover, Goldblum does not claim that her February 12 letter to the University's student newspaper was a protected activity. Indeed, Goldblum's letter to the student newspaper is not protected activity because it is not "complaining of sex discrimination." (*See* Dep. Exs., R. 54-1 at PageID 1022). In the letter, Goldblum used only vague language indicating that the University was "looking into various processes at work so that [the University] can improve them." (*Id.*) But when she was asked what that meant, not even Goldblum knew. (Marshall Dep., R. 55 at PageID 1246).

Even assuming Goldblum's "communication" with Marshall, or the letter, is protected activity, Goldblum must prove that Marshall pursued her resignation because Goldblum *complained of sex discrimination*. *Jackson*, 544 U.S. at 184. Marshall sought Goldblum's resignation because of Goldblum's *insubordination*, i.e. defying a direct order to *wait*[4] to send her letter to the student newspaper. This alone severs any causal connection. *See Wasek v. Arrow Energy Servs.*, 682 F.3d

---

[4]     There is no evidence that Marshall was intending to prohibit Goldblum from ever sending a communication.  Marshall merely asked Goldblum to wait until the matter could be fully discussed with colleagues. Moreover, the letter needed more work given Goldblum struggled explaining what its contents meant and the fact that she called the Student out by name. (Marshall Dep., R. 55 at PageID 1246).

463, 472 (6th Cir. 2012) ("an intervening legitimate reason to discipline" an employee can sever a causal connection).

In response, Goldblum claims temporal proximity alone establishes causation. (App. Br., Doc. 16 at p. 33-34). However, this Court has explained that "[t]emporal proximity alone generally is not sufficient to establish causation," and "[e]xceptions to this rule are 'rare,' even in instances involving relatively short time periods." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 449 (6th Cir. 2020); *see also Kinney v. McDonough*, 6th Cir. No. 21-1414, 2022 U.S. App. LEXIS 2635, at *20 (Jan. 26, 2022).

Goldblum's "temporal proximity" label alone is not sufficient to establish causation especially considering she omits relevant context. Notably, what Goldblum knew at the time. Recall that Goldblum defied her supervisor's direct order on February 12 when she sent her letter to the student newspaper, and, at the same time, admitted she would accept the consequences. (Goldblum Dep., R. 54 at PageID 802-04, 807-08; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3264, ¶¶88-91). In other words, knowing there would be consequences for her defiant act, Goldblum saw the "proverbial writing on the wall[.]" *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014). Indeed, Marshall contacted HR the very next day to discuss Goldblum's insubordination. (Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3266, ¶108). And that same day, Goldblum opened her

investigation file on "systemic issues," which she now claims amounts to protected activity. (Goldblum Aff., R. 69-1, PageID 2702). Goldblum should not be able to use the timing of her supposed protected activity to insulate herself from an adverse employment action caused by her insubordination. *See Montell*, 757 F.3d at 507; *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam).

Nevertheless, if this Court assumes that Goldblum could establish a *prima facie* case of Title IX retaliation, the University is still entitled to summary judgment. Goldblum cannot prove the remaining parts of the *McDonnell Douglas* analysis because: (1) the University presented legitimate, non-retaliatory reasons for its actions, and (2) Goldblum has not presented evidence of pretext.

### 2. The University's legitimate, non-retaliatory reasons for seeking Goldblum's resignation: insubordination and unacceptable behavior.

The University articulated two legitimate, non-retaliatory reasons for seeking Goldblum's resignation: Goldblum's violation of sections 3(c) and 3(ff) of the University's conduct policy, respectively, insubordination and deviations from standard and acceptable behavior.

*Insubordination*. The March 15 letter Goldblum received explains that, on February 12, 2019, she "violated a direct order" from Marshall "to refrain from taking certain actions" until Marshall was able to "confer with colleagues on a preferred direction." (Marshall Decl. Ex., R. 64-1 at PageID 2307). It goes on to say

18

that Goldblum "chose to act on [her] own accord by moving forward despite [Marshall's] directive," that she indicated she would accept the repercussions, and that she "communicated [her] defiance" of Marshall's directive to other University employees. (*Id.*) In short, her conduct was "insubordinate." (*Id.*)

The letter finds support in both the evidence of record and the provisions of the University's conduct policy.

Marshall spent a substantial amount of time on February 12 discussing with other University staff what the official response to the Article controversy would be. She kept Goldblum apprised of these conversations because she knew Goldblum wanted to address the situation too. But she asked her to *wait* as she discussed the problem with other decision-making colleagues. Instead of waiting, Goldblum held Marshall—her own supervisor—to a "deadline" of her own making, feeling she "needed to do [her] duty" and because it "had already been delayed a week." (Goldblum Dep., R. 54, PageID 808-09). When Goldblum pressed Marshall again through a text message, Marshall responded in no uncertain terms: "I'm on a call regarding the matter. ***Please do not send***." (Marshall Decl. Ex., R. 64-1 at PageID 2302; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3264, ¶89). Goldblum sent the letter anyway. And the next morning, after time to reflect on the propriety of sending the letter, she again decided to act in contradiction to her supervisor and sent a revised version. (Order, R. 89 at PageID 3647).

19

These events fall under the conduct policy's definition of "insubordination." Under the policy, an employee is insubordinate if she refuses to follow instructions when such instructions "normally and properly are required" of her. (Dep. Exs., R. 66-1 at PageID 2428). Insubordination constitutes a violation under the policy, and violations may result in "disciplinary action up to and including *immediate* termination[.]" (*Id.* (emphasis added)). Goldblum does not contest that Marshall was her supervisor. Nor does she deny that she refused to follow her supervisor's instructions. Those instructions simply asked her to wait on sending a letter that would speak on behalf of the University, while Marshall made her way through the normal process of working through the issue with her colleagues. Such a directive was normal and proper under these circumstances. Accordingly, the basis for seeking Goldblum's resignation—her insubordination—was legitimate and non-retaliatory. (Order, R. 89 at PageID 3647-48).

*Unacceptable behavior.* The March 15 letter Goldblum received explains that Marshall became aware of behavior that "demonstrates a lack of good judgment and leadership" by Goldblum. (Marshall Decl. Ex., R. 64-1 at PageID 2307). That included, for example, Goldblum communicating her defiance of Marshall's directive to others at the University, including Goldblum's direct reports.[5] (*Id.*)

---

[5]     In a subsequent meeting with Goldblum regarding her insubordination, she also continued to maintain her position on the matter, in complete disregard to the

Goldblum also often interrupted the Title IX office's work for one to two hours at a time to just talk, she was delayed in assigning incident reports, and she would often make personal attacks against a colleague to staff. (Shaw Dep., R. 56 at PageID 1614-15, 1650-51, 1704, 1733-35). In short, her conduct deviated from standard and acceptable behavior.

The University's conduct policy prohibits deviations from standard and acceptable behavior. (Dep. Exs., R. 66-1 at PageID 2430). Such violations may result in "disciplinary action up to and including *immediate* termination[.]" (*Id.* at PageID 2428 (emphasis added)). Accordingly, this additional basis for seeking Goldblum's resignation was legitimate and non-retaliatory.

### 3. Goldblum cannot show that the University's decision was pretext for retaliation.

The fundamental question in the pretext analysis is this: Did the employer make the adverse employment decision for the stated reason or not? *Tingle v. Arbors at Hilliard,* 692 F.3d 523, 530 (6th Cir. 2012). Plaintiffs often attempt to refute an employer's proffered legitimate reason by showing that the stated reason (1) has no basis in fact, (2) did not actually motivate the challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 576 (6th Cir. 2003).

---

conduct policy. (Marshall Dep., R. 55 at PageID 1287-89; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3266, ¶109).

The University articulated two reasons for seeking Goldblum's resignation (her insubordination and her unacceptable behavior). However, this Court can limit its pretext analysis to the events of February 12 and Goldblum's insubordination, as they are dispositive. *Smith v. Chrysler Corp.,* 155 F.3d 799, 809 (6th Cir. 1998); *Sims v. Cleland,* 813 F.2d 790, 793 (6th Cir. 1987). The Sixth Circuit has held that when an employer offers more than one independent legitimate, non-retaliatory reason for an adverse employment action, even if one is found to be pretextual but at least one other is not, the defendant employer is still entitled to summary judgment.[6] *Id.*

Goldblum cannot establish that her *admitted* insubordination was a pretext for retaliation.

### a. Marshall's reasons for seeking Goldblum's resignation are based in fact and well-supported by the record.

Goldblum cannot show that her admitted insubordination lacked a basis in fact, that is, the thing that the University said happened did not actually

---

[6]     The University and Marshall have consistently cited Goldblum's insubordination and deviations from standard and acceptable behavior as the justifications for seeking Goldblum's resignation. *See infra* at p. 25. While Goldblum's deviations from standard and acceptable behavior are well supported by the record, the Court can readily affirm summary judgment based on Goldblum's undisputed insubordination. (*See* Marshall Dep., R. 55 at PageID 1172-73; Dep. Exs., R. 66-1 at PageID 2663; Shaw Dep., R. 56 at PageID 1685, 1688-89; 1704, 1712-13, 1718-19, 1722-23, 1729-35, 1739).

happen. *Miles v. S. Cent. Hum. Res. Agency, Inc.,* 946 F.3d 883, 888-89 (6th Cir. 2020). Again, Goldblum *admits* that she sent her letter to the student newspaper despite her supervisor's direct order to wait. (Goldblum Dep., R. 54 at PageID 802-04, 807-08, 815; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3264, ¶¶88-91).[7]

Shackled to her own admission, Goldblum does not contend that the University fabricated its reasons for seeking her resignation. Instead, she first argues that violating her supervisor's direct order occurred but was not misconduct. Goldblum's self-serving affidavit to this effect does not create an issue of fact for a jury. *Brooks v. Am. Broad. Cos., Inc.*, 999 F.2d 167, 172 (6th Cir. 1993). Whether

---

[7]    Additionally, with regard to unacceptable behavior, Goldblum's supervisor confirmed that Goldblum communicated the defiance of Dr. Marshall's order, disrupted the work of the Title IX office, was unprofessional, and delayed assigning Title IX reports to staff. (Marshall Dep., R. 55 at PageID 1172-73; Dep. Exs., R. 66-1 at PageID 2663; Shaw Dep., R. 56 at PageID 1685, 1688-89; 1704, 1712-13, 1718-19, 1722-23, 1729-35, 1739). Goldblum claims these events never happened because there is no contemporaneous document proving it. (App. Br., Doc. 16 at p. 49). However, Goldblum overlooks Marshall's contemporaneous notes. (Dep. Exs., R. 66-1 at PageID 2661-63). Those notes detail Marshall's meetings with colleagues to gain more insight into Goldblum's job performance. (*Id.*; Marshall Dep., R. 55 at PageID 1274, 1281). Goldblum has offered no evidence proving Marshall's decisional process "unworthy of credence." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006). Or that Marshall made an "error too obvious to be unintentional[.]" *Smith*, 155 F.3d at 807. Additionally, Sixth Circuit cases instruct that Marshall's level of diligence suffices. *See, e.g., Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 740-41, 743 (6th Cir. 2012) (a single interview could satisfy the requirement that the investigation turn up particularized facts of misconduct). "That [Goldblum] or the court might have come to a different conclusion if they had conducted the investigation is immaterial." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 287 (6th Cir. 2012).

Goldblum, or anyone else, subjectively believes her letter to the student newspaper was appropriate, that does not disprove the fact that Goldblum defied a direct order from her supervisor to hold off on sending the letter. *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326-27 (6th Cir. 2021) ("a plaintiff must provide evidence that the employer's allegations never happened.").

Next, Goldblum makes the astonishing claim that the University's reasons lack a basis in fact because "[a] Title IX Coordinator [c]annot [b]e [i]nsubordinate." (App. Br., Doc. 16 at p. 37). She argues that the University's conduct policy does not apply to her because she should be free to act independently from her supervisor's directives. (*Id.*) Notably, she does not cite any authority for this far-reaching proposition. Nor does she cite any authority proving that her supervisor's directive to wait may have been illegal. (*Id.* at p. 38, n. 13).

Regardless, Goldblum's arguments in this regard do not prove that the conduct never happened. Again, she admits she sent the letter despite her supervisor's direct order otherwise. (Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3264, ¶¶88-91).

Essentially, Goldblum asks the Court to second-guess her supervisor's determination that Goldblum's violation of her direct order constitutes a conduct violation. However, a court does not sit as a "super-personnel department," second-guessing management decisions. *Hardesty v. Kroger Co.*, 758 F. App'x 490, 496

(6th Cir. 2019).

Lastly, Goldblum argues her misconduct never happened because her supervisor provided shifting justifications. (App. Br., Doc. 16 at p. 50). But that's not the case. A true shift in justifications happens when an employer provides materially different reasons at different stages of the litigation (i.e., one reason initially, adding more reasons in response to interrogatories, and yet more reasons at summary judgment). *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2012). The record does not reflect any change in Marshall's justification before or during this litigation. The justifications have always been insubordination and deviations from standard and acceptable behavior. (Marshall Dep., R. 55 at PageID 1168-73, 1270, 1272-73, 1280-82; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3266, ¶108–09; Dep. Exs., R. 66-1 at PageID 2655; Def.'s Mot. Summ. J., R. 65 at PageID 2396-97).

> **b. Goldblum has no admissible evidence to suggest her resignation was motivated by anything other than her own insubordination.**

As to the second method of demonstrating pretext—that the proffered reason did not actually motivate the employer's decision—Goldblum "admits the factual basis underlying the [University's] proffered explanation and further admits that such conduct *could* motivate dismissal." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Goldblum then, "attempts to indict the

credibility of [the University's] explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the [University]." *Id*.

Goldblum argues that "suspicious timing," coupled with two other circumstances, suggests that the University was illegally motivated, and not motivated by her insubordination. (App. Br., Doc. 16 at p. 40). The two other circumstances are (1) Goldblum had no discipline prior to her resignation, and (2) the University allegedly prevented Goldblum from investigating its process for admitting sex offenders. (*Id.* at p. 43, 44-47). Taken together, in Goldblum's view, the evidence permits an inference that she was terminated in part to prevent the disclosure of facts related to the Article controversy or what she characterizes as systemic issues related to the admission of sex offenders. As the District Court correctly noted, "The problem is that there is little to nothing, besides her own speculation, connecting this mostly post hoc material to the University's actual motivation." (Order, R. 89 at PageID 3650).

There is nothing suspicious about the timing here. Goldblum violated her supervisor's direct order on February 12. (Goldblum Dep., R. 54 at PageID 802-04, 807-08; Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3264, ¶¶88-91). Her supervisor contacted Human Resources the very next day to discuss Goldblum's violation. (Pl.'s Resp. Undisputed Facts, R. 73-1 at PageID 3264, ¶108). A few days

26

after that, her supervisor spoke with the chief Human Resources officer about taking action in response to Goldblum's conduct; then again with Human Resources to discuss discipline options; and a meeting with Goldblum herself where Marshall told her she was still dealing with what happened on February 12.

The record shows that Goldblum's conduct is what triggered Marshall's contact with Human Resources about what to do.[8] Indeed, nowhere amidst this sequence/timing did Marshall impede any alleged investigation by Goldblum into "systemic issues" or student admissions. In fact, Marshall didn't know of Goldblum's purported investigation or any investigation files. (Marshall Dep., R. 55 at PageID 1141-43, 1148-49, 1262). Nor was Marshall aware of any supposed shortcomings in the University's admissions process generally, or regarding the Student specifically. (Marshall Dep., R. 55 at PageID 1204-06, 1224).

---

[8]    Ostensibly, Goldblum believes that pretext lies anytime a supervisor considers disciplining an employee soon after the employee engages in misconduct and protected activity. That cannot be. Goldblum's proposed standard would permit an employee to freely engage in misconduct without fear of repercussion anytime she engages in protected activity. In any event, here, Goldblum did not engage in protected activity, but even if she had, this Court is not required to overlook the fact that she also violated the University's conduct policy at the same time. *Montell*, 757 F.3d at 507; *cf. Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 455 (6th Cir. 2007) (plaintiff "fails to perceive that it was not the *subject* of her Faculty Assembly presentation that elicited the adverse reaction from her peers, but the manner in which she chose to make her presentation"); *Wasek*, 682 F.3d at 472 (while close temporal proximity can support the causal element of a *prima facie* case of retaliation, "an intervening legitimate reason to discipline" an employee can dispel that inference).

That leaves Goldblum's argument that a first-time offense cannot motivate seeking termination. To the contrary, the University's misconduct policy permits first-time offense terminations. *See* Ohio Adm. Code 3361:30-19-01(B).

Goldblum references various other events that had nothing to do with Marshall and, thus, could not have motivated her decision to seek Goldblum's resignation. The events are: (1) One member of the University's admissions staff did not respond to Goldblum, (2) the University should have consulted public safety when admitting the Student and did not, (3) Goldblum's successor did not investigate the Student's admission and receipt of a triumph cord after Goldblum left, (4) another University employee created a supposedly fake investigation, and (5) Marshall has not taken steps to change the University's admission process. (App. Br., Doc. 16 at p. 44-47).

Because Goldblum's characterization of these events misstates evidence in the record, the University provides citations to the relevant portions of the record for the Court's benefit.

*Admissions staff responses*. There was just *one* inquiry, and the admissions staff responded to it, just not in the manner Goldblum wanted. Goldblum emailed Tamara Byland in Admissions, but Byland was not a University employee at the time the Student was admitted, so she forwarded the email to her superior, Caroline Miller. (Sealed Dep. Exs., R. 75 at PageID 3429). Miller looked into the matter,

28

communicated with others, and indicated to Byland that the matter was done. (*Id.*) Miller did not instruct Byland not to talk with Goldblum. Rather, her email stated it would be a good conversation to have with the Title IX office. (*Id.*) Byland simply forgot to respond to Goldblum's email before Goldblum's departure. (Byland Dep., R. 63 at PageID 2281-82). Notably, there is nothing in the record showing that Marshall was aware of Goldblum's inquiry or in communication with Byland or Miller about their response. (Marshall Dep., R. 55 at PageID 1224; Miller Dep., R. 62, *passim*; Byland Dep., R. 63 at PageID 2288).

*Public safety*. Goldblum claims "UC is supposed to consult with public safety officials before admitting convicted sex offenders, yet did not do so for [the Student] and, apparently, other applicants with similar background." (App. Br., Doc. 16 at p. 44). In support, Goldblum cites Caroline Miller's deposition testimony about the admissions process and one of the University's interrogatory responses. (*Id.*) This information only shows that a public safety official was not consulted before the Student's admission but says nothing about other applicants. Regardless, the University substantially complied with its process when admitting the Student. (Merchant Decl., R. 64-2 at PageID 2312). Specifically, the Student underwent a separate review process that required him to submit additional information and meet in-person with the Assistant Dean of Students. (Cummins Dep., R. 60 at PageID 2111-20; Sealed Dep. Exs., R. 75 at PageID 3353, 3426-28). The Student's

admission was then conditioned on monthly meetings with the Assistant Dean of Students. (Cummins Dep., R. 60 at PageID 2111-20). Soon after the Student's admission, a University public safety official met with the Student and his probation officer. (Sealed Dep. Exs., R. 75 at PageID 3363-65). The University's then-Title IX coordinator spoke with both the public safety official and the Admissions Office to obtain more information about the Student. (Phillips Dep., R. 61 at PageID 2181-84, 2188-94; Sealed Dep. Exs., R. 75 at PageID 3363-68). Importantly, there is no evidence that Marshall was aware of any supposed shortcomings in the Student's admissions process. (Marshall Dep., R. 55 at PageID 1204-06, 1224).

*Goldblum's successor*. Goldblum claims that "[t]he investigation by Goldblum was transferred to her successor (selected by Marshall) on the day she was terminated and closed a month later with no evidence of any work being conducted." (App. Br., Doc. 16 at p. 45). In support, she cites a Maxient file she created, which reveals very little information. Goldblum never deposed her successor and, as a result, there is no record evidence to support her inference that no investigation was conducted.[9] Even if there is no evidence of Goldblum's successor performing work on the file, that does not prove pretext. To make that leap

---

[9]    Interestingly, Goldblum claims she conducted an investigation, but the Maxient file reflects no evidence of her investigatory work product either. (Dep. Exs., R. 54-1 at PageID 1012; Pl's Resp. Undisputed Facts, R. 73-1 at PageID 3265-66, ¶101).

would require stacking unsupported inference upon unsupported inference (e.g. Marshall fired Goldblum (1) so she could appoint a successor, and (2) she told the successor not to investigate further, and (3) the successor shirked his Title IX duties to investigate).

*Another file*. Goldblum next claims the University "tried to cover-up matters by creating a fake investigation to be conducted by the person alleged to have been involved in the initial misconduct." (App. Br., R. 16 at p. 45). In support, she references another Maxient file. The person who created that file, Daniel Cummins, explained he created it at the direction of his superior, Debra Merchant. (Cummins Dep., R. 60 at PageID 2141). Cummins explained he created the file not for purposes of conducting or tracking an investigation but only to collect and make available to Merchant certain student records that she requested to review in connection with the Article. (*Id.* at 2141-45). Merchant confirmed this. (Merchant Decl., R. 64-2 at PageID 2312). Goldblum's "fake investigation" theory strains credulity. *See Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 323 (6th Cir. 2012) (in ruling on summary judgment, the Court "need not make assumptions that strain credulity"). In fact, Goldblum's own testimony contradicts her theory as she testified that Maxient is used for purposes beyond conducting investigations. (Goldblum Dep., R. 54 at PageID 771). Additionally, there is no evidence showing Marshall was aware of the existence of this other Maxient file or the circumstances

31

surrounding it. (Marshall Dep., R. 55 at PageID 1262).[10]

*Admissions process review.* Finally, Goldblum claims Marshall "buried" a review of the admissions process. (App. Br., Doc. 16 at p. 45). However, Marshall is not in charge of the admissions process. (Marshall Dep., R. 55 at PageID 1141). Besides, subsequent remedial measures are inadmissible. Fed. R. Evid. 407. And Goldblum overlooks a few obvious counterpoints. First, Marshall encouraged Goldblum to contact other University administrators with her questions. (Marshall Dep., R. 55 at PageID 1204-05, 1216). Second, Goldblum chose not to speak to

---

[10]      Goldblum alludes to another one of her conspiracy theories, stating that after she complained about the matter involving the Student and the Article "when Marshall sought out information about Goldblum's job performance to justify her termination, the *only* person she contacted was the daughter [Shaw] of the person Goldblum would have investigated." (App. Br., Doc 16 at p. 46, n. 22). Goldblum's attempt to attack Shaw's credibility must fail as the Court does not make credibility determinations at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Even if it did, what Goldblum asks requires stacking unsupported inference upon unsupported inference. To believe Goldblum, the Court would have to infer that Shaw knew (1) Goldblum was investigating the Article and/or the Student's admission, (2) her father (Cummins) was involved in the Student's admission, (3) her father purportedly violated Title IX by being involved in the Student's admission, (4) Goldblum's investigation of the student who had already graduated would reveal a Title IX violation, (5) Marshall intended to discipline Goldblum, (6) providing information to Marshall would result in Goldblum's termination, and (7) no one else would look into the Student's admission. Record material proves Shaw lacked knowledge of these events. (Shaw Dep., R. 56 at PageID 1626-27, 1660-61, 1700-02). Moreover, there is no evidence demonstrating Shaw spoke with her father about the Student or Goldblum, nor did Marshall discuss the Student or Goldblum with Shaw's father. (*Id.* at PageID 1660-61, 1700-02; Cummins Dep., R. 60 at PageID 2136-37; Marshall Dep., R. 55 at PageID 1206-08).

presumably key individuals such as students and individuals with firsthand knowledge of the Student's admission. (Goldblum Dep., R. 54 at PageID 838-41). And finally, if Marshall was trying to stop Goldblum from investigating, it belies logic that Marshall would keep Goldblum employed for more than one month, during which time Goldblum could continue investigating. If Goldblum was investigating, she stopped on her own initiative long before she resigned on March 15, 2019. There is no evidence in the record that Goldblum took any action on the matter after February 15. (Dep. Exs., R. 54-1 at PageID 1012, 1031-34; Pl's Resp. Undisputed Facts, R. 73-1 at PageID 3265-66, ¶101).

*Calling Marshall a liar*. Left with nothing else, in a final attempt to establish that her own misconduct did not motivate the University's decision, Goldblum claims that Marshall "lied to at least two people about the reasons for Goldblum's termination." (App. Br., Doc. 16 at PageID 51). She points to affidavits from two students who speculate Marshall lied to them about the reasons for Goldblum's departure. (*Id.*) The students' inadmissible speculation cannot rebut Marshall's testimony. *See Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1984) (conclusory statements, subjective beliefs, or intuition cannot defeat summary judgment). Marshall offered a reasonable explanation for her concise comments to the students—she found it inappropriate to discuss a University employee's employment matter with a student. (Marshall Dep., R. 55 at PageID 1305-06).

Informing the students that Goldblum would have been terminated had she not resigned would have defeated the purpose of providing Goldblum the opportunity to resign. Goldblum chose to resign to maintain appearances that she left on her own volition. (Goldblum Aff. Ex., R. 69-1 at PageID 2852-54). That is not a lie.

### c. Goldblum cannot show that her insubordination and misconduct were insufficient to motivate the University to seek her resignation.

Finally, Goldblum has not shown that her insubordination and other misconduct were insufficient to motivate the University's decision to seek her resignation. To establish pretext under the "insufficient to motivate" method, Goldblum may show that similarly-situated employees were not fired even though they engaged in substantially-similar conduct that the University contends motivated its discharge of Goldblum. *Manzer*, 29 F.3d at 1084. However, to show pretext in this way, "the comparison must be precise." *Ahad v. Wilkie*, 787 F. App'x 286, 289 (6th Cir. 2019). That is, the "individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct." *Id.*, quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

Goldblum identifies two employees who were not terminated after having been found insubordinate. (App. Br., Doc. 15 at p. 55-56). However, neither employee reported to the same supervisor as Goldblum, and Goldblum has no

explanation for why this relevant aspect should be ignored.[11] *See McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) (it is inappropriate to compare employees who are not subject to the same ultimate decisionmaker).

Importantly, neither employee engaged in misconduct that is substantially similar to Goldblum's misconduct. One, a professor and associate dean, received a written reprimand for taking University-owned equipment off campus and failing to return it after being asked to do so. (Dougherty Aff. Ex., R. 69-2 at PageID 2867). The other, a director of compensation, shared details about a confidential, personnel matter with a co-worker. (*Id.* at 2868-69). While both proposed comparators were insubordinate, their conduct was not of "comparable seriousness" to Goldblum's actions. *See Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) ("When it comes to comparable seriousness, it is the particular conduct of the [employees], not broad generalizations, that counts. Drawn at too high a level of generality, the 'comparable seriousness' test becomes meaningless").

Goldblum was not only insubordinate, she boasted to her staff about being insubordinate, disrupted the work of the Title IX office, made personal and

---

[11]    For example, this is not the case where a violation "does not occur frequently enough to invite such direct comparison within a compartmentalized organization." *Seay v. TVA*, 339 F.3d 454, 479-80 (6th Cir. 2003). Nor does this case present a situation where Marshall was "well-aware of the discipline meted out" to Goldblum's alleged comparators, *id.*, or where the University's management structure would make it virtually impossible to find a comparator, *Louzon v. Ford Motor Co.*, 718 F.3d 556, 564 (6th Cir. 2013).

unprofessional comments about a colleague to her staff, and delayed assigning Title IX reports. (Marshall Dep., R. 55 at PageID 1172-73; Dep. Exs., R. 66-1 at PageID 2663; Shaw Dep., R. 56 at PageID 1685, 1688-89; 1704, 1712-13, 1718-19, 1722-23, 1729-35, 1739; *see also Braithwaite v. Timken Co.*, 258 F.3d 488, 497 (6th Cir. 2001) (being accused of violating two work rules instead of one was sufficiently distinct to render alleged comparators not similarly situated to the plaintiff).

Unable to identify a proper comparator, Goldblum turns to the level of discipline received claiming she should have received nothing more than a written reprimand. But, as she correctly notes, the University's conduct policy permits *immediate termination* for insubordination. (App. Br., Doc. 16 at p. 52).

Goldblum's assertion that there was an expectation that she "would receive a written reprimand or be formally warned before termination" is not supported by any admissible evidence. *See also generally White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005) ("an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext"). She references only her supposed experts' opinion that no other institutions of higher education would have terminated her. But Goldblum has not shown that these opinions are admissible. *See* Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). And the District Court was not required to "tak[e] the expert's word for

it." *See* Advisory Committee Notes to 2000 Amendments to Rule 702; *Johnson v. Manitowoc Boom Trucks, Inc*., 484 F.3d 426, 431 (6th Cir. 2007). "For the purposes of summary judgment under Fed. R. Civ. P. 56(e), an expert affidavit must include materials on which the expert based his opinion, as well as an indication of the reasoning process underlying the opinion." *Boyd v. State Farm Ins.*, 158 F.3d 326, 331 (5th Cir. 1998).

Regardless, Goldblum is again asking this Court to substitute its judgment for that of management. Employers are entitled to some deference in business-making decisions and "it is inappropriate for the judiciary to substitute its judgment for that of management." *Smith v. Legget Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000). The District Court, therefore, properly declined to second guess the level of discipline imposed by the University.

For the foregoing reasons, the University respectfully requests that this Court affirm the District Court's grant of summary judgment.

### C.    The District Court did not abuse its discretion in placing reasonable limitations on discovery.

Goldblum contends that the District Court abused its discretion in managing discovery. In particular, Goldblum challenges two discovery rulings: (1) the order limiting discovery regarding potential comparators to other director-level employees; and (2) the order precluding her from deposing the University's

President. Goldblum also challenges the District Court's denial of her Rule 56(d) motion, seeking deferral of the District Court ruling on the summary judgment motion to allow her additional time to conduct discovery based on the aforementioned issues.

Goldblum's merit brief falls short of showing the District Court abused its discretion in its rulings. Instead, the District Court properly exercised its discretion to manage and place reasonable limitations on discovery in this single-claim employment matter.[12] *Halsey v. AGCO Corp.*, 755 F. App'x 524, 529-530 (6th Cir. 2018) (because district courts "'have broad discretion and inherent power' to manage discovery, 'we will intervene only if the decision was an abuse of discretion resulting in substantial prejudice'").

---

[12]    Goldblum claims that she should have been permitted additional discovery given the "scope of permissible discovery, in general, is broad." (Goldblum's App. Br., Doc. 16 at p. 58). Each case Goldblum cites in this regard pre-dates the 2015 amendments to the Civil Rules. (*Id.* at p. 58-59). Amended Rule 26(b) brings an end to the days of nearly unlimited discovery and "encourage[s] judges to be more aggressive in identifying and discouraging discovery overuse." Fed. R. Civ. P. 26, Advisory Committee Notes to the 2015 Amendment. "The court's responsibility, using all the information provided by the parties, is to consider these and all other factors in reaching a case-specific determination of the appropriate scope of discovery." (*Id.*) That is exactly what the District Court did throughout its active involvement in the discovery phase of this litigation. (*See* Order, R. 36; Order, R. 41; Order, R. 45; Order, R. 49; Order, R. 79; Order, R. 80).

**1. Goldblum was permitted to conduct discovery regarding potential comparators in a manner consistent with this Court's precedent.**

Goldblum first claims the District Court abused its discretion in limiting discovery regarding potential comparators to other University employees who, like Goldblum, held director-level positions.[13] Rather than an abuse of discretion, this limitation is appropriate and consistent with this Court's precedent. *See Miles v. S. Cent. Human Res. Agency*, 946 F.3d 883, 894 (6th Cir. 2020); *Ahad,* 787 F. App'x at 289; *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741 (6th Cir. 2012).

Contrary to Goldblum's assertion, the District Court's rulings regarding potential comparators do not run afoul of the principles set forth in *Bobo*. *Bobo* reviewed a trial court's denial of a motion to compel "discovery on a small number of specific individuals outside [the plaintiff's] protected categories" whom plaintiff alleged engaged in acts of comparable seriousness. *Bobo*, 665 F.3d at 753. This Court reversed, effectively finding that the plaintiff was entitled to discovery regarding "the seven persons [plaintiff] claimed violated the policy yet were retained by the same high-level managers[.]" *Id.* This Court explained that in identifying proper potential comparators, a plaintiff must at least show that the proposed

---

[13]    During discovery, Goldblum sought information related to "every University of Cincinnati employee" who received corrective action for violating the same University conduct policy provisions as Goldblum between "March 15, 2014 through March 15, 2019." (*See* Ex. 5 to Pl.'s Obj. Mag. Order, R. 44-5, at PageID 600; Ex. 6 to Pl.'s Obj. Mag. Order, R. 44-6, at PageID 605).

comparators "were *similar in all relevant respects* … [and] engaged in acts of comparable seriousness," which the Court found the plaintiff in *Bobo* had done. *Id.* at 751 (emphasis added).

Here, the unfettered discovery sought by Goldblum is a far cry from the limited discovery sought by the plaintiff in *Bobo.* Rather than identifying a narrow group of similarly-situated employees like the plaintiff in *Bobo*, Goldblum sought discovery across the *entire* University irrespective of the particular characteristics of each employee. That is, Goldblum sought information and records across approximately 15,000 employees regardless of the employee's job duties or the circumstances and conditions of the individual's employment.[14] (*See* Ex. 5 to Pl.'s Obj. Mag. Order, R. 44-5, at PageID 600; Ex. 6 to Pl.'s Obj. Mag. Order, R. 44-6, at PageID 605). Because Goldblum was non-union, did not have an employment contract, and was a director-level employee, she cannot properly be compared to unionized employees, employees with a contract, or employees in lower-level positions. *See Miles*, 946 F.3d at 894 ("[i]t cannot be said that conduct that might be

---

[14] Goldblum claims the University failed to establish that the burden or expense of the proposed discovery outweighed its likely benefit because it "did not provide any evidence in the record of this burden." (App. Br., Doc. 16 at p. 61). To the extent the District Court contemplated the burden Goldbum's requests would place on the University in issuing the orders, the court relied on information the parties submitted prior to the discovery conference, as well as information discussed during the in-chambers conference. This included discussions regarding the burden of manually collecting personnel files for 15,000 employees, which are not housed in one centralized filing system.

tolerated or treated with progressive discipline at lower ranks must be similarly accepted from the [highest employee's] advisors, who are held to a higher level of professionalism and who are expected to set the standard of conduct for the [employer]"); *Ercegovich*, 154 F.3d at 352.

The District Court did not abuse its discretion by properly narrowing the scope of Goldblum's discovery requests regarding potential comparators to comport with this Court's guidance in *Bobo*.

### 2. The District Court did not commit an abuse of discretion by issuing a protective order precluding Goldblum from deposing the University's President.

Next, Goldblum claims that she should have been permitted to depose the University's President. Following a discovery conference and briefing on the issue, the District Court granted the University a protective order because of the President's limited knowledge of the issues in dispute. (Order, R. 45, PageID 608-13). The District Court did not abuse its discretion in granting this protective order.

The record shows that the President's knowledge was second-hand. The President received two updates provided to him by Marshall. One on February 12 and a second after Marshall decided to offer Goldblum the opportunity to resign. (Marshall Dep., R. 55 at PageID 1244-45, 1254-55, 1298-99, 1309-10).

Importantly, the President was not the decisionmaker, and there is no evidence that he influenced Marshall's decision in any way. (*Id.*) In fact, the President told

Marshall that the termination of Goldblum was "[Dr. Marshall's] decision to make." (*Id*. at PageID 1299). Because the President had delegated all decision-making authority to Marshall, the District Court did not abuse its discretion in finding that the President's involvement with the matter was minimal.

Goldblum points to two additional pieces of testimony that she claims supports her appeal. First, Goldblum claims she is entitled to the President's deposition because "Marshall testified that she had discussed the letter Goldblum wished to send to the student newspaper with [the President]." (App. Br., Doc 16 at p. 62-62). Actually, Marshall testified she did not discuss the letter with the President. (Marshall Dep., R. 55 at PageID 1254). Instead, Marshall merely referenced the letter, and there was no indication that the President ever saw or read the letter. (*Id.* at PageID 1254-1255). In any event, a reference to the letter does not lead to the conclusion that the President has discoverable knowledge regarding Goldblum's termination beyond what Marshall has already testified to.

Lastly, Goldblum asserts that "Marshall had indicated that [the President] was aware of Goldblum's investigation of the [Student] Matter and that Marshall 'got in trouble for it.'" (App. Br., R. 16 at p. 63). However, this is self-serving testimony from *Goldblum* who was purely speculating. As she put it, "it was a big enough issue that I can't see how he would not know," but there is no corroborating evidence, just speculation. (Goldblum Dep., R. 54 at PageID 917).

In sum, the President's limited, second-hand knowledge regarding the issues does not go beyond the scope of what Marshall has already testified to. As the District Court correctly pointed out, "[t]he less beneficial the deposition would be, the lower the harm needs to be to satisfy Rule 26(c)(1)." (Order, R. 45 at PageID 610, citing *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012)). The District Court did not abuse its broad discretion to manage discovery by precluding the President's deposition.

### 3. The District Court did not abuse its discretion in denying Goldblum's Rule 56(d) motion.

Goldblum argues that the District Court abused its discretion by not granting her Rule 56(d) motion, seeking additional time to conduct discovery regarding comparators and to take the President's deposition. The District Court succinctly denied the motion because it had "already addressed these issues exhaustively" and found that Goldblum "had ample opportunity to conduct discovery." (Order, R. 81 at PageID 3614).

Goldblum's reliance on *McKinley v. City of Mansfield,* 404 F.3d 418 (6th Cir. 2005) is not persuasive. In *McKinley*, the defendant moved for summary judgment before *any* discovery occurred. 404 F.3d at 442. The plaintiff moved to conduct discovery, but the court only permitted plaintiff to depose one witness. *Id*. at 443. Therefore, the matter was remanded to the district court for further discovery. *Id*.

The facts in *McKinley* are vastly different from this case. Here, the parties had

43

six months to conduct discovery, which Goldblum took full advantage of by taking ten depositions, serving twenty-one Interrogatories, serving twenty Requests for Admissions, and receiving more than 4,500 pages of documents from the University. Moreover, the District Court was very active in carefully reviewing and ruling on all the parties' discovery issues. As set forth above, there is simply no indication that additional discovery would result in any relevant information that could change the outcome of the District Court's ruling on the University's summary judgment motion.

Consequently, Goldblum cannot meet her burden of showing that the District Court abused its discretion by denying her motion to defer consideration of the University's motion for summary judgment and allow her time to take additional discovery.

## VI.    CONCLUSION

For the foregoing reasons, the University respectfully requests that this Court affirm the District Court's grant of summary judgment and dismiss Goldblum's case in its entirety.

Respectfully submitted,

DAVE YOST (0056290)
OHIO ATTORNEY GENERAL

*/s/ Marissa J. Palumbo*

MARISSA J. PALUMBO (0089283)
COLLEEN KOEHLER (0090728)
Senior Assistant Attorneys General
Employment Law Section
30 E. Broad Street, 16th Floor
Columbus, Ohio 43215
(614) 644-7257 – Telephone
(614) 752-4677 – Facsimile
elsreview@OhioAGO.gov

*Attorneys for Defendant-Appellee*

45

## VII.  CERTIFICATE OF COMPLIANCE

1. This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   a. As calculated by Microsoft Word, this brief contains 10,674 words, excluding the parts of the brief exempted by Fed. R. App P. 32(f) and 6 Cir. R. 32(b)(1), and

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportional font using Times New Roman at 14 point.

*/s/ Marissa J. Palumbo*

MARISSA J. PALUMBO (0089283)
Senior Assistant Attorney General

## CERTIFICATE OF SERVICE

This will certify that the foregoing *Brief of Defendant-Appellee University of Cincinnati* was filed electronically on September 14, 2022. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Marissa J. Palumbo*

MARISSA J. PALUMBO (0089283)
Senior Assistant Attorney General

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Defendant-Appellee, pursuant to Sixth Circuit Rule 30(b), hereby designates the following filings in the district court's electronic record as relevant to this appeal:

| R. | Description | PAGEID# |
|---|---|---|
| R. 1 | Plaintiff Andrea Goldblum's Complaint | 1-20 |
| R. 25 | Order Adopting Report & Recommendation and Granting in Part and Denying in Part Defendant's Motion to Dismiss | 163-73 |
| R. 36 | Magistrate Judge's Order | 437-38 |
| R. 41 | Magistrate Judge's Order | 532-34 |
| R. 44-5 | Exhibit to Plaintiff's Objection to Order of Magistrate Judge | 600 |
| R. 44-6 | Exhibit to Plaintiff's Objection to Order of Magistrate Judge | 605 |
| R. 45 | Order Overruling Plaintiff's Objections to Magistrate Judge Order (Doc. 39) | 608-13 |
| R. 49 | Magistrate Judge's Order | 632-34 |
| R. 54 | Plaintiff Andrea Goldblum's Deposition Transcript | 747, 771, 802-04, 807-09, 815, 824, 838-841, 917 |
| R. 54-1 | Deposition Exhibits from Plaintiff Andrea Goldblum's Deposition | 950-51, 973-84, 1008, 1012, 1020, 1022-24, 1026-29, 1031-34, 1035-36, 1101 |
| R. 55 | Bleuzette Marshall's Deposition Transcript | 1141-43, 1148-49, 1168-73, 1182, 1204-08, 1212-13, 1216, 1224, 1234, 1244-47, 1251, 1254-55, 1257, 1262, 1270, 1272-74, 1280-84, 1287-89, 1291-92, 1294-95, 1298-99, 1305-06, 1309-10 |

| R. 56 | Morgan Shaw's Deposition Transcript | 1614-15, 1626-27, 1650-51, 1660-61, 1685, 1688-89, 1700-02, 1704, 1712-13, 1718-19, 1722-23, 1729-35, 1739 |
|---|---|---|
| R. 57 | Lisa Holstrom's Deposition Transcript | 1788-91, 1832-34 |
| R. 58 | Kenneth Petren's Deposition Transcript | 1923-24, 1930-39 |
| R. 60 | Daniel Cummins' Deposition Transcript | 2111-20, 2136-37, 2141-45 |
| R. 61 | Karla Phillip's Deposition Transcript | 2181-84, 2188-94, 2201 |
| R. 62 | Caroline Miller's Deposition Transcript | 2212-65 |
| R. 63 | Tamara Byland's Deposition Transcript | 2281-82, 2288 |
| R. 64-1 | Declaration of Bleuzette Marshall and Declaration Exhibits | 2302-07 |
| R. 64-2 | Declaration of Debra S. Merchant | 2312 |
| R. 65 | Defendant University of Cincinnati's Motion for Summary Judgment | 2380-2400 |
| R. 66-1 | Exhibits from Depositions Taken by Plaintiff | 2428, 2430, 2499-2519, 2533-34, 2563, 2568, 2655, 2661-63 |
| R. 69-1 | Affidavit of Andrea Goldblum and Affidavit Exhibits | 2702, 2852-54 |
| R. 69-2 | Affidavit of Alison Dougherty and Affidavit Exhibits | 2867-69 |
| R. 73-1 | Plaintiff's Response to Proposed Undisputed Facts | 3247, 3252-53, 3256-58, 3260-62, 3264-66 |
| R. 74 | Plaintiff's Motion Pursuant to Fed. R. Civ. P. 56(d) to Defer Consideration of Motion for Summary Judgment and Allow Time to Take Discovery | 3286-91 |
| R. 75 | Exhibits from Depositions Taken by Plaintiff – Sealed Version | 3353, 3363-65, 3367-68, 3426-29 |

| R. 79 | Order Overruling Plaintiff's Objections to Magistrate Judge Order (Doc. 44) | 3602-08 |
| R. 80 | Order Overruling Plaintiff's Objections to Order of Magistrate Judge (Doc. 51) | 3609-13 |
| R. 81 | Order denying Plaintiff's Motion to Defer Consideration of the Motion for Summary Judgment | 3614 |
| R. 89 | Judge McFarland's Order Granting Defendant's Motion for Summary Judgment | 3638-52 |
| R. 90 | Judgment | 3653 |
| R. 91 | Goldblum's Notice of Appeal | 3654 |