## CASE NO. 22-3289

# UNITED STATES COURT OF APPEALS
# FOR THE
# SIXTH CIRCUIT

**Andrea Goldblum**
*Plaintiff-Appellant*

v.

**University of Cincinnati**
*Defendant-Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
Civil Action No. 1:19-cv-00398
Honorable Matthew W. McFarland, United States District Judge, presiding

**REPLY BRIEF OF PLAINTIFF-APPELLANT**
Andrea Goldblum

/s/ Joshua Adam Engel
Joshua Adam Engel (OH 0075769)
ENGEL & MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

**CORPORATE DISCLOSURE**

Appellant is not a subsidiary or affiliate of a publicly owned corporation.   There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE ................................................................. ii

SUMMARY OF ARGUMENT ................................................................ 1

ARGUMENT ........................................................................................ 3

    A.   Summary Judgment Is Not Warranted And Goldblum Should Be
        Given The Opportunity To Present Her Retaliation Case To A
        Jury ............................................................................................ 3

        1.   The *Prima Facie* Case Of Retaliation ............................... 3

               a.   Plaintiff Engaged In Protected Activity ............................. 3

               b.   Causal Connection ............................................................ 7

        2.   Pretext .............................................................................. 7

               a.   This Court's Precedents Reject UC's Use Of
                   Insubordination As A Convenient Excuse – A Pretext –
                   For Unlawful Retaliation ................................................. 8

               b.   The Claimed Misconduct Did Not Have A Basis In Fact ........... 12

               c.   Suspicious Timing Combined With Independent
                   Evidence Permits An Inference Of Pretext ..................... 15

                   i.   Lack Of Concerns About Goldblum's Job
                       Performance Prior To The Protected Activity,
                       Marshall's Lies, And The Failure To Follow A
                       Progressive Discipline Policy. ..................................... 16

                   ii.   UC Was Motivated To Prevent An Investigation Of
                       Misconduct ................................................................ 17

               d.   The Claimed Misconduct Was Insufficient To Justify
                     Termination ................................................................... 19

    C.   Goldblum Should Have Been Permitted Additional Discovery ................... 22

        1.   Potential Comparators ..................................................... 22

        2.   Deposition Of UC's President ........................................... 23

        3.   Rule 56(D) ........................................................................ 24

CONCLUSION ................................................................................... 25

CERTIFICATE OF COMPLIANCE .................................................... 26

CERTIFICATE OF SERVICE ............................................................. 26

# TABLE OF AUTHORITIES

## CASES

*Adamov v. United States Bank Natl. Assn.*, 681 F.App'x 473 (6th Cir. 2017) ...............4, 17

*Alexander v. Univ. of Memphis,* 6th Cir. No. 20-5426, 2021 U.S. App. LEXIS 16949 (June 7, 2021) ...................................................................................... 4

*Amos v. McNairy Cty.*, 622 F.App'x 529 (6th Cir. 2015) .................................... 12

*Bledsoe v. TVA Bd. of Dirs.*, 42 F.4th 568 (6th Cir. 2022) ............................*passim*

*Bobo v. UPS*, 665 F.3d 741 (6th Cir. 2012) .......................................................22

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) .................................... 5

*Crawford v. Chipotle Mexican Grill, Inc.*, 773 F. App'x 822 (6th Cir. 2019) ........................... 3

*Crawford v. City of Richardson,* N.D.Tex. No. 3:98-CV-0731, 2001 U.S. Dist. LEXIS 8825 (June 27, 2001) .............................................................. 13

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998) .....................22, 24

*Gianfrancisco v. Excelsior Youth Ctrs., Inc.*, D.Colo. Civil Action No. 10-cv-00991, 2012 U.S. Dist. LEXIS 98040 (July 16, 2012) ....................................21

*Hamilton v. GE*, 556 F.3d 428 (6th Cir. 2009) ...................................................12

*Harris v. J.B. Robinson Jewelers*, 627 F.3d 235 (6th Cir. 2010) .............................12

*Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769 (6th Cir. 2016) .........................22

*Jones v. Potter,* 488 F.3d 397 (6th Cir. 2007) .......................................................11

*Kempcke v. Monsanto Co.*, 132 F.3d 442 (8th Cir. 1998) .........................................10

*Kenney v. Aspen Technologies, Inc.*, 965 F.3d 443 (6th Cir. 2020) ............................ 4

*Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1208 (11th Cir. 2013)......................................23

*Kinney v. McDonough*, 6th Cir. No. 21-1414, 2022 U.S. App. LEXIS 2635 (Jan. 26, 2022) ........................................................................................ 5

*Lauderdale v. Wells Fargo Home Mtge.*, 552 F.App'x 566 (6th Cir. 2014) ........................... 20

*Lindsay v. Yates*, 578 F.3d 407 (6th Cir. 2009) ...................................................... 16

*Macy v. Hopkins Cty. School Bd. of Edn.*, 484 F.3d 357 (6th Cir. 2007) .............................. 22

*McKinnon v. L-3 Communs. Corp.*, 814 F.App'x 35 (6th Cir. 2020) ..................................... 7

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008) .................................. 4, 16

*Miles v. S. Cent. Human Resource Agency, Inc.*, 946 F.3d 883 (6th Cir. 2020) ....................... 9

*Miller v. American Family Mutual Insurance Company,* 203 F.3d 997, 1008 (7th Cir. 2000) ............................................................................................. 17

*Montell v. Diversified Clinical Servs.*, 757 F.3d 497 (6th Cir. 2014) .............................. 5

*Schmidt v. United States*, 145 Ct.Cl. 632 (1959) ................................................... 13

*Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555 (6th Cir. 2004) ................................ 4

*Tingle v. Arbors at Hilliard*, 692 F.3d 523 (6th Cir. 2012) ........................................ 9

*Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) .............................. 5

*Upshaw v. Ford Motor Co.,* 576 F.3d 576 (6th Cir. 2009) ........................................... 12

*Wood v. Montana Dept. of Revenue*, D.Mont. No. CV 10-13, 2011 U.S. Dist. LEXIS 105478 (Sep. 16, 2011) ........................................................................... 21

*Yazdian v. ConMed Endoscopic Technologies*, Inc., 793 F.3d 634 (6th Cir. 2015) ........... *passim*

**OTHER AUTHORITIES**

April 24, 2015 Dear Colleague Letter from the Department of Education,
 Office for Civil Rights ...........................................................................................14

34 C.F.R. § 106 .............................................................................................................14

Fed. R. Civ. P 26 ..........................................................................................................21

Fed. R. Evid. 602 ..........................................................................................................21

Fed. R. Evid. 702 ..........................................................................................................21

**SUMMARY OF ARGUMENT**

In *Bledsoe v. TVA Bd. of Dirs.*, 42 F.4th 568 (6th Cir. 2022), and *Yazdian v. ConMed Endoscopic Technologies*, Inc., 793 F.3d 634 (6th Cir. 2015), this Court warned against employers using minor rules violations in general, and charges of 'insubordination' in particular,  as a convenient excuse – a pretext – for unlawful retaliation.   That is what happened in this case.  Summary judgment was not appropriate under these and other precedents because it is entirely believable that UC jumped at Goldblum's alleged insubordination as a convenient 'solution' to the problem of a Title IX coordinator who insisted on acting independently to expose systemic problems at UC.  Goldblum has provided ten categories of evidence from which a jury could conclude that UC used a claim of 'insubordination' as a convenient excuse to cover up the true retaliatory motive behind her termination:  (1) the Letter was not misconduct; (2) Title IX Coordinators are permitted to act independently; (3) UC failed to follow its a policy of progressive discipline; (4) academic employers are highly unlikely to terminate an employee with no prior disciplinary history for sending an unauthorized email to the student newspaper; (5) the suspicious timing between Goldblum's protected activity and her discharge; (6) the lack of prior concerns about Goldblum's job performance; (7) the increased scrutiny of Goldblum following her protected activity; (8) UC's independent motive to cover-up misconduct; (9) UC administrators offered shifting and unsubstantiated post-hoc

justifications; and (10) UC administrators lied about the reason for Goldblum's termination.

Additionally, the District Court abused its discretion in denying Goldblum relevant discovery and then denying her Rule 56(d) Motion.   UC fails to direct this Court to any evidence in the record that such discovery would be burdensome.

**ARGUMENT**

**A.    Summary Judgment Is Not Warranted And Goldblum Should Be Given The Opportunity To Present Her Retaliation Case To A Jury**

**1.    The *Prima Facie* Case Of Retaliation**

**a.    Plaintiff Engaged In Protected Activity**

UC claims that Goldblum's complaints were not "protected activity" because she did not specifically complain about "sex discrimination."  Appellee Br. at 16.  The record shows that Goldblum complained about "potential Title IX violations" related to the Houston matter and the process for admitting convicted sex offenders and told Marshall that UC could be "considered deliberately indifferent under Title IX." (Goldblum Aff., R.69-1, PageID#2699; Goldblum Depo., R.54, PageID#794.)  Saying "Title IX" and "deliberately indifferent" is the same thing as complaining about "gender discrimination."  This Court does not require complaints to "be lodged with absolute formality, clarity, or precision" to constitute protected activity.  *Yazdian*, 793 F.3d at 649.  *See also Crawford v. Chipotle Mexican Grill, Inc.*, 773 F. App'x 822, 829 (6th Cir. 2019) ("governing principle" for establishing protected activity "is not that magic words must be intoned…").

**b.    Causal Connection**

This Court's precedents establish that timing, *alone*, can provide evidence of causation for purposes of a *prima facie* case.[1]  *Appellant* Br. at 22-23, *citing inter alia Mickey*

---

[1] UC confuses the *prima facie* and pretext inquiries under *McDonnell Douglas*.  Appellee Br. at 15-18.  After a *prima facie* case is established, the inquiry *then* turns to the separate

*v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). *See also Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) ("[T]he temporal proximity of these events is significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [plaintiff's] burden of demonstrating a *prima facie* case."); *Adamov v. United States Bank Natl. Assn.*, 681 F.App'x 473, 478 (6th Cir. 2017) ("based on temporal proximity alone, [plaintiff] has established causation for purposes of his *prima facie* showing"). UC fails to acknowledge this authority at all in its briefing, and certainly does not ask this Court to reconsider or overrule this line of cases.[2]

---

question of whether an employer's claimed legitimate, non-retaliatory reason for an adverse action was pretextual. Unlike at the *prima facie* stage, at the pretext stage a plaintiff must present evidence in addition to temporal proximity to survive summary judgment (although temporal proximity remains a relevant fact). *Cf. Alexander v. Univ. of Memphis,* 6th Cir. No. 20-5426, 2021 U.S. App. LEXIS 16949, at *19 (June 7, 2021) (observing that "temporal proximity" may be enough for a "plaintiff to satisfy the causation prong of her *prima facie* retaliation case" but "temporal proximity alone cannot prove pretext").

To be sure, this Court's jurisprudence has perhaps unartfully suggested that temporal proximity in the absence of other evidence of causation is not sufficient at the *prima facie* level. But counsel is not aware of any case where this Court has found temporal proximity, by itself, insufficient to establish a *prima facie* case on the short timeframe presented by cases like this one. Regardless, even if this Court applies a more rigorous *prima facie* analysis, Goldblum has more than satisfied the causation prong of a *prima facie* case: Goldblum's lack of disciplinary history, the school's progressive discipline policy, and the minor nature of the alleged infraction, combined with the very short time period within which Goldblum was terminated following protected activity, certainly suffice to raise an inference of causation for *prima facie* purposes.

[2] The cases cited by UC do not overrule this Court's holdings that close temporal proximity is sufficient at the *prima facie* stage. Appellee Br. at 17, *citing Kenney v. Aspen Technologies, Inc.*, 965 F.3d 443, 449 (6th Cir. 2020); *Kinney v. McDonough*, 6th Cir. No. 21-

UC next argues that an intervening act disrupted the purported causal chain between a protected act and an adverse employment action.[3]  Appellee Br. at 15-16. This argument fails because the timeline establishes that Goldblum complained to Marshall and others about the Title IX issues raised by the Houston Matter, and opened an investigation, *before* any termination decision was contemplated.[4]

---

1414, 2022 U.S. App. LEXIS 2635, at *20 (Jan. 26, 2022).  In *Kenney* the "a roughly 75-day delay" between protected activity and an adverse employment was insufficient to permit an inference of causation.  In *Kinney* a plaintiff merely set forth "sparse and conclusory assertions" and never asserted that supervisors even knew that she engaged in protected activity. 2022 U.S. App. LEXIS 2635, at *20.

[3] UC cites *Montell v. Diversified Clinical Servs.*, 757 F.3d 497 (6th Cir. 2014), to suggest that Goldblum "saw the proverbial writing on the wall" and then engaged in protected activity to protect herself from discipline.  Appellee Br. at 17.  Nothing in the record supports such a timeline.  UC does not, and cannot, suggest that the adverse employment action was "previously contemplated" as described in the Supreme Court's decisions in *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), and *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001).  Goldblum's statement about accepting "consequences" does not mean that she ever expected to be fired, for example. (Goldblum Aff., R.69-1, PageID#2702.)  Moreover, in *Montell*, this Court warned that the fact that an employer had previously contemplated terminating an employee does not make it "open season" to violate an employee's legal protections.  757 F.3d at 507.

[4] A fundamental problem with UC's briefing is the expectation that this Court will simply accept its description of events and explanations at face value.  UC often presents Marshall's recitation of the facts as undisputed or conclusive when, in fact, the record shows otherwise.  Example: UC claims that Marshall did not "know of Goldblum's investigation of concerns about the UC admissions process."  Appellee Br. at 27.  Marshall may be making such a claim, but this is at best a disputed issue of fact. Goldblum provided an affidavit stating that she told Marshall that she would be commencing an investigation.  (Goldblum Aff, R.69-1, PageID#2700.)  Goldblum testified in her deposition that she recalled "many times emphasizing" to Marshall that "there were systemic issues surrounding this… -- questions as to who knew what when he was admitted… and what kind of processes were in place."  (Goldblum Depo., R.54, PageID#795.)

- January 23, 2019 – UC students complain about the publication of the article about Houston. (Corey Aff., R.69-4, PageID#2882; Cunningham Aff., R.69-3, PageID#2879-2880.)

- February 7, 2019 -- Administrators at the College of Arts & Sciences realized that there was a problem. (Email, R.66 PageID#3141.)

- February 5, 2019 – Goldblum first learned about the Houston Matter. (Goldblum Depo., R.54, PageID#758-760.)

- February 9, 2019 – Goldblum received a copy of email indicating that Houston may have sexually assaulted students at UC. (Email, R.72-1 PageID#3071.) She wrote in an email, "There may be questions re: who knew what when he was admitted…" (Email, R.66-1 PageID#2528.)

- February 11, 2019 – Goldblum informed Marshall that the Title IX office had received complaints. (Goldblum Aff., R.69-1, PageID#2700.)

- February 11, 2019 -- Goldblum sent an email to the Admissions Office requesting more information. (Email, R.66-1 PageID#2559.)

- February 12, 2018 – Goldblum tells the VP for Student Affairs that she would be commencing an investigation. (Goldblum Aff, R.69-1, PageID#2700.)

- February 12, 2019 – Goldblum sends letter to the student newspaper. (Goldblum Depo., R.54, PageID#793.)

- February 13, 2019 – Goldblum told Marshall that she would be commencing an investigation. (Goldblum Aff, PageID#2700.)

- February 13, 2019 – Goldblum initiated a formal investigation. (Goldblum Depo., R.54, PageID#831; Report, R.66, PageID#2539.)

- February 13, 2019 – Goldblum sends revised letter to student newspaper.

- February 15, 2019 -- Marshall meets with HR to discuss a reprimand. (Marshall Depo. R.55, PageID#1272-1273.)

- February 27, 2019 – Marshall changes her mind and decides to terminate Goldblum. (Marshall Depo. R.55, PageID#1292.)

Drawing all inferences in Goldblum's favor, a reasonable jury could conclude that Goldblum engaged in protected activity as early as February 9, 2019 (and certainly by February 11, 2019). Marshall did not consider discipline until February 15, 2019 and did not decide on termination until February 27, 2019. This Court has held that where a timeline shows protected activity shortly *before* the employee learns of potential termination, that is sufficient to establish causation.[5] *McKinnon v. L-3 Communs. Corp.*, 814 F.App'x 35, 45-46 (6th Cir. 2020) (reversing grant of summary judgment where decision-maker "knew that [employee] had made a harassment complaint" when deciding to terminate).

### 2. Pretext

UC primarily claims that Goldblum was terminated because she was insubordinate.[6] Appellee Br. at 18-19. Goldblum does not deny that she sent the letter

---

[5] Marshall's deposition testimony acknowledges that the disciplinary decision occurred while Marshall was aware that Goldblum was complaining about University's handling of the Houston matter. (Marshall Depo., R.55, PageID#1261, PageID#1269, PageID#1278.).

[6] UC also refers to allegations of "unacceptable behavior." Appellee Br. at 21. However, other than a footnote, UC barely refers to this alleged unacceptable behavior in its Argument. *Compare* Appellee Br. at 23 n. 7 and Appellant Br. at 36-38. Goldblum denied these allegations in an Affidavit and UC fails to direct this Court to a single document supporting this claim. Goldblum's specific denials of the allegations and the fact that no such misconduct was ever mentioned to Goldblum as a basis for the termination suffices to create an issue of fact sufficient to defeat summary judgment.

despite a direct order from her supervisor. Nor does Goldblum deny that UC's rules prohibit insubordination. At the summary judgment stage, this Court should not accept UC's claim that Goldblum was insubordinate in this circumstance or that this alleged insubordination justified termination. Viewing the record in the light most favorable to Goldblum, a reasonable jury could conclude that UC wanted to get rid of Goldblum because she was going to expose wrongdoing at the institution, so pounced on "insubordination" as an excuse.

> **a.    This Court's Precedents Reject UC's Use Of Insubordination As A Convenient Excuse – A Pretext – For Unlawful Retaliation**

Pretext, by definition, means that the given reason is not the true reason, but only a cover-up for retaliation. UC treats the fact that Goldblum did not follow her superior's order – a fact that is not contested – as the alpha and omega of the case despite this Court's holdings that the "ultimate inquiry" in establishing pretext is

---

One aspect of UC's briefing on this matter warrants a further response, however, because of the brazen misrepresentation of the record. UC claims that Marshall possessed "contemporaneous notes" showing Goldblum's unprofessional conduct. Appellee Br. at 23 n. 7. These "notes" are really a "chronology" that Marshall put together "at some point" after the events; there is nothing in the record describing these as "contemporaneous" notes. (Marshall Dep., R.55, PageID#1176.) Marshall testified specifically that she did not create any contemporaneous notes. (Marshall Dep., R.55, PageID#1174.) Worse: even if these "notes" could be accepted at face value, they are misleading on their face. Marshall wrote in the chronology that she "met with colleagues [plural]" to "gain perspective" on Goldblum. In fact, she spoke with a single subordinate with a significant conflict of interest and limited experience and made no effort to verify any of the information that the subordinate had shared. (Marshall Depo., R.55, PageID#1174, 1284-1285.) Worser: UC repeats this misrepresentation verbatim on page 11 of its Brief.

whether the employer took the adverse action for the stated reason. *Miles v. S. Cent. Human Resource Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020), *quoting Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012).

This Court's precedents do not establish that an employer is entitled to summary judgment as long as it can point to *some* misconduct by the employee. This Court has, instead, consistently expressed a wariness that employers will use minor rules violations as "a convenient excuse – a pretext" for unlawful retaliation. In *Bledsoe*, *supra,* the employer, argued, in part, that an employee was demoted not because of discriminatory or retaliatory intent, but because of separate ethics violations. The employee argued that the reasons given were pretextual. This Court agreed that summary judgment was not appropriate because the record revealed "a few reasons to view with skepticism [the supervisor's] testimony that he was independently concerned about the ethics issue from the start."[7] 42 F.4th at 583. In reaching this conclusion, this Court refused to accept the supervisor's justifications at face value but, instead, observed that "it is

---

[7] Two other factors make this case similar to *Beldsoe*: the failure of the employer to follow progressive discipline and the timing of the adverse action. First, the ethical concerns – if true – would not necessarily have led to a demotion because other, alternative, disciplinary options were available. Second, "the timing of the [adverse action was] suspicious" because the employee had complained to HR around the same time that the ethics inquiry was initiated. 42 F.4th at 588.

entirely believable" that a supervisor would "jump at the opportunity to press for a convenient 'solution' to his problems."[8]  42 F.4th 568 at *29.

UC's effort to use a charge of "insubordination" as pretext for retaliatory actions is precluded by this Court's decision in *Yazdian*.[9]  Appellee Br. at 18.  In *Yazdian*, *supra*, an employer claimed that an employee was fired for, *inter alia*, insubordination.  The district court had granted the employer's motion for summary judgment, reasoning that "no reasonable jury could find that [the employer] stated legitimate reasons were pretextual because [the employee] had made 'objectively rude, disrespectful and insubordinate comments.'"  793 F.3d at 651, *quoting* district court decision.   However, in reversing, this Court cautioned that "not all 'insubordination' is treated equally."  This Court acknowledged that "an employer has legitimate cause to discipline or terminate an employee who refuses to follow through on an employer's expressed directions."

---

[8] This is where the video of Marshall dancing becomes relevant – she is clearly pleased to be rid of Goldblum.  (Video, R.71, PageID#2961.)

[9] *Yazdian* also suggests that Marshall's decision to terminate Goldblum for sending a letter to the newspaper was *direct* evidence of discriminatory intent because the letter was protected conduct.  This Court in *Yazdian* explained that such an explanation could be "direct evidence from which a reasonable jury could conclude that [the employer] believed [the employee's] protected activity constituted insubordination, and therefore… terminated [the employee] because of the protected statements."  793 F.3d at 648.  Later, this Court cautioned:

> we cannot accept an employer's conclusory claim that an employee was insubordinate when the alleged "insubordination consists of refusing to cease what a jury could find to be reasonable [ ]-protected activity."

*Id.*, *quoting Kempcke v. Monsanto Co.*, 132 F.3d 442, 446 (8th Cir. 1998).

But this Court in *Yazdian* did not accept that this power as absolute.  Instead, this Court noted – in language directly applicable to this case – that, especially where the alleged insubordinate actions were "intertwined with" protected activity and the employee produced "some evidence" contesting the description of the employee's conduct, "a reasonable jury could find that [the employee] was not insubordinate" and "that summary judgment is not proper."

The lesson from this Court's decisions in *Bledsoe, Yazdian,* and other cases is this: an employer cannot do what UC has tried to do in its Brief – use the fact that an employee may have committed misconduct to foreclose further inquiry into whether the employer was using the misconduct as an excuse to accomplish an unlawful end.[10] In *Jones v. Potter*, this Court warned against employers using what appeared to be "a legal, legitimate reason" that "fortuitously materialize[s]," to "cover up" true unlawful motivations.  488 F.3d 397, 408 (6th Cir. 2007).  And in *Upshaw v. Ford Motor Co.*, this Court, noted that "Although [an employer] is entitled to terminate an employee for an actual violation of its internal policies," summary judgment is not available where a

---

[10] Twice in a little over a year prior to this Reply Brief this Court reversed a decision of a district court that a plaintiff failed to present sufficient evidence or plausible claims that UC used pretextual reasons to cover up unlawful discrimination. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021) ("record contains evidence from which a reasonable jury could conclude that [UC's action] was retaliatory rather than innocent"); *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1061 (6th Cir. 2022) (UC's failure to hire a person because of gender, then cancelling a search, plausible evidence of pretext).

plaintiff "has introduced evidence suggesting that these 'actual violations' were nothing more than 'trumped up' charges." 576 F.3d 576, 593 (6th Cir. 2009). *See also Hamilton v. GE*, 556 F.3d 428, 437 (6th Cir. 2009) (plaintiff presented evidence that employer "waited for, and ultimately contrived, a reason to terminate [plaintiff] to cloak its true, retaliatory motive"); *Amos v. McNairy Cty.*, 622 F.App'x 529, 540 (6th Cir. 2015) (employer "began to intensely scrutinize" plaintiff "to find a legitimate reason… to justify its decision post-hoc").

### b.    The Claimed Misconduct Did Not Have A Basis In Fact

Goldblum was not insubordinate because, as the Title IX coordinator, she was permitted to send the letter despite a direct order otherwise. *Compare* Appellant Br. at 26-28. UC specifically fails to engage substantively with evidence in the record from Goldblum[11] and two experienced school administrators stating that sending the Letter was not only reasonable and expected, but that Title IX Coordinators often take such action despite direct orders of supervisors to the contrary. (Goldblum Aff., R.69-1, PageID#PageID#2702 ("As Title IX Coordinator, I possessed independent discretion"); Bullard Rep., R.69-6, PageID#2943 (noting that Title IX coordinators often "run afoul of other campus administrators, including their direct supervisor or

---

[11] UC improperly asks this Court to reject Goldblum's Affidavit as self-serving speculation. Appellee Br. at 23, 26. Goldblum's explanation is based on her training and experience and this Court has observed that a "court may not disregard evidence merely because it serves the interests of the party introducing it." *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010).

campus leadership"); Dougherty Rep., R.69-2, PageID#2864 (refusal to follow Marshall's order was "required of a Title IX Coordinator").)

UC, notably, never defends Marshall's order as lawful.[12] This is important, because, as noted in Goldblum's Brief, an employer may not discharge an employee for refusing to comply with an unlawful order prohibiting protected activity. Appellee Br. at 27 n.13. *See also Schmidt v. United States*, 145 Ct.Cl. 632 (1959) (stating that an unlawful order "did not have to be obeyed" and that "a refusal to obey it was not insubordination"). *Cf. Crawford v. City of Richardson,* N.D.Tex. No. 3:98-CV-0731, 2001 U.S. Dist. LEXIS 8825, at *23 fn.8 (June 27, 2001) ("The court's ruling regarding insubordination and refusal to follow orders necessarily includes a finding that the order was lawful.")

UC describes Goldblum's assertion that she was empowered to act independently as "astonishing" and without "any authority." Appellee Br. at 24. Not

---

[12] UC describes some "questions" Marshall had about the Letter. Appellee Br. at 7. But these appear to be post-hoc justifications and, at best, there is an issue of fact here. Goldblum states, "I am aware that Marshall claims she shared questions and criticism about the letter. This is not true… Her testimony on these conversations is a complete fabrication." (Goldblum Aff., R.69-1, PageID#2702.)

The closest UC comes to criticizing the content of the Letter is a citation to the deposition of a former interim Title IX Coordinator. Appellee Br. at 7 n.1. This witness never testified in her deposition that the letter was "inappropriate." Instead, she tellingly testified that the concern about Goldblum's letter was not that it was inaccurate, but that Goldblum criticized the institution. (Phillips Depo., R.61, PageID#2201. ("that there's some issue going on that needs to be improved holistically over the university's environment").)

so – Goldblum and the experts rely on federal guidance and industry standards. Federal regulations implementing Title IX require recipients of federal funding to designate a Title IX coordinator "to coordinate its efforts to comply with its responsibilities…" 34 C.F.R. § 106.8(a). Goldblum's independent authority is consistent with an April 24, 2015 Dear Colleague Letter from the Department of Education, Office for Civil Rights, providing guidance about, among other things, the particular duties and challenges facing Title IX coordinators. The Department wrote that "The Title IX coordinator's role should be independent…" April 25, 2015 DCL at 3.[13] The Department could have been speaking directly about this case:

> Title IX's broad antiretaliation provision protects Title IX coordinators from discrimination, intimidation, threats, and coercion for the purpose of interfering with the performance of their job responsibilities. A recipient, therefore, must not interfere with the Title IX coordinator's… monitoring of the recipient's efforts to comply with and carry out its responsibilities under Title IX.

*Id.* at 4. Marshall was aware of this Guidance; she acknowledged that Department guidance provided that Goldblum had "full discretion" to act independently to raise awareness in the community, and even admitted that it was appropriate to do so by

---

[13]Available at: https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf. Although the document has been withdrawn as a result of 2020 regulations, this guidance document remained in effect during the relevant positions of this case.

submitting a letter or article to the newspaper.[14]  (Marshall Depo. R.55, PageID#1133-34, PageID#1159, PageID#1318.)

### c.   Suspicious Timing Combined With Independent Evidence Permits An Inference Of Pretext

UC proclaims that "There is nothing suspicious about the timing here." Appellee Br. at 26. UC's briefing on this issue fails to acknowledge this Court's holdings that timing is suspicious if it occurs – like in this case – in close proximity to the protected activity. *See* Appellant Br. at 30 (collecting cases). The trier of fact should be permitted to decide whether Marshall was genuinely motivated by the alleged insubordination, or, as this Court found possible in *Bledsoe, Yazdian,* and other authority cited *supra,* sought to use the insubordination as convenient excuse shortly after the protected activity. The

---

[14] Marshall has broad responsibilities to the entire institution, including public relations. (Marshall Depo., R.55, PageID#1115.) UC's Brief acknowledges that Marshall was less interested in Title IX issues and the impact on students and more interested in having a UC "team" – including the public relations staff – respond "in a coordinated fashion." Appellee Br. at 12. A charitable explanation is that conflict between Marshall and Goldblum was both inevitable and anticipated as both pursued their independent objectives. The record, however, supports a less chartable explanation. One independent witness indicated that Goldblum "was committed to changing the campus culture at UC." (Corey Aff., R.69-4, PageID#2881.) In contrast, independent witnesses stated that Marshall saw her job as protecting the image of UC, even if that meant lying and retaliating against those advocating for changes in the way the school responds to sexual assault. (Cunningham Aff., R.69-3, PageID#2879 ("Marshall was good at seeming like she cared, but she did not take Title IX issues seriously… My impression was that Marshall was seeking to save face for the university"); Corey Aff., R.69-4, PageID#2881 ("I am aware that other persons at UC who work on Title IX issues fear being punished if they speak out… UC administrators, including Marshall, have been consistently [sic] made false statements and then sought to sweep things under the rug.").)

temporal proximity between the exercise of the Plaintiff's protected conduct and the allegedly retaliatory action must, therefore, be considered along with other evidence permitting inferences about UC's true motivation.[15] *Lindsay v. Yates*, 578 F.3d 407, 418 (6th Cir. 2009), *quoting Mickey*, 516 F.3d at 525.

### i. Lack Of Concerns About Goldblum's Job Performance Prior To The Protected Activity, Marshall's Lies, And The Failure To Follow A Progressive Discipline Policy.

Goldblum was only required to paint a convincing picture that would allow a jury to conclude that she had been subject to retaliation. UC fails to engage with much of the evidence presented by Goldblum to paint that picture.

UC does not, for example, contest that the record is bare of any claims about Goldblum's performance raised prior to her complaints about the Houston Matter. UC admits that Marshall started to examine Goldblum's job performance only after Goldblum started investigating the Houston Matter – a fact that is *also* evidence of

---

[15] UC mischaracterizes Goldblum's briefing and this Court's precedents by suggesting that Goldblum "believes that pretext lies" any time there is temporal proximity between discipline and protected activity. Appellee Br. at 27 n.6. This Court's pretext jurisprudence clearly holds that temporal proximity is one of several factors to be considered – neither Goldblum nor this Court has ever suggested otherwise. The concern that employees could freely engage in misconduct with fear of repercussion anytime they engaged in protected activity is unfounded because employers can still, under *McDonnell Douglas*, act against legitimate misconduct. The opposite is a bigger concern: under UC's analysis an employer could use *de minimis* rules violations or ignore its progressive discipline policies as an excuse – immune from any judicial review -- to terminate employees who engage in protected activity. Or, worse, an employer can order employees to not complain about discrimination; if an employee does not follow that order, the employee can be terminated for "insubordination."

pretext. *Adamov*, 681 F.App'x 474 (increased scrutiny created an inference of causation and pretext); Appellee Br. at 11.

Nor does UC deny that Marshall lied about the reasons Goldblum was terminated and provides no authority that this cannot be considered evidence of pretext. Instead, UC essentially simply asks this Court to accept Marshall's "reasonable explanation" for her lies. That is improper under Rule 56. Whether or not Marshall credibly explains her lies is something for the jury to decide, not a court in deciding a motion for summary judgment. Marshall is free to argue her explanation to the jury, and the jury is free to accept or reject it, but for purposes of summary judgment her lies support an inference of pretext. Appellant Br. at 40. *Cf. Miller v. American Family Mutual Insurance Company,* 203 F.3d 997, 1008 (7th Cir. 2000) ("pretext means a lie").

### ii.    UC Was Motivated To Prevent An Investigation Of Misconduct

UC argues that it "substantially complied" with the policy obligation to consult with public safety officials before admitting the convicted sex offender involved in this case. Appellee Br. at 29. UC just made this up. The record shows that UC had a procedure in place that involved consultation with a "group that's represented by admissions, student disciplinary work, student affairs and public safety that reviews serious cases and makes a determination as to whether or not that student should be admitted to the University." (Miller Depo., PageID#2224-2225.) UC did not do this

for Houston.  That is not "substantial compliance," it is the definition of non-compliance.[16]

UC ignores the evidence in the record that the admission of students with backgrounds as convicted sex offenders could pose a risk to the community and, in the absence of sufficient vetting, had the potential to unreasonably interfere with other students' work or academic performance.  (Miller Depo., PageID#2229; Bullard Report, R.69-6 PageID#2939, PageID#2940.)  UC even received information that Houston may have sexually assaulted other students.  (Email, R.66 PageID#2530-2532; Bullard Rep., R.69-6 at PageID#2043-2944.)  UC's response to the allegation that Goldblum's investigation – an investigation likely to disclose systemic problems and wrongdoing – was stonewalled and then shelved is a litany of excuses.  *See e.g.,* Appellee Br. at 29 (an admissions staff officer "forgot to respond to an email); Appellee Br. at 31 (subject of investigation created fake investigation "only to collect… student records"); Appellee Br. at 32 (Marshall never looked into admissions concerns because "she is not in charge").  Significantly, all of these excuses involve specifically the Title IX issues Goldblum was investigating.  UC's arguments improperly cite the effectiveness of the cover-up as proof that it had nothing to cover-up – a *non-sequitur* that is contrary to the record. (Miller Depo., R.62, PageID#2225-2226; Response to Interrogatories, R.69-7,

---

[16] UC seems to suggest that a meeting with an Assistant Dean of Students is the equivalent of involving public safety officials.  Appellee Br. at 29.  UC cites no evidence in the record to support this dubious assertion.

PageID#2958.)    In making what UC describes as "counterpoints," UC essentially admits that a genuine issue of material fact exists.[17] Appellee Br. at 32.  A jury could reasonably believe UC's "counterpoints," or a jury could believe that UC acted to prevent the disclosure of systemic issues that created significant financial and reputational exposure for the school.[18]

### d.    The Claimed Misconduct Was Insufficient To Justify Termination

True, UC's policies permit termination for insubordination.  Appellee Br. at 28. But that is only a portion of the analysis.  There is no evidence in the record that termination was mandatory for insubordination and UC's Brief never even mentions the school's progressive discipline policy.   (Policy, R.55-1, PageID#1354.)   The failure of UC to follow its progressive discipline policy, when combined with suspicious timing

---

[17] For example, UC looks at the investigative file Goldblum created, acknowledges that the file was closed a few weeks later with no interviews conducted or documents reviewed, and offers the following claim: "there is no record evidence to support [Goldblum's] inference that no investigation was conducted."  Appellee Br. at 30.  But this is contrary to how a Rule 56 Motion is resolved.  The fact that no investigative work was conducted is a reasonable inference from these facts that must be drawn in favor of Goldblum.  Besides, UC could easily have presented direct evidence describing exactly what investigative work had actually been done; the failure of UC to submit an affidavit from the investigator is telling and may permit an adverse inference.

[18] UC unwittingly proves Goldblum's point about a motive to quash her investigation by suggesting that the fact that public safety officials were not consulted before Houston was admitted "says nothing about other applicants."  Appellee Br. at 29. Goldblum was attempting to investigate just this very question – how many convicted sex offenders does UC admit without proper vetting?

and other independent evidence, is further evidence of pretext. Appellant Br. at 43 n. 20 (collecting cases). UC makes no effort to distinguish this authority, either.

Nor does UC try to justify the termination of an employee (with no prior disciplinary history) for sending a letter to the student newspaper (that was never published) offering resources to victims of sexual assault without permission. Pretext hinges on the truthfulness of the justification, and the severity of the discipline is, thus, relevant to the extent it reflects some measure of untruthfulness in the justification for the punishment. A reasonable juror could conclude that UC's proffered reason for Goldblum's termination, her alleged insubordination, was pretextual in that it was insufficient to merit termination. In other words, termination here was so arbitrary or harsh that its arbitrariness or harshness is itself a piece of evidence in support of pretext. Goldblum's affidavit stating her expectation that she would receive a reprimand or be formally warned before termination, and the expert opinion that academic institutions would typically impose a reprimand for this type of conduct, remain unrebutted and provide the factual basis to defeat summary judgment.

UC suggests, without any explanation, that none of these opinions are "admissible." Appellee Br. at 36. UC waived this argument by failing to file objections as required by Fed. R. Civ. P. 56(c)(2) or motions *in limine* to exclude the testimony of Plaintiff's experts on the grounds that their testimony failed to satisfy the standard for reliability set forth in *Daubert*. *Lauderdale v. Wells Fargo Home Mtge.*, 552 F.App'x 566, 572 (6th Cir. 2014) ("when a party fails to object to evidentiary materials submitted by

the opposing party in support of summary judgment, the objections are deemed forfeited or waived.").

UC cites no authority that this type of evidence is inadmissible because it is. Goldblum, as an employee who is familiar with the school's disciplinary practices and progressive discipline policy, would be permitted to testify about her experiences at the institution. Fed. R. Evid. 602 ("Evidence to prove personal knowledge may consist of the witness's own testimony."). As for the experts, they have significant experience in both Title IX and school disciplinary issues and the reports satisfy the requirements of Fed. R. Civ. P 26(a)(2) and Fed. R. Evid. 702. Courts routinely allow expert testimony on employment practices. *See Gianfrancisco v. Excelsior Youth Ctrs., Inc.*, D.Colo. Civil Action No. 10-cv-00991, 2012 U.S. Dist. LEXIS 98040, at *6 (July 16, 2012) ("Courts have allowed testimony from human resources experts in cases alleging discrimination."); *Wood v. Montana Dept. of Revenue*, D.Mont. No. CV 10-13, 2011 U.S. Dist. LEXIS 105478, at *6 (Sep. 16, 2011) ("courts commonly permit… experts to testify on human resources management policies and practices and whether an employer deviated from those policies and practices").

Finally, UC does not contest that pretext may also be shown by the fact that other high-ranking employees were not similarly punished for the same misconduct. UC, instead, argues that the proposed comparators did not engage in conduct that is "substantially similar" to Goldblum's. Appellee Br. at 34. But this Court does not require a plaintiff to demonstrate an exact correlation in order for two employees to be

considered 'similarly situated.' *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777 (6th Cir. 2016), *quoting Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).  And: "Whether the comparison between similarly situated individuals is sufficiently relevant is itself a jury question." *See Bledsoe*, 42 F.4th at 586.  *See also Macy v. Hopkins Cty. School Bd. of Edn.*, 484 F.3d 357, 370 n.8 (6th Cir. 2007) ("if a reasonable jury could conclude that [two employees] engaged in conduct of comparable seriousness, the jury could also conclude that [the decision to investigate and eventually fire [one employee[ but not to investigate [the other] shows that the proffered reason was pretextual").

## C.    Goldblum Should Have Been Permitted Additional Discovery

### 1.    Potential Comparators

UC's efforts to distinguish *Bobo v. UPS*, 665 F.3d 741 (6th Cir. 2012), are unavailing.  This Court in *Bobo* acknowledged that discovery is broad and warned against the "the danger of treating [the similarly situated] standard as requiring exact correlation…." as well as the "problems inherent in allowing a defendant to control the designation of comparators by simply refusing to provide requested comparator evidence except as to those persons it selects."  665 F.3d at 753.

None of this matters, though.  While UC claims that discovery would be burdensome, UC did not direct this Court to any evidence *in the record* of this burden;

regardless of any interpretation of *Bobo*, it was an independent abuse of discretion to make a decision based on the burden of discovery without evidence.[19]

### 2.    Deposition Of UC's President

UC acknowledges, as it must, the Marshall discussed in detail the decision to terminate Goldblum with UC's President; UC fails to direct this Court to any evidence in the record that the deposition in these circumstances would be unduly burdensome. Appellee Br. at 41.

UC's argument that Pinto could not be deposed despite his knowledge of this matter because he only had "second-hand knowledge." This is not the record. Marshall did more than simply inform her supervisor about her actions – she testified that she discussed the content of the Letter with Pinto. (Goldblum Depo., R.54, PageID#917; Marshall Depo., R.55, PageID#1244.) This is also wrong, legally. Whether or not evidence is hearsay has no bearing on whether it is discoverable, and this Court has not adopted the "Apex" rule. *See* Appellant Br. at 51. Pinto is entitled to no special status from any other witness with knowledge of relevant facts; he spoke directly to Marshall about the facts of this case and his testimony is, therefore, discoverable even if he was not the decision-maker. *See Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1208, fn.16 (11th Cir. 2013) ("a statement made by a non-decisionmaker may be both relevant and

---

[19] UC cites only to discovery responses, not any affidavits or other evidence. Appellee Br. at 40.

attributable to the defendant employer if the non-decisionmaker was sufficiently involved in the decision making process leading up to the adverse employment action").

UC's briefing expects this Court to believe that Marshall acted without any retaliatory motivation; and if this case proceeded to trial Marshall's credibility would be an important factor for the jury to consider. Pinto has the ability to corroborate – or contradict – the evidence of her motivation. UC fails to bring to this Court's attention any case prohibiting a deposition of a person with whom a decision-maker discussed a decision, and the undersigned counsel is not aware of any such authority. *Cf. Ercegovich*, 154 F.3d at 356 (while a non-decisionmaker's discriminatory statement, standing alone, generally does not support an inference of discrimination, the comments are "not categorically excludable").

### 3. Rule 56(d)

Goldblum should have been permitted to pursue the discovery described, *supra,* under Rule 56(d). Goldblum relies on the briefing, *supra*, in her Original Brief.

**CONCLUSION**

The Order Granting the Motion for Summary Judgment should be reversed, and this case remanded for further proceedings including appropriate further discovery.

Respectfully submitted,

_____/s/ Joshua Adam Engel_____
Joshua Adam Engel (0075769)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Suite 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g) and 6 Cir R. 32(a) I hereby certify that this document complies with the type-volume limitation. This document contains 6408 words, excluding the portions listed in 6 Cir. R. 32(b), as calculated by Microsoft Word.

<u>/s/ Joshua Adam Engel</u>
Joshua Adam Engel (0075769)


**CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Reid T. Caryer, reid.caryer@OhioAGO.gov
Marissa J. Palumbo, marissa.palumbo@ohioago.gov

<u>/s/ Joshua Adam Engel</u>
Joshua Adam Engel (0075769)