CASE NO. 22-3289

# UNITED STATES COURT OF APPEALS
# FOR THE
# SIXTH CIRCUIT

**Andrea Goldblum**
*Plaintiff-Appellant*

v.

**University of Cincinnati**
*Defendant-Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
Civil Action No. 1:19-cv-00398
Honorable Matthew W. McFarland, United States District Judge, presiding

**PETITION FOR REHEARING AND REHEARING *EN BANC*
OF PLAINTIFF-APPELLANT**

/s/ Joshua Adam Engel
Joshua Adam Engel (OH 0075769)
ENGEL & MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

**CORPORATE DISCLOSURE**

Appellant is not a subsidiary or affiliate of a publicly owned corporation.   There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE..............................................................................ii

STATEMENT OF REASONS FOR *EN BANC* REVIEW ...........................................1

STATEMENT OF THE CASE .......................................................................3

    A.    Facts................................................................................3

    B.    Procedural History ...................................................8

ARGUMENT...................................................................................9

CONCLUSION ...............................................................................13

CERTIFICATE OF COMPLIANCE ................................................13

CERTIFICATE OF SERVICE ...........................................................14

# TABLE OF AUTHORITIES

## CASES

*Amos v. McNairy Cty.*, 622 F.App'x 529 (6th Cir. 2015) ....................................................12

*Bledsoe v. TVA Bd. of Dirs.*, 42 F.4th 568 (6th Cir. 2022) ...........................................*passim*

*Hamilton v. GE*, 556 F.3d 428 (6th Cir. 2009) .....................................................................12

*Jones v. Potter,* 488 F.3d 397 (6th Cir. 2007)........................................................................12

*Kempcke v. Monsanto Co.*, 132 F.3d 442 (8th Cir. 1998) .......................................................11

*Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253 (4th Cir. 1998) ...............................1

*Miles v. S. Cent. Human Resource Agency, Inc.*, 946 F.3d 883, (6th Cir. 2020) ....................10

*Tingle v. Arbors at Hilliard*, 692 F.3d 523 (6th Cir. 2012) ...................................................10

*Upshaw v. Ford Motor Co.,* 576 F.3d 576 (6th Cir. 2009) .....................................................12

*Yazdian v. ConMed Endoscopic Technologies*, Inc., 793 F.3d 634 (6th Cir. 2015) ...........*passim*

**STATEMENT OF REASONS FOR *EN BANC* REVIEW**

The panel decision conflicts with the following decisions of this Court: *Bledsoe v. TVA Bd. of Dirs.*, 42 F.4th 568 (6th Cir. 2022), and *Yazdian v. ConMed Endoscopic Technologies*, Inc., 793 F.3d 634 (6th Cir. 2015).  Consideration by the full Court is therefore necessary to secure and maintain uniformity of the court's decisions:

The panel decision said:

We have previously held that an employee's insubordination and her failure to follow company policies constitute legitimate, nonretaliatory reasons to terminate employment. *See Yazdian*, 793 F.3d at 651; *see also Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998) (Congress didn't "intend[] to immunize insubordinate, disruptive, or nonproductive behavior at work." (quotation omitted)).

Opinion at 6.

In *Bledsoe* and *Yazdian*  this Court warned against employers using minor rules violations in general, and charges of 'insubordination' in particular, as a convenient excuse – a pretext – for unlawful retaliation.   The Panel decision suggests otherwise: that that an employer is entitled to summary judgment as long as it can point to *some* misconduct by the employee.  This Court has, instead, consistently expressed a wariness that employers will use minor rules violations as "a convenient excuse – a pretext" for unlawful retaliation.   In *Bledsoe*, this Court refused to accept the supervisor's justifications at face value but, instead, observed that "it is entirely believable" that a

supervisor would "jump at the opportunity to press for a convenient 'solution' to his problems." 42 F.4th 568 at *29. The Panel did not consider *Bledsoe.*

The Panel cited *Yazdian* decision for the proposition that an employer has legitimate cause to discipline or terminate an employee who refuses to follow through on an employer's expressed directions. The Panel did not consider the caution in *Yazdian*, that "not all 'insubordination' is treated equally." 793 F.3d at 652. The Panel decision conflicts with *Yazdian* by failing to acknowledge that, especially where the alleged insubordinate actions were "intertwined with" protected activity and the employee produced "some evidence" contesting the description of the employee's conduct, "a reasonable jury could find that [the employee] was not insubordinate" and "that summary judgment is not proper."

The Panel decision effectively overrules *Bledsoe* and *Yazdian*. The Panel decision permits an employer to cite insubordination (or other alleged misconduct) to cover up true unlawful motivations and effectively end any further detailed inquiry. The Panel decision, if permitted to stand unreviewed by the full Court, shifts the burden or production to defeat summary judgment against employees and would eviscerate the anti-retaliation provisions of Title VII and Title IX, as an employer could order employees not to engage in protected activity and then evade court scrutiny by disciplining the employees for 'insubordination' when they did so.

## STATEMENT OF THE CASE

### A.    Facts

The University of Cincinnati ("UC") is a public institution located within the city of Cincinnati, Ohio with more than 90 undergraduate and graduate programs and an enrollment of roughly 46,000 students within its 13 individual colleges.  UC voluntarily participates in federal funding programs.  (Complaint, R.1, PageID#2; Answer, R.24, PageID#147.))

In July 2018, Goldblum was hired to serve as the Director of the University's Office of Gender Equity & Inclusion, a position commonly referred to as a "Title IX Coordinator."  Her responsibilities included ensuring timely, impartial investigations of complaints of alleged instances of sexual harassment and/or sexual assault on campus.  (Job Description, R.54-1, PageID# #950.)  As a Title IX Coordinator, Goldblum was expected to act independently.  (Goldblum Aff., R.69-1, PageID#2702; Marshall Depo. R.55, PageID#1159.)  Goldblum was empowered to initiate and conduct investigations designed to identify and expose patterns or systemic problems with Title IX compliance at UC.  (Goldblum Aff., R.69-1, PageID#2699.)   Bleuzette Marshall, the University's Vice President for Equity, Inclusion and Community Impact, was Goldblum's direct supervisor.

In the summer of 2016, UC admitted William Houston, a former Ohio State University and Bowling Green State University football player who was convicted of gross sexual imposition.  UC administrators approved the admission without reviewing

his disciplinary or criminal history or complying with the procedures for the consideration of students with criminal backgrounds. (Cummins Depo., R.60, PageID#2109-2110; Miller Depo., R.62, PageID#2234, 2225-2226; Responses to Interrogatories, R.69-7, PageID#2958.)

On January 23, 2019, the University published an online article recognizing graduating students who wore a "triumph cord" at graduation indicting that the students had overcome "obstacles" to graduate. Houston was profiled as one of those students. (Article, R.54-1, PageID#977.)[1] The article failed to mention that the "obstacle" Houston had overcome was a conviction for a felony sex offense and restrictions on his presence on campus because he was a registered sex offender. (Complaint, R.1, PageID#7; Petren Depo. R. 58, PageID#1872-1874.) The publication of the article made female UC students feel vulnerable to sexual assault and, as a result, unreasonably interfered with students' work or academic performance and created an intimidating, hostile and offensive work or learning environment for students. (Corey Aff., R.69-4, PageID#2882; Cunningham Aff., R.69-3, PageID#2879-2880.) UC officials subsequently received emails suggesting that Houston had assaulted other persons on campus. (Email, R.66 PageID#2531; Marshall Depo., R.55, PageID#1217-

---

[1] Currently available at https://www.uc.edu/news/articles/2019/01/n2060727.html. References to Houston have been delated. An editorial note from the Dean states, "Out of sensitivity to members of our community, the original information in this article has been modified."

1221.)  Administrators realized that there was a problem for UC and its image.  One administrator wrote, "Oh no. I don't even know how he would have gotten admitted to UC." Another administrator wrote, "We need to figure out how to deal with this ASAP. Because this could be REALLY bad."  (Email, R.66 PageID#3141.)

Goldblum first learned about the Houston Matter around February 5, 2019. (Goldblum Depo., R.54, PageID#758-760.)  Goldblum became concerned about the impact on students and believed that UC was obligated to respond under Title IX and UC Policy.  (Goldblum Depo., R.54, PageID#782-784.)  Goldblum believed that UC providing resources on its web page and through training events on campus was insufficient.  Instead, Goldblum believed the best way to share resources, such as the counseling center, the on-campus advocates, medical assistance options and off-campus resources, was through a letter to the editor to the student newspaper. (Goldblum Depo., R.54, PageID#782-783, 792.)

Goldblum became concerned that the admission of students, like Houston, with backgrounds as convicted sex offenders could pose a risk to the community.  She also was concerned about possible systemic issues in the University of Cincinnati admissions process, including whether public safety or the Title IX Office was consulted prior to the admission of the student.  (Goldblum Aff., R.69-3, PageID#2698-2699; Goldblum Depo., R.54, PageID#858.)   Goldblum communicated her concerns to Marshall and other UC administrators about the Houston Matter and possible systemic issues in the admissions process.  On February 9, 2019, Goldblum wrote in an email, "There may

be questions re: who knew what when he was admitted…" (Email, R.66 PageID#3198.) On February 11, 2019, Goldblum informed Marshall about student complaints, including specifically the complaint outlined in a February 8, 2019 email alleging that Houston had sexually assaulted students at UC. (Goldblum Aff, R.69-1, PageID#2700.) Goldblum told Marshall that she "would be commencing an investigation into the Houston Matter in particular and the admissions process for convicted sex offenders in general." (Goldblum Aff., R. 69-1, PageID#2699-2700.) Goldblum sent an email to the UC Admissions Office requesting more information about the process for the admission of Houston and students with criminal records. (Email, R.66 PageID#2559.) Goldblum also told Marshall that her investigation would extend beyond Houston's admission and include systemic concerns and an inquiry into whether other similarly situated students may have been admitted without following proper procedures. (Goldblum Depo. R.54, PageID#795.)

On February 12, 2019, Goldblum drafted a letter to the student newspaper, the News Record, and shared a copy with Marshall and others at UC. (Goldblum Depo., R.54, PageID#793.) Marshall told Plaintiff not to send the letter. Goldblum believed that she had a responsibility as Title IX Coordinator to send the letter and that Marshall was using "delay tactics." (Goldblum Depo., R.55, PageID#803-805.). Believing that she had independent authority to act,[2] Goldblum sent the letter, anyway, on February

---

[2] Goldblum never claims, as the Panel characterizes, that "anything done" in her role as Title IX Coordinator is "exempt from all University oversight or discipline."

12, 2019. (Goldblum Depo., R.54, PageID#81-82.) On the morning of February 13, 2019, Goldblum sent a revised letter. (Goldblum Depo., R.54, PageID#803.) For reasons that have never been adequately explained, the letter was never published. (*See* Marshall Depo., R.55, PageID#1248.)

Marshall believed that Goldblum's actions were in violation of UC Policy 15.02. This Policy outlines that it is a violation for any employee to engage in insubordination, or other deviations from standard and acceptable behavior. (Policy, R.55-1, PageID#1351.) While an employee may be terminated for violating UC Policy 15.02, another UC Policy, Policy 15.03, states that UC "subscribes to the principle of progressive corrective action…" (Policy, R.55-1, PageID#1354.)

On March 15, 2019, Marshall, accompanied, by a representative from HR and a uniformed police officer, met with Goldblum. Prior to the meeting, the video from the police officer's body camera captured Marshall dancing and laughing with the HR representative. (Video, R.71, PageID#2961.) Goldblum was told that she was being terminated but was given the option to resign in lieu of a termination. (Marshall Depo.,

---

Opinion at 8. An April 25, 2015 Dear Colleague Letter from the Department of Education states "Title IX's broad antiretaliation provision protects Title IX coordinators from discrimination, intimidation, threats, and coercion for the purpose of interfering with the performance of their job responsibilities." Marshall acknowledged that Goldblum, as a result of this guidance, had "full discretion" to act independently. (Marshall Depo. R.55, PageID#1133-34, PageID#1159, PageID#1318.)

R.55, PageID#1181.) Goldblum resigned[3] and was escorted off campus. Marshall subsequently lied to multiple people about Plaintiff's termination. (Cunningham Aff., R.69-3, PageID#2881; Corey Aff., R.69-4, PageID#2881; Marshall Depo., R.55, PageID#1307-1308.)

This litigation followed.

**B.    Procedural History**

On May 27, 2019, Goldblum brought this action for violation of Title IX and Title VII. (Complaint, R.1, Page ID#1-20.)

On March 28, 2022, the trial court (McFarland, J.) granted Defendant's Motion for Summary Judgment. (Order, R.89.) Final Judgment was entered. (Judgment, R.90.)

This appeal followed.

On March 10, 2023, this Court issued a Panel decision affirming the judgment of the District Court.

---

[3] This resignation was not voluntary. (Goldblum Depo., R.54, PageID#844.)

**ARGUMENT**

Review by the full Court is appropriate and necessary because the Panel decision is in conflict with *Bledsoe* and *Yazdian*. The Panel decision essentially renders these decisions meaningless, as it replaces the holistic inquiry of those cases with an approach the credulously accepts the explanations provided by employers. The Panel decision effectively permits an employer to use the fact that an employee may have committed some minor misconduct to foreclose further inquiry into whether the employer was using the misconduct as an excuse to accomplish an unlawful end.

UC claimed that Goldblum was terminated because she was insubordinate. The Panel decision accepted this conclusion. True: Goldblum never denied that she sent the letter despite a direct order from her supervisor and did not deny that UC's rules prohibit insubordination. But, viewing the record in the light most favorable to Goldblum, a reasonable jury could conclude that UC wanted to get rid of Goldblum because she was going to expose wrongdoing at the institution, so pounced on her alleged "insubordination" as an excuse.[4]

---

[4] There is an issue of fact about whether Goldblum's action constituted insubordination: (i) almost every other UC employee who testified stated that the letter (which was never published) was not inappropriate; and (ii) Goldblum was entitled to act independently.

There is an issue fact about, even if Goldblum was insubordinate, whether this single act provided justification for termination: (i) UC also has a policy of progressive discipline; and (ii) two experts offered uncontradicted affidavits that an academic employer is highly unlikely to terminate an employee with no prior disciplinary history for sending an unauthorized email to the student newspaper.

Pretext, by definition, means that the given reason is not the true reason, but only a cover-up for retaliation. The Panel decision treats the fact that Goldblum did not follow her superior's order – a fact that is not contested – as the alpha and omega of the case despite this Court's prior holdings that the "ultimate inquiry" in establishing pretext is whether the employer took the adverse action for the stated reason. *Miles v. S. Cent. Human Resource Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020), *quoting Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012).

The Panel decision is a departure from this Court's prior wariness that employers will use minor rules violations as "a convenient excuse – a pretext" for unlawful retaliation. In *Bledsoe*, *supra,* the employer, argued, in part, that an employee was demoted not because of discriminatory or retaliatory intent, but because of separate ethics violations. The employee argued that the reasons given were pretextual. This Court agreed that summary judgment was not appropriate because the record revealed "a few reasons to view with skepticism [the supervisor's] testimony that he was independently concerned about the ethics issue from the start."[5] 42 F.4th at 583. In

_____

There is also an issue of fact about whether the claim of 'insubordination' was pretextual when viewed in the context of the suspicious timing between Goldblum's protected activity and her discharge based on independent evidence: (i) there was a lack of prior concerns about Goldblum's job performance; (ii) UC had an independent motive to cover-up misconduct related to the Houston matter; (iii) UC administrators offered shifting and unsubstantiated *post-hoc* justifications; and (iv) UC administrators lied about the reason for Goldblum's termination.

[5] Two other factors make this case similar to *Beldsoe*: the failure of the employer to follow progressive discipline and the timing of the adverse action. First, the ethical

reaching this conclusion, this Court refused to accept the supervisor's justifications at face value but, instead, observed that "it is entirely believable" that a supervisor would "jump at the opportunity to press for a convenient 'solution' to his problems." 42 F.4th 568 at *29.

In *Yazdian*, *supra*, an employer claimed that an employee was fired for, *inter alia*, insubordination.[6] The district court had granted the employer's motion for summary judgment, reasoning that "no reasonable jury could find that [the employer] stated legitimate reasons were pretextual because [the employee] had made 'objectively rude, disrespectful and insubordinate comments.'" 793 F.3d at 651, *quoting* district court decision. However, in reversing, this Court cautioned that "not all 'insubordination' is treated equally." This Court acknowledged that "an employer has legitimate cause to

---

concerns – if true – would not necessarily have led to a demotion because other, alternative, disciplinary options were available. Second, "the timing of the [adverse action was] suspicious" because the employee had complained to HR around the same time that the ethics inquiry was initiated. 42 F.4th at 588.

[6] *Yazdian* also suggests that Marshall's decision to terminate Goldblum for sending a letter to the newspaper was *direct* evidence of discriminatory intent because the letter was protected conduct. This Court in *Yazdian* explained that such an explanation could be "direct evidence from which a reasonable jury could conclude that [the employer] believed [the employee's] protected activity constituted insubordination, and therefore… terminated [the employee] because of the protected statements." 793 F.3d at 648. Later, this Court cautioned:

> we cannot accept an employer's conclusory claim that an employee was insubordinate when the alleged "insubordination consists of refusing to cease what a jury could find to be reasonable [ ]-protected activity."

*Id.*, *quoting Kempcke v. Monsanto Co.*, 132 F.3d 442, 446 (8th Cir. 1998).

discipline or terminate an employee who refuses to follow through on an employer's expressed directions." But this Court in *Yazdian* did not accept that this power as absolute. Instead, this Court noted – in language directly applicable to this case – that, especially where the alleged insubordinate actions were "intertwined with" protected activity and the employee produced "some evidence" contesting the description of the employee's conduct, "a reasonable jury could find that [the employee] was not insubordinate" and "that summary judgment is not proper."

Rehearing *en banc* is necessary because the Panel decision permits an employer to use the fact that an employee may have committed misconduct to foreclose further inquiry into whether the employer was using the misconduct as an excuse to accomplish an unlawful end. In *Jones v. Potter*, this Court warned against employers using what appeared to be "a legal, legitimate reason" that "fortuitously materialize[s]," to "cover up" true unlawful motivations. 488 F.3d 397, 408 (6th Cir. 2007). And in *Upshaw v. Ford Motor Co.*, this Court, noted that "Although [an employer] is entitled to terminate an employee for an actual violation of its internal policies," summary judgment is not available where a plaintiff "has introduced evidence suggesting that these 'actual violations' were nothing more than 'trumped up' charges." 576 F.3d 576, 593 (6th Cir. 2009). *See also Hamilton v. GE*, 556 F.3d 428, 437 (6th Cir. 2009) (plaintiff presented evidence that employer "waited for, and ultimately contrived, a reason to terminate [plaintiff] to cloak its true, retaliatory motive"); *Amos v. McNairy Cty.*, 622 F.App'x 529, 540 (6th Cir. 2015) (employer "began to intensely scrutinize" plaintiff "to find a

legitimate reason… to justify its decision post-hoc"). The Panel decision departs from this line of cases.

## CONCLUSION

The Petition for Rehearing or Rehearing *En Banc* should be granted.

Respectfully submitted,

_____/s/ Joshua Adam Engel_____
Joshua Adam Engel (0075769)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Suite 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limitation. This document contains 2889 words, as calculated by Microsoft Word.

/s/ Joshua Adam Engel
Joshua Adam Engel (0075769)

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Reid T. Caryer, reid.caryer@OhioAGO.gov
Marissa J. Palumbo, marissa.palumbo@ohioago.gov

/s/ Joshua Adam Engel
Joshua Adam Engel (0075769)
