**CASE NO. 22-3289**

# UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

**Andrea Goldblum**
*Plaintiff-Appellant*

v.

**University of Cincinnati**
*Defendant-Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
Civil Action No. 1:19-cv-00398
Honorable Matthew W. McFarland, United States District Judge, presiding

**PETITION FOR REHEARING AND REHEARING *EN BANC*
OF PLAINTIFF-APPELLANT**

/s/ Joshua Adam Engel
Joshua Adam Engel (OH 0075769)
ENGEL & MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

**CORPORATE DISCLOSURE**

Appellant is not a subsidiary or affiliate of a publicly owned corporation.   There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE...................................................................................ii

STATEMENT OF REASONS FOR *EN BANC* REVIEW ..........................................1

STATEMENT OF THE CASE ..........................................................................3

    A.   Facts..........................................................................................3

    B.   Procedural History ..................................................................8

ARGUMENT.......................................................................................9

CONCLUSION ....................................................................................13

CERTIFICATE OF COMPLIANCE ...................................................13

CERTIFICATE OF SERVICE ..........................................................14

TABLE OF AUTHORITIES

**CASES**

*Amos v. McNairy Cty.*, 622 F.App'x 529 (6th Cir. 2015) ....................................................12

*Bledsoe v. TVA Bd. of Dirs.*, 42 F.4th 568 (6th Cir. 2022) ...........................................*passim*

*Hamilton v. GE*, 556 F.3d 428 (6th Cir. 2009) ...............................................................12

*Jones v. Potter,* 488 F.3d 397 (6th Cir. 2007) ................................................................12

*Kempcke v. Monsanto Co.*, 132 F.3d 442 (8th Cir. 1998) ........................................................11

*Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253 (4th Cir. 1998) ...............................1

*Miles v. S. Cent. Human Resource Agency, Inc.*, 946 F.3d 883, (6th Cir. 2020) .....................10

*Tingle v. Arbors at Hilliard*, 692 F.3d 523 (6th Cir. 2012) ....................................................10

*Upshaw v. Ford Motor Co.,* 576 F.3d 576 (6th Cir. 2009) ....................................................12

*Yazdian v. ConMed Endoscopic Technologies*, Inc., 793 F.3d 634 (6th Cir. 2015) ...........*passim*

**STATEMENT OF REASONS FOR *EN BANC* REVIEW**

The panel decision conflicts with the following decisions of this Court: *Bledsoe v. TVA Bd. of Dirs.*, 42 F.4th 568 (6th Cir. 2022), and *Yazdian v. ConMed Endoscopic Technologies*, Inc., 793 F.3d 634 (6th Cir. 2015). Consideration by the full Court is therefore necessary to secure and maintain uniformity of the court's decisions:

The panel decision said:

> We have previously held that an employee's insubordination and her failure to follow company policies constitute legitimate, nonretaliatory reasons to terminate employment. *See Yazdian*, 793 F.3d at 651; *see also Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998) (Congress didn't "intend[] to immunize insubordinate, disruptive, or nonproductive behavior at work." (quotation omitted)).

Opinion at 6.

In *Bledsoe* and *Yazdian* this Court warned against employers using minor rules violations in general, and charges of 'insubordination' in particular, as a convenient excuse – a pretext – for unlawful retaliation. The Panel decision suggests otherwise: that that an employer is entitled to summary judgment as long as it can point to *some* misconduct by the employee. This Court has, instead, consistently expressed a wariness that employers will use minor rules violations as "a convenient excuse – a pretext" for unlawful retaliation. In *Bledsoe*, this Court refused to accept the supervisor's justifications at face value but, instead, observed that "it is entirely believable" that a

supervisor would "jump at the opportunity to press for a convenient 'solution' to his problems."   42 F.4th 568 at *29.  The Panel did not consider *Bledsoe*.

The Panel cited *Yazdian* decision for the proposition that an employer has legitimate cause to discipline or terminate an employee who refuses to follow through on an employer's expressed directions.  The Panel did not consider the caution in *Yazdian*, that "not all 'insubordination' is treated equally." 793 F.3d at 652.  The Panel decision conflicts with *Yazdian* by failing to acknowledge that, especially where the alleged insubordinate actions were "intertwined with" protected activity and the employee produced "some evidence" contesting the description of the employee's conduct, "a reasonable jury could find that [the employee] was not insubordinate" and "that summary judgment is not proper."

The Panel decision effectively overrules *Bledsoe* and *Yazdian*.  The Panel decision permits an employer to cite insubordination (or other alleged misconduct) to cover up true unlawful motivations and effectively end any further detailed inquiry.  The Panel decision, if permitted to stand unreviewed by the full Court, shifts the burden or production to defeat summary judgment against employees and would eviscerate the anti-retaliation provisions of Title VII and Title IX, as an employer could order employees not to engage in protected activity and then evade court scrutiny by disciplining the employees for 'insubordination' when they did so.

**STATEMENT OF THE CASE**

**A.     Facts**

The University of Cincinnati ("UC") is a public institution located within the city of Cincinnati, Ohio with more than 90 undergraduate and graduate programs and an enrollment of roughly 46,000 students within its 13 individual colleges.  UC voluntarily participates in federal funding programs.  (Complaint, R.1, PageID#2; Answer, R.24, PageID#147.))

In July 2018, Goldblum was hired to serve as the Director of the University's Office of Gender Equity & Inclusion, a position commonly referred to as a "Title IX Coordinator."  Her responsibilities included ensuring timely, impartial investigations of complaints of alleged instances of sexual harassment and/or sexual assault on campus. (Job Description, R.54-1, PageID# #950.)  As a Title IX Coordinator, Goldblum was expected to act independently.  (Goldblum Aff., R.69-1, PageID#2702; Marshall Depo. R.55, PageID#1159.)  Goldblum was empowered to initiate and conduct investigations designed to identify and expose patterns or systemic problems with Title IX compliance at UC.  (Goldblum Aff., R.69-1, PageID#2699.)   Bleuzette Marshall, the University's Vice President for Equity, Inclusion and Community Impact, was Goldblum's direct supervisor.

In the summer of 2016, UC admitted William Houston, a former Ohio State University and Bowling Green State University football player who was convicted of gross sexual imposition.  UC administrators approved the admission without reviewing

his disciplinary or criminal history or complying with the procedures for the consideration of students with criminal backgrounds. (Cummins Depo., R.60, PageID#2109-2110; Miller Depo., R.62, PageID#2234, 2225-2226; Responses to Interrogatories, R.69-7, PageID#2958.)

On January 23, 2019, the University published an online article recognizing graduating students who wore a "triumph cord" at graduation indicting that the students had overcome "obstacles" to graduate. Houston was profiled as one of those students. (Article, R.54-1, PageID#977.)[1] The article failed to mention that the "obstacle" Houston had overcome was a conviction for a felony sex offense and restrictions on his presence on campus because he was a registered sex offender. (Complaint, R.1, PageID#7; Petren Depo. R. 58, PageID#1872-1874.) The publication of the article made female UC students feel vulnerable to sexual assault and, as a result, unreasonably interfered with students' work or academic performance and created an intimidating, hostile and offensive work or learning environment for students. (Corey Aff., R.69-4, PageID#2882; Cunningham Aff., R.69-3, PageID#2879-2880.) UC officials subsequently received emails suggesting that Houston had assaulted other persons on campus. (Email, R.66 PageID#2531; Marshall Depo., R.55, PageID#1217-

---

[1] Currently available at https://www.uc.edu/news/articles/2019/01/n2060727.html. References to Houston have been delated. An editorial note from the Dean states, "Out of sensitivity to members of our community, the original information in this article has been modified."

1221.)  Administrators realized that there was a problem for UC and its image.  One administrator wrote, "Oh no. I don't even know how he would have gotten admitted to UC." Another administrator wrote, "We need to figure out how to deal with this ASAP. Because this could be REALLY bad."  (Email, R.66 PageID#3141.)

Goldblum first learned about the Houston Matter around February 5, 2019. (Goldblum Depo., R.54, PageID#758-760.)  Goldblum became concerned about the impact on students and believed that UC was obligated to respond under Title IX and UC Policy.  (Goldblum Depo., R.54, PageID#782-784.)  Goldblum believed that UC providing resources on its web page and through training events on campus was insufficient.  Instead, Goldblum believed the best way to share resources, such as the counseling center, the on-campus advocates, medical assistance options and off-campus resources, was through a letter to the editor to the student newspaper. (Goldblum Depo., R.54, PageID#782-783, 792.)

Goldblum became concerned that the admission of students, like Houston, with backgrounds as convicted sex offenders could pose a risk to the community.  She also was concerned about possible systemic issues in the University of Cincinnati admissions process, including whether public safety or the Title IX Office was consulted prior to the admission of the student.  (Goldblum Aff., R.69-3, PageID#2698-2699; Goldblum Depo., R.54, PageID#858.)   Goldblum communicated her concerns to Marshall and other UC administrators about the Houston Matter and possible systemic issues in the admissions process.  On February 9, 2019, Goldblum wrote in an email, "There may

be questions re: who knew what when he was admitted…" (Email, R.66 PageID#3198.) On February 11, 2019, Goldblum informed Marshall about student complaints, including specifically the complaint outlined in a February 8, 2019 email alleging that Houston had sexually assaulted students at UC. (Goldblum Aff, R.69-1, PageID#2700.) Goldblum told Marshall that she "would be commencing an investigation into the Houston Matter in particular and the admissions process for convicted sex offenders in general." (Goldblum Aff., R. 69-1, PageID#2699-2700.) Goldblum sent an email to the UC Admissions Office requesting more information about the process for the admission of Houston and students with criminal records. (Email, R.66 PageID#2559.) Goldblum also told Marshall that her investigation would extend beyond Houston's admission and include systemic concerns and an inquiry into whether other similarly situated students may have been admitted without following proper procedures. (Goldblum Depo. R.54, PageID#795.)

On February 12, 2019, Goldblum drafted a letter to the student newspaper, the News Record, and shared a copy with Marshall and others at UC. (Goldblum Depo., R.54, PageID#793.) Marshall told Plaintiff not to send the letter. Goldblum believed that she had a responsibility as Title IX Coordinator to send the letter and that Marshall was using "delay tactics." (Goldblum Depo., R.55, PageID#803-805.). Believing that she had independent authority to act,[2] Goldblum sent the letter, anyway, on February

---

[2] Goldblum never claims, as the Panel characterizes, that "anything done" in her role as Title IX Coordinator is "exempt from all University oversight or discipline."

12, 2019. (Goldblum Depo., R.54, PageID#81-82.) On the morning of February 13, 2019, Goldblum sent a revised letter. (Goldblum Depo., R.54, PageID#803.) For reasons that have never been adequately explained, the letter was never published. (*See* Marshall Depo., R.55, PageID#1248.)

Marshall believed that Goldblum's actions were in violation of UC Policy 15.02. This Policy outlines that it is a violation for any employee to engage in insubordination, or other deviations from standard and acceptable behavior. (Policy, R.55-1, PageID#1351.) While an employee may be terminated for violating UC Policy 15.02, another UC Policy, Policy 15.03, states that UC "subscribes to the principle of progressive corrective action…" (Policy, R.55-1, PageID#1354.)

On March 15, 2019, Marshall, accompanied, by a representative from HR and a uniformed police officer, met with Goldblum. Prior to the meeting, the video from the police officer's body camera captured Marshall dancing and laughing with the HR representative. (Video, R.71, PageID#2961.) Goldblum was told that she was being terminated but was given the option to resign in lieu of a termination. (Marshall Depo.,

---

Opinion at 8. An April 25, 2015 Dear Colleague Letter from the Department of Education states "Title IX's broad antiretaliation provision protects Title IX coordinators from discrimination, intimidation, threats, and coercion for the purpose of interfering with the performance of their job responsibilities." Marshall acknowledged that Goldblum, as a result of this guidance, had "full discretion" to act independently. (Marshall Depo. R.55, PageID#1133-34, PageID#1159, PageID#1318.)

R.55, PageID#1181.)  Goldblum resigned[3] and was escorted off campus.  Marshall subsequently lied to multiple people about Plaintiff's termination.  (Cunningham Aff., R.69-3, PageID#2881; Corey Aff., R.69-4, PageID#2881; Marshall Depo., R.55, PageID#1307-1308.)

This litigation followed.

**B.    Procedural History**

On May 27, 2019, Goldblum brought this action for violation of Title IX and Title VII.  (Complaint, R.1, Page ID#1-20.)

On March 28, 2022, the trial court (McFarland, J.) granted Defendant's Motion for Summary Judgment.  (Order, R.89.)  Final Judgment was entered.  (Judgment, R.90.)

This appeal followed.

On March 10, 2023, this Court issued a Panel decision affirming the judgment of the District Court.

---

[3] This resignation was not voluntary.  (Goldblum Depo., R.54, PageID#844.)

**ARGUMENT**

Review by the full Court is appropriate and necessary because the Panel decision is in conflict with *Bledsoe* and *Yazdian*. The Panel decision essentially renders these decisions meaningless, as it replaces the holistic inquiry of those cases with an approach the credulously accepts the explanations provided by employers. The Panel decision effectively permits an employer to use the fact that an employee may have committed some minor misconduct to foreclose further inquiry into whether the employer was using the misconduct as an excuse to accomplish an unlawful end.

UC claimed that Goldblum was terminated because she was insubordinate. The Panel decision accepted this conclusion. True: Goldblum never denied that she sent the letter despite a direct order from her supervisor and did not deny that UC's rules prohibit insubordination. But, viewing the record in the light most favorable to Goldblum, a reasonable jury could conclude that UC wanted to get rid of Goldblum because she was going to expose wrongdoing at the institution, so pounced on her alleged "insubordination" as an excuse.[4]

---

[4] There is an issue of fact about whether Goldblum's action constituted insubordination: (i) almost every other UC employee who testified stated that the letter (which was never published) was not inappropriate; and (ii) Goldblum was entitled to act independently.

There is an issue fact about, even if Goldblum was insubordinate, whether this single act provided justification for termination: (i) UC also has a policy of progressive discipline; and (ii) two experts offered uncontradicted affidavits that an academic employer is highly unlikely to terminate an employee with no prior disciplinary history for sending an unauthorized email to the student newspaper.

Pretext, by definition, means that the given reason is not the true reason, but only a cover-up for retaliation. The Panel decision treats the fact that Goldblum did not follow her superior's order – a fact that is not contested – as the alpha and omega of the case despite this Court's prior holdings that the "ultimate inquiry" in establishing pretext is whether the employer took the adverse action for the stated reason. *Miles v. S. Cent. Human Resource Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020), *quoting Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012).

The Panel decision is a departure from this Court's prior wariness that employers will use minor rules violations as "a convenient excuse – a pretext" for unlawful retaliation. In *Bledsoe*, *supra,* the employer, argued, in part, that an employee was demoted not because of discriminatory or retaliatory intent, but because of separate ethics violations. The employee argued that the reasons given were pretextual. This Court agreed that summary judgment was not appropriate because the record revealed "a few reasons to view with skepticism [the supervisor's] testimony that he was independently concerned about the ethics issue from the start."[5]  42 F.4th at 583.  In

_____

There is also an issue of fact about whether the claim of 'insubordination' was pretextual when viewed in the context of the suspicious timing between Goldblum's protected activity and her discharge based on independent evidence:  (i) there was a lack of prior concerns about Goldblum's job performance; (ii) UC had an independent motive to cover-up misconduct related to the Houston matter; (iii) UC administrators offered shifting and unsubstantiated *post-hoc* justifications; and (iv) UC administrators lied about the reason for Goldblum's termination.

[5] Two other factors make this case similar to *Beldsoe*: the failure of the employer to follow progressive discipline and the timing of the adverse action.  First, the ethical

reaching this conclusion, this Court refused to accept the supervisor's justifications at face value but, instead, observed that "it is entirely believable" that a supervisor would "jump at the opportunity to press for a convenient 'solution' to his problems."  42 F.4th 568 at *29.

In *Yazdian*, *supra*, an employer claimed that an employee was fired for, *inter alia*, insubordination. [6]  The district court had granted the employer's motion for summary judgment, reasoning that "no reasonable jury could find that [the employer] stated legitimate reasons were pretextual because [the employee] had made 'objectively rude, disrespectful and insubordinate comments.'"  793 F.3d at 651, *quoting* district court decision.  However, in reversing, this Court cautioned that "not all 'insubordination' is treated equally."  This Court acknowledged that "an employer has legitimate cause to

---

concerns – if true – would not necessarily have led to a demotion because other, alternative, disciplinary options were available.  Second, "the timing of the [adverse action was] suspicious" because the employee had complained to HR around the same time that the ethics inquiry was initiated.   42 F.4th at 588.

[6] *Yazdian* also suggests that Marshall's decision to terminate Goldblum for sending a letter to the newspaper was *direct* evidence of discriminatory intent because the letter was protected conduct.  This Court in *Yazdian* explained that such an explanation could be "direct evidence from which a reasonable jury could conclude that [the employer] believed [the employee's] protected activity constituted insubordination, and therefore… terminated [the employee] because of the protected statements."  793 F.3d at 648.  Later, this Court cautioned:

> we cannot accept an employer's conclusory claim that an employee was insubordinate when the alleged "insubordination consists of refusing to cease what a jury could find to be reasonable [ ]-protected activity."

*Id.*, *quoting Kempcke v. Monsanto Co.*, 132 F.3d 442, 446 (8th Cir. 1998).

discipline or terminate an employee who refuses to follow through on an employer's expressed directions." But this Court in *Yazdian* did not accept that this power as absolute. Instead, this Court noted – in language directly applicable to this case – that, especially where the alleged insubordinate actions were "intertwined with" protected activity and the employee produced "some evidence" contesting the description of the employee's conduct, "a reasonable jury could find that [the employee] was not insubordinate" and "that summary judgment is not proper."

Rehearing *en banc* is necessary because the Panel decision permits an employer to use the fact that an employee may have committed misconduct to foreclose further inquiry into whether the employer was using the misconduct as an excuse to accomplish an unlawful end. In *Jones v. Potter*, this Court warned against employers using what appeared to be "a legal, legitimate reason" that "fortuitously materialize[s]," to "cover up" true unlawful motivations. 488 F.3d 397, 408 (6th Cir. 2007). And in *Upshaw v. Ford Motor Co.*, this Court, noted that "Although [an employer] is entitled to terminate an employee for an actual violation of its internal policies," summary judgment is not available where a plaintiff "has introduced evidence suggesting that these 'actual violations' were nothing more than 'trumped up' charges." 576 F.3d 576, 593 (6th Cir. 2009). *See also Hamilton v. GE*, 556 F.3d 428, 437 (6th Cir. 2009) (plaintiff presented evidence that employer "waited for, and ultimately contrived, a reason to terminate [plaintiff] to cloak its true, retaliatory motive"); *Amos v. McNairy Cty.*, 622 F.App'x 529, 540 (6th Cir. 2015) (employer "began to intensely scrutinize" plaintiff "to find a

12

legitimate reason… to justify its decision post-hoc"). The Panel decision departs from this line of cases.

**CONCLUSION**

The Petition for Rehearing or Rehearing *En Banc* should be granted.

Respectfully submitted,

_____/s/ Joshua Adam Engel_____
Joshua Adam Engel (0075769)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Suite 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this document complies with the type-volume limitation. This document contains 2889 words, as calculated by Microsoft Word.

/s/ Joshua Adam Engel
Joshua Adam Engel (0075769)

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Reid T. Caryer, reid.caryer@OhioAGO.gov
Marissa J. Palumbo, marissa.palumbo@ohioago.gov

/s/ Joshua Adam Engel
Joshua Adam Engel (0075769)

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0037p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANDREA GOLDBLUM,

          *Plaintiff-Appellant*,

    *v.*

UNIVERSITY OF CINCINNATI,

          *Defendant-Appellee*.

No. 22-3289

---

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:19-cv-00398—Matthew W. McFarland, District Judge.

Argued: January 26, 2023

Decided and Filed: March 10, 2023

Before: GRIFFIN, WHITE, and THAPAR, Circuit Judges.

---

### COUNSEL

**ARGUED:** Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for Appellant. Marissa J. Palumbo, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for Appellant. Marissa J. Palumbo, Colleen Koehler, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

---

### OPINION

---

THAPAR, Circuit Judge. Citing her insubordination and other infractions, the University of Cincinnati ("UC" or the "University") requested that Andrea Goldblum resign as its Title IX Coordinator. Because Goldblum believes that UC retaliated against her for engaging in activity

protected under Title IX, she sued for unlawful retaliation.  The district court granted summary judgment for UC and denied Goldblum's motions for additional discovery.  We affirm.

I.

In January 2019, UC's College of Arts and Sciences awarded "triumph cords" to graduating students who had overcome some form of adversity.  R. 73-1, Pg. ID 3252.  The College awarded these cords based on nominations by faculty and staff—it didn't vet the nominees.  As a result, the College unintentionally awarded a cord to a convicted sex offender who had also been suspended for sexual misconduct at one university and investigated for the same at another.  When members of the UC community discovered this student's criminal record, they became upset, "venting and sharing their frustrations" on social media.  R. 55, Pg. ID 1212.

Once Goldblum learned of the College's oversight, she told her direct supervisor, Dr. Bleuzette Marshall, and other UC officials that:  (1) she planned to investigate how UC evaluated admissions applications from convicted sex offenders, and (2) she believed that UC could be considered deliberately indifferent toward potential sex discrimination unless it provided resources to students who "didn't feel safe on campus."  R. 54, Pg. ID 858.[1]  Goldblum also passed the news along to M.B. Reilly, UC's Executive Director of Public Relations, and expressed her intention to formally address the controversy in a letter published by the University's student newspaper.  That letter reads as follows:

> Dear Editor:
>
> I am writing in response to the feedback and concerns expressed by members of our community regarding the award to and article about [the student].  I understand that members of our community are being impacted by this situation and are hurting.  Please be assured that I hear you.  We are looking into various processes at work so that we can improve them.  In the meantime, we have resources on campus for your support. . . .
>
> We must do better; we *will* do better, continuing to work to make the environment safe and equitable.  Please don't give up on us, as we are not giving up on you.  We are here and we hear you.

---

[1]In briefing and at oral argument, Goldblum's counsel represented that these conversations took place "approximately around February 5," Argument 1:42–3:59, and "certainly by February 11, 2019," Reply Br. 7.

R. 66-1, Pg. ID 2534.   The letter also included the phone numbers for several counseling services.

In response, Reilly directed Goldblum to check with her direct supervisor before submitting anything.  So Goldblum forwarded the letter to Marshall.

After reading the letter during the afternoon of February 12, Marshall ordered Goldblum not to submit anything until Marshall obtained permission and coordinated with other University officials.  While discussing the letter with her colleagues, Marshall discovered that the UC administration had authorized Ken Petren, the Dean of the College of Arts and Sciences, to formally address the controversy.  Marshall then informed Goldblum of her discovery, reminding her that Dean Petren, not Goldblum, had been "tasked with issuing [the] University response[]." R. 55, Pg. ID 1246.  Marshall also identified problems with the content of Goldblum's letter.  For one, the letter included the offending student's name.  For another, it made vague promises—like "we will do better"—which Goldblum lacked the power to both make and keep.  *Id.*

Marshall also identified a procedural concern: before issuing any official communications, the University would typically develop an FAQ, anticipating and answering questions potentially arising from such communications.  But there was no FAQ accompanying Goldblum's letter.  Nevertheless, Marshall promised to continue discussing the letter with her colleagues and ordered Goldblum not to submit anything unless and until Marshall obtained approval.

Goldblum didn't wait.  Mere hours after their conversation, she texted Marshall that she intended "to send in the letter to the editor," that she would accept "any repercussions" for her actions, and that she just wanted "to be done and go home."  R. 64-1, Pg. ID 2302.  In response, Marshall texted:  "I'm on a call regarding the matter.  Please do not send."  *Id.*  Goldblum sent the letter to the newspaper anyway.

Once Marshall ended her call, she called Goldblum and asked whether she had sent the letter.  Goldblum said, "Yeah, I sent it, and I don't regret what I did."  R. 55, Pg. ID 1251.  As her direct supervisor, Marshall reiterated: "You can't get ahead of our colleagues.  There was already a process in place.  We can't insert ourselves into the system or into a process."  *Id.*

In fact, a few minutes later, Dean Petren emailed Goldblum the College's statement addressing the controversy and its plan to remove the student from the College's article recognizing each cord recipient.

Early the next morning, Goldblum asked the student newspaper to replace her initial letter with an updated draft. The newer draft was nearly identical to the earlier one, except it expressly mentioned the University's Title IX office. Goldblum didn't tell Marshall about the revised letter, much less obtain permission to send it. For reasons not evident in the record, Goldblum's letter was never published.

Following these incidents, Marshall reported Goldblum's insubordination to UC's human-resources department. During the internal investigation that followed, the University discovered additional infractions, namely that Goldblum repeatedly ignored Title IX complaints, justified her insubordination to her staff, repeatedly criticized her colleagues in front of her staff, routinely interrupted her staff's work, and missed many of her own reporting deadlines.

At the conclusion of its investigation, UC allowed Goldblum to resign in lieu of termination for her insubordination and unacceptable work behavior in violation of UC's Conduct Policy. *See* R. 66-1, Pg. ID 2428, 2430 (establishing UC's right to "immediately terminat[e]" Goldblum for "insubordination," Policy No. 15.02 §§ 2, 3(c), or for deviating from "standard and acceptable behavior," *id.* § 3(ff)). After Goldblum resigned on March 15, 2019, UC discovered that she hadn't followed up on a February 9 email accusing the sex offender of assaulting other persons on UC's campus. Nor had she performed any further investigations into UC's admissions practices.

Though Goldblum had said that she'd accept "any repercussions" for her actions, Goldblum sued UC for unlawful termination under Title VII and Title IX. The district court dismissed Goldblum's Title VII claim and subsequently granted UC summary judgment on Goldblum's Title IX claim. Goldblum now appeals the ruling on her Title IX claim, as well as the district court's orders denying her motions for additional discovery. Addressing Goldblum's Title IX claim and discovery motions in turn, we affirm.

II.

We review the district court's grant of summary judgment de novo, construing the facts in the light most favorable to Goldblum.  *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020).

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a). While this statute doesn't expressly provide a cause of action, the Supreme Court has told us that Title IX is enforceable through an implied right of action.  *Cannon v. Univ. of Chi.*, 441 U.S. 677, 688–89 (1979).  And particularly relevant here, the Court has held that "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional discrimination on the basis of sex, in violation of Title IX."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (cleaned up).

Under our precedent, we review Goldblum's Title IX claim under the analogous test for Title VII retaliation claims.  *Bose*, 947 F.3d at 988–89.  Because Goldblum relies on only indirect evidence, she may bring a prima facie retaliation claim under Title IX by showing that: "(1) she engaged in protected activity, (2) the funding recipient knew of the protected activity, (3) she suffered an adverse [employment]-related action, and (4) a causal connection exists between the protected activity and the adverse action."  *Id.* (cleaned up).

If Goldblum establishes a prima facie case, UC must articulate a legitimate, nonretaliatory reason for her termination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Should UC meet its burden, Goldblum may then refute UC's proffered reason by showing that it's really a pretext for unlawful retaliation.  *Flowers v. WestRock Servs., Inc.*, 979 F.3d 1127, 1132–33 (6th Cir. 2020).

Because UC presented legitimate reasons for seeking Goldblum's resignation, we proceed to pretext without deciding whether Goldblum established a prima facie case.

A.

UC claims two nonretaliatory reasons for asking Goldblum to resign.  First, she was insubordinate:  she "violated a direct order" from Marshall when she sent the letter.  R. 64-1, Pg. ID 2307.  Second, she failed to abide by UC's standard of acceptable behavior:  she justified her insubordination to her staff, criticized her colleagues in front of her staff, interrupted her staff's work, routinely ignored Title IX complaints, and missed many of her own reporting deadlines.  And UC's Conduct Policy permits "immediate termination" for both "[i]nsubordination" and "[a]ny other deviation from standard and acceptable behavior."  R. 66-1, Pg. ID 2428, 2430.  Thus, UC has identified at least two ways in which Goldblum violated its policies, either of which provides for immediate termination.

Our precedent also supports that conclusion.  We have previously held that an employee's insubordination and her failure to follow company policies constitute legitimate, nonretaliatory reasons to terminate employment.  *See Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 651 (6th Cir. 2015); *see also Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998) (Congress didn't "intend[] to immunize insubordinate, disruptive, or nonproductive behavior at work." (quotation omitted)).  So what logic compels, precedent confirms:  UC had legitimate nonretaliatory reasons to fire Goldblum.

B.

Because UC has proffered two legitimate reasons for seeking her resignation, Goldblum must accordingly demonstrate pretext to succeed on her retaliation claim.

Plaintiffs typically show pretext by establishing one of three things: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that [the proffered reasons] were insufficient to motivate the employer's action."  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).  These are not the only ways that a plaintiff can establish pretext.  Rather, these three categories are simply a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'"  *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Chen*, 580 F.3d at 400 n.4).  As a result, a plaintiff may also

proffer some other "cognizable explanation of how the evidence she has put forth establishes pretext." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). But here, Goldblum has not produced "sufficient evidence from which a jury could reasonably reject" UC's proffered reasons for firing her. *Id.*

1.

First, Goldblum argues that UC had no factual basis for seeking her resignation because: (i) she wasn't insubordinate, and (ii) she didn't violate the University's standard of acceptable behavior. But neither argument stands up to scrutiny.

i.

Goldblum argues she wasn't insubordinate for two reasons: (1) her letter was protected activity under Title IX, so it couldn't have constituted insubordination, and (2) "a Title IX Coordinator cannot be insubordinate." Appellant's Br. 26 (cleaned up). We reject each in turn.

First, Goldblum's letter wasn't protected activity because it didn't complain of sex discrimination. *See Jackson*, 544 U.S. at 174. To be protected by Title IX, a complaint must specifically accuse a recipient of engaging in intentional sex discrimination—a "vague charge of discrimination" isn't enough. *Yazdian*, 793 F.3d at 645 (cleaned up). And it must provide notice to an official authorized to address the complaint and "institute corrective measures on the recipient's behalf." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *Jackson*, 544 U.S. at 181.

Goldblum's letter fails to satisfy either requirement.

For one thing, the letter didn't specifically accuse UC of intentionally discriminating based on sex. Instead, it merely promised to make unspecified policy changes, expressed sympathy to UC students, provided telephone numbers for various counseling services, and defended UC's efforts to "make the environment safe and equitable." R. 66-1, Pg. ID 2534. So at most, the letter hints at UC's possible failure to provide the appropriate resources required by Title IX's implementing regulations. But that vague suggestion doesn't amount to a specific allegation of intentional discrimination.

For another, Goldblum didn't send her letter to an official authorized to both address the controversy and "institute corrective measures on the [University's] behalf." *Gebser*, 524 U.S. at 290. Instead, she sent it to the editor of the student newspaper. So her letter failed to notify the proper UC officials.

Thus, Goldblum's letter isn't protected by Title IX because it neither complained of sex discrimination nor was sent to an official authorized to do something about it.

Second, Goldblum's argument that "a Title IX Coordinator cannot be insubordinate" fails because she cites no authority for such a consequential assertion, *see* Appellant's Br. 26–29, nor can we find one. To be sure, Goldblum accurately states that being a Title IX Coordinator involves "coordinating the recipient's responses" to sex discrimination complaints, "monitoring outcomes, identifying and addressing any patterns, and assessing effects on the campus climate." R. 69-6, Pg. ID 2934. But it doesn't follow that anything done in that role is exempt from all University oversight or discipline.

ii.

Goldblum next argues that UC's second proffered reason had no basis in fact because UC contrived evidence of her poor work performance after asking her to resign. Because UC had another legitimate reason—insubordination—for firing Goldblum, this argument is ultimately inconsequential. But even taking the argument straight on, it fails.

Specifically, Goldblum claims UC couldn't have truly fired her for her poor work performance because its only contemporary source supporting that conclusion came from a flawed and self-interested report from one of Goldblum's employees, Morgan Shaw. And Goldblum alleges Shaw's report was unreliable for two reasons. First, she argues that Shaw had limited work experience. Second, she contends that Shaw had a conflict of interest because Goldblum intended to investigate her father, Assistant Dean of Students Daniel Cummins, for his role in admitting the sex offender.

But even assuming Goldblum's allegations about Shaw were true, they wouldn't matter for two independent reasons. First, Shaw's report wasn't UC's only evidence of Goldblum's

poor work performance.  Rather, two other employees also complained of her "unprofessional" and even "disrespectful" behavior towards her colleagues.  R. 55, Pg. ID 1189, 1193–94.

Second, even if these complaints failed to establish Goldblum's poor work performance before she resigned, reliable corroborating evidence was discovered shortly thereafter.  Indeed, Goldblum's own files and correspondence confirm that she failed to meet many of her reporting deadlines.  Instead of disputing whether she failed to meet these deadlines, however, Goldblum claims that the "suspicious timing" of the discovery suggests pretext.  Reply Br. 1.  Specifically, she alleges that UC's "shifting" and "post-hoc justifications" demonstrate it had no legitimate reason to fire her for unprofessional conduct until after she resigned.  *Id.* at 1–2.  But this argument fails for two reasons.

For starters, UC may rely on newly discovered evidence so long as it fits within one of the reasons it gave for terminating Goldblum "at the time of discharge" and during litigation.  *Miles*, 946 F.3d at 891; *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002).  Here, Marshall referenced Goldblum's poor work performance in the termination letter she prepared in case Goldblum refused to resign.   And both below and on appeal, UC has consistently maintained that it terminated Goldblum for unacceptable behavior.  Therefore, we won't infer pretext merely because UC elaborated on its justifications for terminating Goldblum after she resigned.

Moreover, because Goldblum's own files and correspondence confirmed that she failed to meet many of her reporting deadlines, UC had a factual basis to terminate her for poor work performance.

Therefore, even if Shaw's report were unreliable, no reasonable juror could conclude that UC's work-performance rationale wasn't based in fact.[2]

---

[2]Regardless, UC's reliance on any false information would've been excused under the "honest belief" rule.  *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).  To overcome UC's honest-belief defense, Goldblum must do more than merely allege that the investigation was less than "optimal."  *Id.* at 807.  Rather, she must put forth evidence showing that UC's reliance on false information was "too obvious to be unintentional."  *Id.* (citation omitted).  Here, Marshall found evidence confirming Goldblum's disrespectful behavior and missed reporting deadlines.  Employers relying on less thorough investigations have prevailed on the honest-belief defense.  *Seeger v.*

2.

Next, Goldblum argues that UC's proffered reasons didn't actually motivate it to seek her resignation.  Instead, Goldblum argues that UC asked her to resign to prevent her from discovering systemic issues with its admissions process.  But no reasonable juror could find that this argument establishes pretext.

First, UC never opposed Goldblum's independent investigation.  Instead, the University largely shared and addressed Goldblum's concerns.  For example, beyond issuing its own response to the controversy, UC deleted the article's mention of the sex offender, met with student leadership, and held a town hall to address students' concerns.  To the extent UC disagreed with Goldblum, such disagreement was about minor details, such as who should issue a response and when it should be issued.  And even then, UC tried to accommodate Goldblum's concerns.  Indeed, despite her numerous objections to Goldblum's letter, Marshall continued to run Goldblum's letter by her colleagues—which she was in the process of doing when Goldblum sent it out.

Second, Goldblum merely created an investigation file—she made no findings, took no notes, and logged no investigative work during the remainder of her employment at UC, which ended more than a month after opening her investigation.  So it's unclear whether UC actually prevented Goldblum from conducting any investigations.

Thus, no reasonable juror could conclude that UC was motivated by reasons other than the ones it proffered.

3.

Goldblum also contends that even if she was insubordinate and unprofessional, such misconduct didn't sufficiently warrant termination.  Specifically, she claims that because these were her first infractions, UC should've given her a less severe reprimand under its "progressive discipline" policy.  Appellant's Br. 42.  We disagree.

---

*Cincinnati Bell Tel. Co.*, 681 F.3d 274, 286–87 (6th Cir. 2012).  And nothing supports Goldblum's claim that UC's decision to terminate her employment was clearly "unworthy of credence."  *Smith*, 155 F.3d at 807–08.

To begin, UC's policies permit "immediate termination" for "conduct and rule violations." R. 66-1, Pg. ID 2428. And though these policies also subscribe to the principle of progressive corrective discipline for first-time infractions, Goldblum wasn't entitled to the most lenient reprimand possible. To the contrary, UC's policies expressly "reserve[] the right to impose an appropriate level of corrective action, including termination, depending upon the severity of the violation." R. 55-1, Pg. ID 1354. And while she ultimately disagreed with the termination, Goldblum's own expert acknowledges that Goldblum's "behavior may have been deemed 'severe' because she 'defied a direct order.'" R. 69-2, Pg. ID 2864.

Moreover, though the failure to *uniformly* apply a progressive discipline policy can be evidence of pretext, Goldblum has identified no similarly situated employee who received a more lenient reprimand despite engaging in "substantially identical conduct." *Miles*, 946 F.3d at 893.

To constitute similarly situated employees, the individuals with whom Goldblum seeks to compare her treatment "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 364 (6th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Though Goldblum needn't show an exact correlation between herself and the proposed comparators, she must show similarities in "all relevant respects." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

Here, Goldblum identifies two director-level employees who were reprimanded—rather than terminated—for their insubordination. But for two independent reasons, these employees fail as comparators. First, neither reported to Marshall. *See Younis*, 610 F.3d at 364.[3] Second, these potential comparators were reprimanded for different conduct: in one case, taking

---

[3]Whether the "same supervisor" criterion "is relevant depends upon the facts and circumstances of each individual case." *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005). Indeed, we have observed that requiring comparators to have the "same supervisor" may be better understood as requiring comparators to have "dealt with the same ultimate decision-maker." *Id.* In this case, we consider the "same supervisor" criterion relevant because UC President Neville Pinto delegated to Marshall all decision-making authority concerning Goldblum's discipline.

University equipment off campus; and in the other, sharing confidential information with a co-worker.  Thus, since they aren't similarly situated comparators, Goldblum fails to show that UC didn't uniformly apply its progressive discipline policy.

Therefore, no reasonable juror could find that Goldblum's insubordination and unprofessional behavior was insufficient to warrant termination.

4.

Finally, Goldblum raises two general allegations she claims establish pretext: (1) the "suspicious timing" between her protected activity and discharge, and (2) Marshall's "outright lies." Appellant's Br. 39 (cleaned up).  Neither stands up to scrutiny.

Start with timing.  Goldblum resigned on March 15, 2019, just over one month after she began complaining that UC "could be considered deliberately indifferent under Title IX" for "siding with the sex offenders" instead of victims of sex discrimination.  R. 54, Pg. ID 794, 801. In conjunction with other evidence, such "temporal proximity can be used a[s] 'indirect evidence' to support an employee's claim of pretext." *Asmo v. Keane, Inc.*, 471 F.3d 588, 598 (6th Cir. 2006).  But since Goldblum fails to provide such additional evidence, the mere timing of her resignation "cannot alone prove pretext." *Id.*

Goldblum also points to two instances in which Marshall told students that Goldblum's resignation was voluntary instead of coerced.  But these statements don't establish pretext for two reasons.  First, as a factual matter, Goldblum did resign.  And she did so voluntarily to avoid termination.  Second, Marshall's obfuscation is justified by her belief that it would've been inappropriate to "discuss employment matters" with students.  R. 55, Pg. ID 1305–06.  And we won't second-guess this judgment, especially given that its "falsity or incorrectness" isn't enough to "impeach the credibility of [UC's] remaining articulated reason(s)" for requesting Goldblum's resignation. *Sims v. Cleland*, 813 F.2d 790, 793 (6th Cir. 1987).  So the alleged lies don't prove pretext either.

For all these reasons, Goldblum fails to establish that UC's two proffered reasons for seeking her resignation were mere pretexts for retaliation.

## III.

Goldblum also appeals three of the district court's discovery orders: (1) the order denying her motion to depose UC President Neville Pinto; (2) the order denying her request for the records of approximately 15,000 UC employees; and (3) the order denying her Rule 56(d) motion. We review each for an abuse of discretion. *Doe v. City of Memphis*, 928 F.3d 481, 486 (6th Cir. 2019). Indeed, district courts have significant discretion "to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce." *Info-Hold, Inc. v. Sound Merch., Inc.*, 538 F.3d 448, 457 (6th Cir. 2008) (cleaned up); *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 236 (6th Cir. 2016) ("Th[e] desire to allow broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." (quoting *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 906 (6th Cir. 1991))).

### A.

Start with Goldblum's request to depose President Pinto after exceeding the deposition limit. The magistrate judge granted UC's motion for a protective order, finding that President Pinto only had limited knowledge of Goldblum's resignation. The district court overruled Goldblum's objection to the magistrate judge's order, finding that President Pinto expressly disclaimed any role in the matter by delegating all decision-making authority to Marshall. That was not an abuse of the wide discretion afforded by Federal Rule of Civil Procedure 26.

Indeed, Rule 26(c)(1)(A) provides that a district "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by barring the deposition of that individual. Given the unlikely chance of President Pinto's deposition proving beneficial, the district court properly found that even a "slight inconvenience" imposed by a deposition would "amount to unreasonable harassment" under Rule 26. R. 45, Pg. ID 610 (quoting *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012)).

To be sure, the record indicates that Marshall was involved in a UC-wide response to the triumph-cord controversy and that Marshall informed President Pinto of her decision to let

Goldblum go.  But President Pinto appears to have had very little knowledge of Goldblum's letter or Marshall's reasons for asking Goldblum to resign.  Absent a "definite and firm conviction that the trial court committed a clear error of judgment," we affirm.  *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 623 (6th Cir. 2014) (quoting *United States v. Hunt*, 521 F.3d 636, 648 (6th Cir. 2008)).

## B.

The district court also denied Goldblum's request to obtain the records of as many as 15,000 UC employees.  Both below and on appeal, Goldblum argues that she needed these records to identify possible comparators.  True, Goldblum may establish pretext by showing that UC treated similarly situated employees who didn't complain of sex discrimination more favorably.  But Goldblum can't pick out UC employees at random.  Rather, her comparators must have the same supervisors, must be subject to the same standards, and must have engaged in similar conduct.  *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003).

Because Goldblum held a director-level position at UC, the magistrate judge limited Goldblum's request to the approximately thirty "director level" UC employees who had also been disciplined for insubordination and unacceptable behavior.  R. 41, Pg. ID 533.  In overruling Goldblum's objection to this order, the district court found that this limitation honored our court's precedent on potential comparators.  We agree, finding no abuse of discretion.[4]

## C.

Finally, the district court denied Goldblum's motion to defer consideration of UC's summary-judgment motion and allow for further discovery under Rule 56(d).  Specifically, Goldblum sought permission to depose President Pinto and obtain the records of thousands of UC employees, the same requests that the district court denied at earlier stages of the proceedings.

---

[4]Goldblum's reliance on *Bobo* is unavailing.  In *Bobo*, we reversed a district court's denial of a motion to compel discovery regarding seven persons who violated the same policy and reported to the same high-level managers as the plaintiff.  665 F.3d at 753.  But Goldblum seeks discovery covering a large swath of UC employees who almost certainly didn't report to Marshall, so *Bobo* is inapposite.

Our review largely "depends on whether further discovery would have changed the legal and factual deficiencies in [Goldblum's] case." *Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 692 F.3d 507, 510 (6th Cir. 2012) (cleaned up). But we also consider Goldblum's diligence, her prior opportunities to obtain discovery, the length of the discovery period, and UC's responsiveness during discovery. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008).

Here, the record shows that Goldblum had ample opportunity to take discovery and that UC was responsive to her requests. Indeed, discovery lasted 6 months, in which time Goldblum took 10 depositions, served 21 interrogatories, served 20 requests for admissions, and received more than 4,500 pages of documents from UC. Moreover, for reasons already discussed, deposing Dr. Pinto and obtaining the records of potentially thousands of dissimilarly situated UC employees likely wouldn't cure any of Goldblum's deficiencies. Specifically, there is little reason to think that Dr. Pinto knew additional information relevant to this suit, and Goldblum hasn't established whether any of the potentially thousands of UC employees were relevant comparators.

Goldblum thus had ample discovery, and her further discovery requests would likely have been futile. For these reasons, the district court didn't abuse its discretion.

\*          \*          \*

Because the district court properly managed discovery and entered summary judgment for UC, we affirm.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-3289

ANDREA GOLDBLUM,

    Plaintiff - Appellant,

    v.

UNIVERSITY OF CINCINNATI,

    Defendant - Appellee.

**FILED**
Mar 10, 2023
DEBORAH S. HUNT, Clerk

Before:  GRIFFIN, WHITE, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk